

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

26 Federal Plaza, 37th Floor
New York, New York 10278

January 10, 2025

**BY ECF**
The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

     Re:     ***United States v. Alon Alexander, Oren Alexander, and Tal Alexander***
               **S1 24 Cr. 676 (VEC)**

Dear Judge Caproni:

     The Government respectfully submits this opposition to the applications for bail made by Alon Alexander, Oren Alexander, and Tal Alexander (collectively the "defendants" or the "Alexander Brothers"). As alleged in the above referenced indictment, for years, together, alone, and with others, the defendants engaged in a pattern of sexual violence that was carried out against dozens of victims. For this, the defendants now face federal sex trafficking charges and the prospect of life imprisonment. As described below, the defendants are a significant danger to others and the community; they are flight risks; and they cannot overcome the statutory presumption in favor of detention in this case. Accordingly, the law requires they remain detained while pending trial. *See* 18 U.S.C. §§ 3142(e)(1), 3142(e)(3)(D). The Court should affirm the decisions of the Honorable Lisette M. Reid, United States Magistrate for the Southern District of Florida, and the Honorable Eduardo I. Sanchez, United States Magistrate for the Southern District of Florida that ordered the detention of Tal Alexander and Alon Alexander, and should deny Oren Alexander's motion for bail.

**BACKGROUND**

     On December 11, 2024, a superseding indictment was returned by a grand jury sitting in the Southern District of New York (the "Indictment") charging: (1) Alon, Oren, and Tal Alexander with participating in a sex trafficking conspiracy from at least 2010 through at least 2021, in violation of 18 U.S.C. § 1594(c) (Count One); (2) Tal Alexander with sex trafficking Victim-1 by force, fraud, and coercion, in 2011, in violation of 18 U.S.C. §§ 1591(a) and (b)(1) and 2 (Count Two); and (3) Alon, Oren, and Tal Alexander with sex trafficking Victim-2, by force, fraud, and coercion in 2016, in violation of 18 U.S.C. §§ 1591(a) and (b)(1) and 2 (Count Three).

**I.     The Alexander Brothers' Sex Trafficking Scheme**

     As described in more detail in the Government's letter in support of detention filed on December 11, 2024 (Dkt. No. 4) (hereinafter, the "Detention Letter"), which is incorporated by

reference herein, the offenses charged in the Indictment span more than a decade of sex trafficking activity by the Alexander Brothers. However, evidence from the Government's investigation goes well beyond the conduct charged and shows that the Alexander Brothers have—together and alone—repeatedly and violently raped and sexually assaulted dozens of victims dating back for nearly twenty years. To date, law enforcement agents have interviewed over 40 women who reported being forcibly raped or sexually assaulted by at least one of the Alexander Brothers. In many of these instances, one or more of the Alexander Brothers drugged their victim prior to the rape. As part of their sex trafficking conspiracy, the Alexander Brothers engaged in a persistent pattern of rape and sexual assault, which included both pre-planned trips and events for which the defendants recruited women to attend and then raped and sexually assaulted them, as well as opportunistic rapes and sexual assaults of numerous victims who they encountered by chance. The rapes and sexual assaults described by victims were committed between approximately 2002 or 2003 and 2021. In the victims' accounts to date, each defendant has separately been accused of forcible rape by at least ten women.

Since the return of the Indictment and filing of the Detention Letter, the Government has adduced even more evidence of the defendant's criminal acts. On or about December 11, 2024, law enforcement agents executed a warrant in order to search an apartment in New York City leased by Tal Alexander. During the search, law enforcement agents seized numerous photos and videos depicting at least Oren, Alon, and several third parties recording or photographing themselves with women in states of intoxication and undress.[1] In multiple videos, the women appear initially unaware that they were being recorded and became upset and attempted to hide or flee from the camera after realizing they were being filmed. In one video, the camera peeked over a bathroom stall where a woman and a man (who is not one of the defendants) are engaging in intercourse. When the woman looked up and saw the camera, she hastily began to get up, saying "no," and stating, in sum and substance, that she does not want "all of [his] friends."

Multiple other videos found in Tal Alexander's apartment depict Alon, Oren, and other men engaged in sexual contact with women who are visibly under the influence of alcohol or other substances. In some instances, at least one defendant and another man physically manipulated the women's bodies in order to have sex with them while the women did not actively participate in the sexual activity or turned away. In combination with the facts set forth in the Detention Letter, this evidence underscores the depraved nature of the defendants' conduct and the immense danger they present.

## II.    Procedural History

On December 11, 2024, the defendants were arrested in and around the greater metropolitan area of Miami, Florida. Tal Alexander was presented in the Southern District of Florida on the day of his arrest. After a lengthy detention hearing, Tal Alexander was ordered detained by Magistrate Judge Reid on December 13, 2024 based on risk of flight—an order that Judge Reid declined to revisit a week later in denying a motion to reopen the detention hearing. In her written order of detention, Judge Reid noted "the strong weight of the evidence; the significant

---

[1] The apartment was previously shared by Oren and Tal Alexander. The photos and videos were found on a hard drive that was in a closet that appeared to include items that belonged to Oren, including a suitcase with his name on the luggage tag.

sentence the Defendant faces; and the nature and circumstances of the offense; and the personal characteristics of the Defendant," as factors that required his pretrial detention based on risk of flight. *United States v. Tal Alexander*, No. 24 MJ 4544, Dkt. No. 24 at 3-4 (S.D. Fla. Dec 17, 2024). Tal Alexander has appealed that detention order to this Court. (Dkt. No. 14).

After first appearing in Florida state court to face felony sexual battery charges, Alon Alexander and Oren Alexander made their initial appearances in the Southern District of Florida on December 20, 2024. On January 3, 2025, following a two-day detention hearing, Magistrate Judge Sanchez ordered Alon Alexander detained, also for risk of flight. In his written order of detention, Judge Sanchez described Alon Alexander as "a serious flight risk" based on "the nature and circumstances of the offense, the weight of the evidence, including the number of accusers, the extensive financial resources available to ALEXANDER, [and] his personal and familial ties to foreign countries, including Israel and Brazil." *United States v. Alon Alexander and Oren Alexander*, No. 24 MJ 4616, Dkt. No. 18 at 4 (S.D. Fla. Jan. 3, 2025). Alon Alexander has also appealed that detention order to this Court. (Dkt. No. 20).

On January 8, 2025, after two different magistrate judges had ordered the detention of his co-defendants, Oren Alexander consented to waive his right to a removal hearing in the Southern District of Florida and stipulated to detention with the right to revisit in the Southern District of New York. *United States v. Alon Alexander and Oren Alexander*, No. 24 MJ 4616, Dkt. No. 34 (S.D. Fla. Jan. 8, 2025). Oren Alexander has now filed his bail application with this Court. (Dkt. No. 21).

## ARGUMENT

### I. Applicable Law

Under the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, the Court may order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e). A finding of risk of flight must be supported by a preponderance of the evidence. *See, e.g., United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Jackson*, 823 F.2d 4, 5 (2d Cir. 1987); *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985). A finding of dangerousness must be supported by clear and convincing evidence. *See, e.g., United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995); *Patriarca*, 948 F.2d at 792; *Chimurenga*, 760 F.2d at 405. The Court's review of appeals of detention orders is *de novo*. *See United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985).

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, including whether the offense is a violation of section 1591; (2) the weight of the evidence against the person; (3) the history and characteristics of the defendant, including the person's "character, . . . past conduct, . . . [and] financial resources"; and (4) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." *See* 18 U.S.C. § 3142(g). The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" *United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

Where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1). Additionally, where, as here, a defendant is charged with sex trafficking in violation of 18 U.S.C. § 1591—in other words, an offense under chapter 77 of Title 18—it shall be presumed, subject to rebuttal, that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community. 18 U.S.C. § 3142(e)(3)(D). The defendant bears the burden of producing evidence to rebut the presumption in favor of detention. *See United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). But even if a defendant satisfies that initial burden, the presumption does not vanish; instead, it "remains a factor to be considered among those weighed by the district court." *Id*.

## II.    Discussion

For the reasons set forth below, the defendants pose a significant danger to the community as well as a serious risk of flight. This is especially true given the nature of the criminal conduct and the strong weight of the evidence in this case. The defendants therefore cannot overcome the statutory presumption in favor of detention in this case.

### A.    No Bail Conditions Will Reasonably Assure the Safety of the Community

For more than a decade, the defendants worked together in a sex trafficking conspiracy that used force, fraud, and coercion to rape and sexually assault numerous victims. The defendants' danger has been demonstrated repeatedly and goes well beyond the charged offense conduct. As described above and in the Detention Letter, the Alexander Brothers' serial sexual violence began far earlier than the period of the charged conspiracy—the Government's evidence shows that they have been raping girls and women alone, together, and with other men, over a period of nearly 20 years. The Government has interviewed more than 40 of those victims and expects the number to continue to grow as the investigation continues.

To commit the charged offenses, as well as other serial acts of sexual violence, the Alexander Brothers drugged victims, rendering them incapable of either consenting or resisting. Then, when the victims were physically compromised or incapacitated, the defendants held them down and forcibly raped them. Some victims said "no" or "stop"; others screamed. But the defendants ignored their victims' distress. Multiple women described being terrified that the Alexander Brothers were going to hurt or even kill them—these victims' only goal in that moment became to survive. Multiple victims who were drugged required medical assistance in the hospital after their encounters with the Alexander Brothers. In short, the defendants' conduct was inherently dangerous, involved numerous victims, and makes clear that the safety of others and of the community cannot possibly be ensured without the defendants' detention. *See* 18 U.S.C. § 3142(g)(1).

The defendants' counterarguments to the clear danger presented by perpetrators who drug and rape dozens of women over the course of nearly two decades come up short. That (so far) only two substantive counts of sex trafficking have been charged in no way suggests that the defendants did not engage in the broader pattern of sexual violence described by dozens of victims or that the evidence of the charged offenses is anything but overwhelming. At trial, numerous victims, in

addition to the victims specified in the stand-alone substantive counts, are expected to testify about the horrific sexual violence committed against them by the Alexander Brothers.[2] The testimony of these victims will be corroborated by, among other things, testimony of non-victim witnesses, electronic evidence, physical evidence, and documentary evidence. Moreover, the victims' accounts strongly corroborate each other, recounting similar experiences of sexual violence from the Alexander Brothers despite occurring in different settings, states, and even different decades.

Because the relevant inquiry at bail is danger, the Court should consider the full, decades-long scope of the defendants' conduct, including accounts of rapes that do not standing alone equate to federal sex trafficking, when deciding whether to detain the defendants pending trial. And in a case like this one, where the conduct is so violent and horrific, and evinces such a disregard for the humanity of others, a pattern of only two victims would still support the detention of the defendants. *See United States v. Paduch*, No. 23 Cr. 181 (RA), Dkt. No. 26 at 41 (S.D.N.Y. June 1, 2023) ("Given that the Bail Reform Act requires Courts to consider the full scope of a defendant's criminal conduct, see Section (g)(1), the Court does not limit its consideration of the factors here to the abuse of the two statutory victims charged in the indictment, as the defense has argued that it should, although, frankly, the indictment and the allegations in it alone are sufficient enough.").

The defendants' arguments that they are not dangers to the community because the charged conspiracy ends in 2021 or because the rapes described by the victims, to date, occurred earlier, is of little mitigating value when considering the scope and duration of the defendants' pattern of violence. *Cf. United States v. Epstein*, 425 F. Supp. 3d 306, 314-20 (S.D.N.Y. 2019) (defendant who trafficked dozens of minor victims detained on danger and flight grounds 14 years after the end of the charged conduct). First, the argument that a specific defendant personally committing his last rape more than five years ago presents a viable statute of limitations defense to the conspiracy count is baseless. *See Smith v. United States*, 566 U.S. 106, 114 (2013). To be clear, the evidence in this case shows that the charged sex trafficking conspiracy continued *at least* until 2021. Second, it is similarly unavailing to claim that the present lack of more recent assaults indicates that the conduct has stopped. There is no evidence demonstrating that the defendants learned the error of their ways. The fact that video versions of trophies of the defendants' criminal conduct were found in Tal Alexander's residence as recently as last month also suggests that the defendants have not closed the door on their criminal conduct. Finally, a nearly twenty-year unbroken pattern of violence that targeted scores of women that the defendants met in both planned and chance encounters is in and of itself clear and convincing evidence of the continued danger the defendants pose to the community. That the Alexander Brothers' sexual violence persisted despite several victims' attempts to report their assaults to others demonstrates that the Alexander Brothers cannot be trusted to stop their violent assaults even in the face of criminal charges.

Rather, the evidence demonstrates that for decades the Alexander Brothers have acted with apparent impunity—forcibly raping women whenever they wanted to do so. In short, the risk of the defendants' continued sexual violence, and to facilitating the sexual violence of each other, cannot reasonably be prevented through bail conditions. The sexual violence alleged occurred

---

[2] The Government expects numerous victims to provide direct evidence of Count One, the charged sex trafficking conspiracy, as well as pursuant to Federal Rules of Evidence 404(b) and 413.

behind closed doors—in the defendants' apartments and homes, hotel rooms, and other private settings. This is precisely the kind of violence that even strict conditions such as home incarceration cannot prevent.[3]

In sum, the Alexander Brothers' long history of violent conduct makes clear that even the most stringent bail conditions will not suffice to ensure the safety of the community. The Alexander Brothers are serial violent rapists who have been drugging and forcibly raping women alone and together for years. They have used their power and wealth to identify victims, carry out their sadistic sex trafficking scheme, and to conceal their sexual violence and prevent victims and witnesses from coming forward. *See* 18 U.S.C. § 3142(g)(3). Based on danger alone, the defendants must be ordered detained.

### B.  No Bail Conditions Will Reasonably Assure the Defendants' Appearances in Court

In addition to the defendants' significant danger to the community, they also present extraordinary flight risks. *First,* the crimes with which they are charged carry significant penalties, including mandatory minimum sentences of 15 years' imprisonment for Counts Two and Three, and statutory maximum sentences of life imprisonment for all counts. *See* 18 U.S.C. § 3142(g)(1). The possibility of a substantial sentence is a significant factor in assessing the risk of flight. *See United States v. Green*, No. 20 Cr. 357 (VM), 2020 WL 5814191, at *2 (S.D.N.Y. Sept. 30, 2020) (noting that substantial sentence defendant may face weighed in favor of finding that defendant was a flight risk); *see also United States v. Moscaritolo*, No. 10 Cr. 4 (JL), 2010 WL 309679, at *2 (D.N.H. Jan 26, 2010) ("[T]he steeper the potential sentence, the more probable the flight risk is, especially considering the strong case of the government . . .") (citation omitted). Here, if they are convicted, each of the Alexander Brothers is facing *at least* 15 years' imprisonment, with Guidelines of life imprisonment.[4] They have every incentive, and every reason to flee, especially considering the vast evidence in the case, including the victim accounts and corroboration described above.

*Second,* the prospect for reputational harm also augments the risk of flight in this case. The nature of this case has the potential to significantly and negatively impact the defendants' reputations. Oren and Tal Alexander, until recently, carefully curated their public reputations in connection with their real estate careers, and Alon Alexander is an executive in his family's successful security services company. A public prosecution and trial will drastically impact those reputations. For example, the Government is in possession of multiple video recordings created

---

[3] As explained more below, Tal Alexander's argument that private security can ensure the safety of the community, including by preventing "non-family female visitors," from entering his residence runs afoul of the Bail Reform Act.

[4] Recent examples in the Southern and Eastern Districts of New York for sex trafficking and similar offenses show that the defendants would likely face sentences well above the mandatory minimum. *See United States v. Paduch*, 23 Cr. 181 (RA), Dkt. No. 186 (S.D.N.Y. Nov. 21, 2024) (life sentence); *United States v. Ray*, 20 Cr. 110 (LJL), Dkt. No. 615 (S.D.N.Y. Jan. 31, 2023) (60-year sentence); *United States v. Maxwell*, No. 20 Cr. 330 (AJN), Dkt. No. 696 (S.D.N.Y. June 29, 2022) (20-year sentence); *United States v. Raniere*, No. 18 Cr. 204 (NGG), Dkt. No. 969 (E.D.N.Y. Oct. 30, 2020) (120-year sentence).

by Oren Alexander depicting Oren and Alon engaging in sexual activity with at least one identified victim. As described above, additional videos, found stored on hard drives, show the defendants and other men engaging in group sexual contact with a number of women, including numerous women who are visibly impaired. Put simply, the defendants have every incentive to flee to avoid prosecution and a public trial putting their criminal exploits on display. *See, e.g.*, *United States v. Madoff*, 316 F. App'x 58, 59 (2d Cir. 2009) ("[I]ncentive to flee . . . naturally bears upon and increases the risk of flight."); *United States v. Sammons*, No. 19 Cr. 107, 2020 WL 613930, at *5 (S.D. Ohio Feb. 10, 2020) ("The shame of the allegations that he is facing is also an immense incentive to flee.").

*Third*, the Alexander Brothers' strong foreign ties demonstrate their flight risk. The Alexander Brothers have close family ties to Israel. Oren Alexander also has family ties to Brazil. All three defendants travel extensively, including frequent trips by boat and private plane to Caribbean countries, including to the Bahamas, where their parents own property. It is, however, the defendants' connections to Israel that are the strongest. Their parents were born there and own property there. Their grandmother lives there. The defendants frequently travel there. Alon's wife is an Israeli citizen, and also has significant family ties to Israel. To be clear, the Government is not arguing that because the defendants are Jewish, they will flee to Israel. Rather, these defendants' specific familial ties to Israel and extensive travel there show that they can seamlessly reestablish their lives in Israel with minimal difficulty. While there exists a current extradition treaty between the United States and Israel, extradition from Israel is frequently a multi-year, drawn out process, at the end of which extradition to the United States is not guaranteed. If the defendants were to flee to Israel, they could attempt to significantly delay or even evade prosecution in the United States.

Finally, as the backdrop to these other flight risk factors, the defendants' ample financial resources also create a significant risk of non-appearance. The defendants earned high incomes and commissions from their employment and have access to vast wealth, their own, and that of their parents and other family members. Indeed, Alon Alexander proposes that the family can post bond "in any dollar amount." All three defendants regularly fly on private jets, a means of travel that is more difficult for law enforcement to track. They also frequently travel to the Caribbean by boat, which is even more difficult for law enforcement to track. In short, the defendants have the vast financial resources to ensure that if they chose to flee, they could do so quickly and without detection.

## C. The Defendants' Proposed Private Security Condition Violates the Bail Reform Act

It is black letter law in this Circuit that "the Bail Reform Act does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails." *United States v. Boustani*, 932 F.3d 79, 82 (2d Cir. 2019). This principle protects the Constitution's guarantee of equal protection and ensures all defendants—poor, wealthy, and even the uber-wealthy—are treated the same under the law. The defendants here seek to circumvent this basic tenet of justice and buy their way out of jail by hiring guards to watch them inside a luxury condo. This is nothing more than an attempt to leverage their wealth to receive special treatment that is forbidden under the law.

In offering to hire private guards, rather than subject themselves to a quotidian federal detention center, the defendants have become the latest examples of wealthy individuals charged with sex trafficking and similar offenses who have attempted to buy their way out of federal detention by funding their own private jails. Courts presented with these proposals have rejected them for what they are: efforts to use money and privilege to receive special treatment in the justice system. *See, e.g.*, *United States v. Combs*, No. 24 Cr. 542 (AS), 2024 WL 4903741, at *3 (S.D.N.Y. Nov. 27, 2024); *United States v. Maxwell*, 510 F. Supp. 3d 165, 177 (S.D.N.Y. 2020); *United States v. Epstein*, 425 F. Supp. 3d 306, 326 (S.D.N.Y. 2019); *United States v. Raniere*, No. 18 Cr. 204 (NGG), 2018 WL 3057702, at *7 (E.D.N.Y. June 20, 2018); *United States v. Valerio*, 9 F. Supp. 3d 283, 296 (E.D.N.Y. 2014).

In *Boustani*, the Second Circuit directly confronted the question of whether private guards are a permissible bail condition and held that the Bail Reform Act permits the use of private guards to avoid pretrial detention *only* where the defendant is detained on risk of flight premised on his wealth. "[A] defendant may be released on such a condition only where, *but for* his wealth, he would not have been detained." *Boustani*, 932 F.3d 82 (emphasis in original). This, however, is the exception to the rule. Where, as here, there are additional factors that require detention—including other factors going to risk of flight—the use of private security guards is not permitted under the Bail Reform Act. *See id.* ("[I]f a similarly situated defendant of lesser means would be detained, a wealthy defendant cannot avoid detention by relying on his personal funds to pay for private detention."); *see also Maxwell*, 510 F. Supp. 3d at 177 ("the Defendant's argument that private security guards could ensure her appearance at future proceedings runs afoul of the Bail Reform Act" because the defendant "would be detained regardless of her wealth"). Circumstances beyond a defendant's wealth that justify pretrial detention include, "the seriousness of the charged offenses and the lengthy possible sentence [a defendant] would face if convicted"; the strength and nature of the evidence against the defendant; and a defendant's "personal characteristics, including . . . 'frequent international travel . . . and extensive ties to foreign countries without extradition.'" *Boustani*, 932 F.3d at 83; *see also* 18 U.S.C. § 3142(g).

This case is far afield from one where the need for detention is based solely on risk of flight related to the defendants' wealth. The defendants are clear dangers to the community. They are also clear flight risks regardless of their wealth. As two federal Magistrate Judges in Florida recognized in their orders detaining Tal and Alon Alexander, most of the factors demonstrating that the defendants are serious flight risks have little to do with their wealth. These include, *inter alia*, the nature of their crimes, the possible life sentences they face, the fifteen-year mandatory minimum sentences they face, the prospect of "both incarceration and reputational harm," the strength of the evidence, including the "testimony of numerous victims and witnesses, electronic evidence, physical evidence, and documentary evidence," the defendants' international contacts, and their frequent international travel. *See United States v. Tal Alexander*, No. 24 MJ 4544, Dkt. No. 24 at 3-4 (S.D. Fla. Dec 17, 2024). Here, the defendants' wealth only exacerbates an already clear risk of flight. *See Boustani*, 932 F.3d at 83 ("It is clear that the District Court did not rely primarily on Boustani's personal wealth in finding that he posed a flight risk. Rather, his wealth was one of many factors the Court considered."). And just as a defendant of lesser means in the same situation would be detained pending trial (including a defendant with foreign contacts and sufficient wealth to pay for travel but insufficient wealth to hire around-the-clock private guards until a trial concluded), so too must the defendants be detained here.

None of the cases the defendants cite where private security was used suggest a different outcome. (*See* Dkt. No. 14 at 8-9; Dkt. No. 20 at 11-12). Each case relied upon by the defendants preceded the Second Circuit's decision in *Boustani*, which cabined the permissible use of private security. And none of the cases involved the high mandatory minimums or the sentencing exposure present in this case. In *United States v. Seng*, the defendant was charged with bribery and money laundering offenses and was ultimately sentenced to 48 months' imprisonment. *See* No. 15 Cr. 706 (S.D.N.Y.). In *United States v. Webb*, the defendant was charged with racketeering, wire fraud and money laundering, related to international soccer. The defendant's sentencing remains pending, but sentences for convicted co-defendants have ranged from time served to 108 months' imprisonment. *See* No. 15 Cr. 252 (E.D.N.Y.). Even in *United States v. Ludwigsen*, the defendant was charged only in a racketeering conspiracy count, faced no mandatory minimum, and was ultimately sentenced to seven years' imprisonment. *See* No. 99 Cr. 520 (E.D.N.Y.).  In sum, *Boustani* squarely forecloses the bail packages offered by the defendants here.

### D. The Defendants' Have Not Rebutted the Presumption of Detention and Their Proposed Bail Package Will Not Mitigate the Risks of Danger and Flight

When faced with a presumption in favor of pretrial detention, defendants have the burden to put forward evidence to rebut the presumption. Especially with respect to the danger that the defendants present, they have failed to do so. Their proffers and arguments contesting the strength of the evidence and characterizing the conduct as dated are insufficient. These arguments ignore the fact that the presumption here has been triggered by a grand jury's finding of probable cause for the substantive sex trafficking counts, which have no statute of limitations, and for a conspiracy count that the grand jury found continued until at least 2021. Moreover, as described above, the scope of the defendants' decades-long criminal scheme is shocking and the evidence of the charged crimes—including but not limited to the accounts of numerous victims—is nothing short of overwhelming.

In any event, the defendants' proposed bail conditions are insufficient. Three primary features of the bail proposal are (1) a bond of $115 million or in "any dollar amount," (2) private security, and (3) the execution of preemptive waivers of extradition. These conditions, considered along with the other proposed bail conditions, do not justify the release of the defendants.

The bond proposal, which the defendants have proposed securing with various properties they and their parents own, would still leave the defendants with vast resources if they were to flee. The financial information provided by Alon Alexander notes his own liquid assets, which are valued at millions of dollars, but gives no description of liquid assets for others in his family. The same information also describes $10 million dollars of property owned by the defendants' parents outside the United States, which could not be used to secure the bond, but would be available if the defendants fled or if needed to be converted into cash. The main issue with the proposed bond, however, runs deeper than one that could be solved by greater financial disclosure or additional collateral. With the charges, the evidence, and the penalties in this case, the incentive to flee is too great. Losing properties in Miami and elsewhere, particularly where the defendants have the ability to relocate and earn income again, is a reasonable price to pay to avoid decades in prison.

The private security proposal is also glaringly insufficient. In addition to being legally impermissible, there is an inherent conflict of interest present when the prisoner is the one paying

his own jailers. *See Epstein*, 425 F. Supp 3d at 326 (noting that there is a "conflict that is created by the salary the 'trustees' are earning from the Defendant and their purported role as independent monitors. (The same problem arises in relation to private 24/7 security guards.)"); *United States v. Boustani*, 356 F. Supp. 3d 246, 257 (E.D.N.Y. 2019) ("Guidepost employees would face a clear conflict of interest—private prison guards paid by an inmate."); *United States v. Tajideen*, 17-CR-46, 2018 WL 1342475, at *6 (D.D.C. Mar. 15, 2018) ("While the Court has no reason to believe that the individuals selected for the defendant's security detail would intentionally violate federal law and assist the defendant in fleeing the Court's jurisdiction, it nonetheless is mindful of the power of money and its potential to corrupt or undermine laudable objectives. And although these realities cannot control the Court's ruling, they also cannot be absolutely discounted or ignored."). The conflict of interest is not only one of divided loyalty but also a financial one where a security guard's act of reporting violations of bail conditions would risk ending a lucrative contract for his employer and potentially his own salary. This creates a significant risk that a company and its employees would observe, if not outright assist, bail condition violations, without bringing them to the Court's attention. *See Boustani*, 356 F. Supp. 3d at 257 ("[T]he defendant in [*Seng* ], who was released to private armed guards from Guidepost in an arrangement similar to what defendant proposes here, was outside of his apartment virtually all day, every weekday; was visited by a masseuse for a total of 160 hours in a 30-day period; and went on an unauthorized visit to a restaurant in Chinatown with his private guards in tow.").[5]

The capabilities of the private security team are also limited. Private security guards are substantially limited in their ability to stop or restrain a defendant determined to flee or otherwise violate his conditions. *See Valerio*, 9 F. Supp. 3d at 295 ("The questions about the legal authorization for the private security firm to use force against defendant should he violate the terms of his release, and the questions over whether the guards can or should be armed, underscore the legal and practical uncertainties—indeed, the imperfections—of the private jail-like concept envisioned by defendant, as compared to the more secure option of an actual jail."); *Boustani*, 356 F. Supp. 3d at 258 ("Although Defendant has consented to the use of 'any' force by Guidepost and has waived his right to sue any party in connection with the risks and dangers associated with escape attempts, it is not clear such an agreement is enforceable—and the defense fails to point to precedent suggesting it would be. Defendant cannot consent to the use of deadly force."). Beyond questions of the defendants' ability to consent to use of force by private security, such an arrangement also implicates the safety of the community. *Raniere*, 2018 WL 3057702, at *7 ("[A]ny escape attempt would also present the risk of a confrontation between armed guards and Defendant (or his followers) in the streets of New York City, which would mean that any reduction in the Defendant's flight risk from this proposal would be at least partially offset by a greater risk to the community."). This concern is exacerbated by the defendants' proposal to be confined in or around Miami—nearly 1,200 miles from the courthouse where the defendants will regularly appear in this case—placing enormous opportunity for risk during the transportation of the defendants to and from the Southern District of New York. This would place undue burden on the courts and

---

[5] The argument that the Government has not pointed out instances where a defendant with a private security bail condition has fled the jurisdiction misses the point. Courts do not allow defendants that present the enormous risk of flight here to be released, with or without private security guards. However, in *Seng*, a case the defendants cite, private security did not ensure compliance with pretrial release conditions.

federal and local law enforcement, who necessarily must coordinate, track and, potentially, recapture, the defendants should they chose to flee while in transit. *See Valerio*, 9 F. Supp. 3d at 295 ("[T]he bail package and attempt to replicate a jail in defendant's home would place a burden on the government not contemplated by the Bail Reform Act.").

Finally, the proposal to preemptively execute a waiver of extradition is nothing more than an "empty gesture." *Epstein*, 425 F. Supp 3d at 325. The defendants cite no "cases where courts addressed the question of whether an anticipatory waiver of extradition is enforceable." *Maxwell*, 510 F. Supp. 3d at 173; *see also United States v. Stroh*, No. 396-CR-139 (AHN), 2000 WL 1832956, at *5 (D. Conn. Nov. 3, 2000) ("[I]t appears that there is a substantial legal question as to whether any country to which he fled would enforce any waiver of extradition signed under the circumstances presented in this case. At any event, extradition from Israel (or any other country) would be, at best, a difficult and lengthy process and, at worst, impossible."). And the DOJ Office of International Affairs has told the Government that the proposed waivers are meaningless and unenforceable.[6]

## CONCLUSION

As set forth above, Alon, Oren, and Tal Alexander pose an ongoing and significant danger to the community and present a serious risk of flight. The Government respectfully submits that the defendants cannot meet their burden of overcoming the statutory presumption in favor of

---

[6] Other arguments raised by the defendants are entirely misplaced. That, under the guise of perfecting cross examination of a witness who testified at a hearing a month ago, Tal and Oren Alexander continue to seek FBI reports of victim interviews they can use to identify victims further underscores that their aim is to engage in an improper fishing exercise. *See United States v. Horton*, No. 16 Cr. 0212 (LAK), 2016 WL 6126669, at *7 (S.D.N.Y. Oct. 20, 2016) ("Nor is a detention hearing to be used as a discovery tool for the defendant."). The defendants' arguments about the Metropolitan Detention Center do not implicate a factor in 18 U.S.C. § 3142(g) and are not relevant to the issue of bail. But more than that, the recent attention paid to the MDC by judges in this District and the Eastern District has resulted in staffing, administrative, medical, and other changes at the facility that are significantly improving the identified issues.

detention. There are no conditions of bail that would assure the appearance and compliance of the defendants, or the safety of others. Accordingly, the defendants' applications should be denied.

Respectfully submitted,

EDWARD Y. KIM
Acting United States Attorney

By: ____/s_____
    Kaiya Arroyo
    Elizabeth A. Espinosa
    Andrew W. Jones
    Assistant United States Attorneys
    (212) 637-2226/-2216/-2249

cc: All defense counsel (by ECF)