

250 Vesey Street
27th Floor
New York, NY 10281

wmhwlaw.com
T: 212-335-2030
F: 212-335-2040

January 13, 2025

**VIA ECF**

Hon. Valerie E. Caproni
United States District Court
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

      Re:    *United States v. Tal Alexander*, Docket No. 24-CR-00676 (VEC)

Dear Judge Caproni:

      On behalf of Tal Alexander, we respectfully submit this reply in support of Mr. Alexander's motion to revoke the detention order entered by the Honorable United States Magistrate Judge Lisette M. Reid in the Southern District of Florida on December 17, 2024 (the "Detention Order") pursuant to 18 U.S.C. § 3145(b), and to reconsider bail. *See* 24-MJ-04544 (LMR) (S.D. Fla.), ECF No. 24. Codefendant Alon Alexander adopts this reply. In his case, United States Magistrate Judge Eduardo I. Sanchez likewise found that Alon did not present a danger to the community under a similar proposed bail package. *See* 24-MJ-04616 (EIS), ECF No. 18, at 2 (S.D. Fla.). Magistrate Judge Sanchez further concluded that the question of flight risk was a "close" decision. ECF No. 20-2, at 24:21-22. Codefendant Oren Alexander has not yet had a detention hearing, which is scheduled for January 15, 2025. Still, the bail package presented in Section C, *infra*, is offered on behalf of all three defendants.

      The government's opposition, like the Detention Order, greatly overstates the risk of flight, which our proposed bail conditions completely and fairly eliminate. Critically, the government ignores the fact that Mr. Alexander and his brothers, Alon and Oren Alexander (collectively, the "Codefendants"), all of whom have no criminal history, knew of this criminal investigation since July and made no attempt to flee. Instead, the government attempts unfairly to detain Mr. Alexander for reasons that stem directly from the family's lawfully earned wealth. The government's additional efforts to support a finding of dangerousness, despite there being (i) no allegations in the indictment since 2021, (ii) no evidence at all of witness tampering, and (iii) two Magistrate Judges having found no dangerousness, are equally unavailing. Respectfully, the Court should grant the proposed bail package, or any bail conditions the Court deems proper.

      **A. The government's stated concerns regarding risk of flight stem entirely from Mr. Alexander's means, and therefore private security is appropriate.**

      As an initial matter, we do not propose the condition of private security as a means to "buy [Mr. Alexander's] way out of jail," as the government asserts. Opp. at 7. Even without the condition of private security, the proposed bail package eliminates any risk of flight. Rather, in Mr. Alexander's initial detention hearing, we did not offer this condition, and Magistrate Judge

Reid found that the proposed conditions did not alleviate the flight risk. Although Magistrate Judge Reid's finding was wrong for reasons outlined in our motion (ECF No. 14, at 5-7), we strengthened Mr. Alexander's bail package in several ways, including adding the condition of private security, to address the Court's stated concerns and eviscerate any risk of flight.

This case presents precisely the scenario that the Second Circuit carved out in *United States v. Boustani* as appropriate for private security. 932 F.3d 79, 82 (2d Cir. 2019). "*But for*" Mr. Alexander's wealth, he is not a risk of flight. *Id.* (emphasis in original). Not only does the government expressly rely on Mr. Alexander's wealth to assert that he is a flight risk,[1] but they tacitly concede that his wealth serves as "the backdrop to [the] other flight risk factors." Opp. at 7. Indeed, the government's theory that Mr. Alexander poses a risk of flight to Israel[2] or another foreign jurisdiction depends entirely on his means. Even without a passport and while under home confinement, the government claims that Mr. Alexander remains a risk to take a private jet or a boat to a foreign jurisdiction. Opp. at 7. This is simply another way of saying that his wealth is the reason he should be detained. An indigent defendant who surrenders his passport and submits to home detention with GPS monitoring poses little risk of flight to a foreign jurisdiction. The

---

[1] To bolster this point, the government states that "Alon Alexander proposes that the family can post bond 'in any dollar amount.'" Opp. at 7. This misconstrues the record and ignores procedure in the Southern District of Florida, where his detention hearing was held. In the Southern District of Florida, a judge often requires a third-party cosigner for personal surety bonds. If a defendant fails to comply with the conditions, though a cosigner risks forfeiting the full bond amount, the Court does not always require a third party post the collateral in advance. *See also* S.D. Fla. Appearance Bond Form, available at
https://www.flsd.uscourts.gov/sites/flsd/files/forms/AppearanceBondForm.pdf.

Here, "any dollar amount" does not mean that the Alexander family has unlimited assets, but that the bond sureties—here, Shlomo and Orly Alexander—are willing to put up any amount of money as collateral, even if it would leave them destitute.

[2] The government continues to rely heavily on the Alexanders' connection to Israel as a basis for detention. The notion that Mr. Alexander or his brothers would be able to flee to Israel to "relocate and earn income again" without being quickly apprehended is, at a minimum, farfetched. Opp. at 9. And, the incentive to flee to a country where swift apprehension is likely is non-existent. As has been demonstrated in prior cases, Israeli authorities work hand-in-hand with United States law enforcement to apprehend known fugitives, especially high-profile defendants such as in this case. *See, e.g.*, Drug Enforcement Administration News Release, "Extradited Israeli Drug Lord Appears in Federal Court to Face Ecstasy Drug Charges," https://www.dea.gov/sites/default/files/divisions/mia/2006/pr030706p.html ("[T]his case would not have been possible without the extraordinary joint efforts of the United States and Israeli authorities, including the Israel Ministry of Justice, the Israel National Police ('INP'), and the INP office at the Israeli Embassy in Washington."). Israel is not going to hide those accused of sex trafficking. The government has not cited a single case where Israel has declined to extradite an American citizen, like Mr. Alexander, even one whose parents are Israeli-born U.S. citizens. The

"principle of fairness" dictates that Mr. Alexander should be treated no differently because he has means. *Boustani*, 932 F.3d 79 at 82.

The government's assertion that *Boustani* "squarely forecloses" the condition of private security in this matter is wrong. Indeed, since *Boustani*, at least one court in this district has approved home detention with private security for a wealthy defendant with greater foreign ties than Mr. Alexander and similarly facing exposure to a lengthy prison sentence. *See United States v. Weigand*, 492 F. Supp. 3d 317, 319 (S.D.N.Y. 2020). In *Weigand*, the defendant was a "wealthy German citizen" with minimal connection to the United States, and charged with, among other charges, conspiracy to commit bank fraud, which carried a maximum sentence of 30 years in prison. *Id.* Like here, "[t]he Government, and this Court, . . . repeatedly emphasized [the defendant's] wealth in explaining the risk of flight." *Id.* Granting a bail package which included home detention with private security, the Court explained: "**[E]qual protection works both ways. If defendants are to be treated similarly, without regard to wealth, then [a defendant] cannot be detained when an otherwise similarly situated indigent defendant would be released.** To that end, the Second Circuit recognized that a private security arrangement may be appropriate where the defendant is deemed to be a flight risk primarily because of his wealth." *Id.* (internal quotations omitted) (emphasis added).

As is the case here, "the fundamental fairness principle identified in *Boustani*, as well as the Eighth Amendment" required the release of the defendant in *Weigand*. *Id.*; *see also* U.S. Const. amend. VIII ("Excessive bail shall not be required."); *United States v. Dreier*, 596 F.Supp.2d 831, 833 (S.D.N.Y. 2009) (granting private security condition on grounds that a defendant's wealth "is not a reason to deny a constitutional right to someone who, for whatever reason, can provide reasonable assurances against flight"). Mr. Alexander, who has no citizenship other than in the United States and no non-tenuous ties anywhere else, presents less of a flight risk than the defendant in *Weigand*.

The Second Circuit in *United States v. Fox* also recently affirmed an order granting a bail package for a defendant charged with sex trafficking and firearms and drug trafficking offenses. No. 22-1043, 2022 WL 2564600, at *1 (2d Cir. July 8, 2022). There, the bail conditions included home detention with GPS monitoring and installation of security cameras at the location of home detention, which are even less stringent than the conditions proposed here. *Id.* With respect to the sex trafficking allegations in particular, the District Court found that although "the images and communications presented by the government have substantial shock value, and the allegations are deeply disturbing," the defendant presented a combination of conditions that reasonably assure his return to court. *Id.* at *2; *see also United States v. Jeffries*, No. 24-CR-423 (E.D.N.Y. Oct. 22, 2024), Dkt. 9; Dkt. 83 (granting bail to defendant charged with, among other things, international sex trafficking where he had no criminal history and the alleged conduct abated less than ten years before indictment). So too, here.

As well, the government's comparison of this matter to certain sex trafficking cases in which a private security proposal was rejected falls short. *See* Opp. at 8. Those cases involved much greater risks of flight beyond just wealth and are easily distinguishable. In *United States v. Maxwell*, 510 F. Supp. 3d 165, 172 (S.D.N.Y. 2020), the defendant (i) had "substantial international ties," including multiple foreign citizenships and citizenship in a country that does not extradite its own citizens (*id.*); (ii) had "the absence of any dependents, significant family ties, or employment in the United States" (*id.* at 172-73); and (iii) "lived in hiding and apart from the

3

family to whom she . . . assert[ed] important ties" (*id.* at 168).  In *United States v. Raniere*, No. 18-CR-204-1 (NGG), 2018 WL 3057702, at *5 (E.D.N.Y. June 20, 2018), the defendant fled to Mexico to avoid law enforcement shortly after he learned of a criminal investigation (unlike Mr. Alexander when confronted with the same information), had a child with a Mexican citizen (who resided in Mexico and whose U.S. visa was expiring), and had "little to lose if he were to flee."  In *United States v. Combs*, the defendant not only presented to be a substantial risk of flight for reasons other than his wealth, including that he owned a private plane, but there was "significant evidence of coercion of witnesses," the defendant was charged with obstruction of justice, and the defendant had substance abuse and anger issues which gave the court concern regarding counsel's "ability to control" him.  No. 24-CR-542, ECF No. 17, at 54-55 (S.D.N.Y. Sept. 30, 2024).  Finally, *United States v. Valerio* is also unavailing.  9 F. Supp. 3d 283, 296 (E.D.N.Y. 2014).  There, the court was concerned primarily with the defendant's dangerousness during home confinement, as he was indicted on charges of sexually exploiting children, including a three-year old child in Ukraine, and transporting and possessing child pornography.  *Id.* at 284, 296.  As the court found, no conditions, even home security, could reasonably prevent this conduct.  *See id.*  The factors supporting detention based on risk of flight in these cases simply do not exist in Mr. Alexander's case.

At the hearing scheduled for January 15, 2024, we will present a team of leading experts in security and home detention that will be overseen by former senior members of federal law enforcement.  The security team has formulated a highly detailed and effective plan for securing and monitoring Mr. Alexander and the Codefendants while on home detention.  While the Alexanders will pay for this service, the security firm will comply with orders from and report directly to the Court and Pretrial Services.  This particular security firm's reputation for integrity and competence will allay any concerns that the government raised regarding a conflict of interest.

Finally, the government's position that "the prospect for reputational harm" resulting from a public trial creates a risk of flight is without merit.  Opp. at 6.  As a threshold matter, this criminal investigation and related civil suits have been publicized nationally since last summer and caused tremendous reputational harm already,[3] and as the government has conceded, Mr. Alexander has made no attempt to flee.  In fact, Mr. Alexander's desire to reclaim his reputation by demonstrating the falsity of the allegations in a public trial, as he intends to do, are reason for him *not* to flee.

### B. The government's renewed efforts to support a finding of dangerousness still fail.

From the outset, the government has conflated the weight of its purported evidence with dangerousness.  However, dangerousness, for purposes of the Bail Reform Act, is not determined solely by looking at the acts charged in the indictment.  *See, e.g., United States v. Mattis*, 963 F.3d 285, 293 (2d Cir. 2020) ("The very reason that Congress directed district courts to consider factors beyond just the severity of the offense is the recognition that an individual is more than the crime

---

[3] It should also be noted that the government opted to hold a press conference announcing this indictment, which further damaged Mr. Alexander's reputation and is still available online on the U.S. Attorney's Office for the Southern District of New York's YouTube page.  *See* https://www.youtube.com/watch?v=3Q77_xFuyN8 (last visited January 11, 2015). Now, the government seeks to detain Mr. Alexander based on potential damage to his reputation.

of which that individual has been accused."). Most importantly, the superseding indictment includes no allegations of any misconduct since 2021,[4] and neither the government's initial detention letter (ECF No. 4) nor its opposition cite any evidence of witness tampering, intimidation, or obstruction, including after Mr. Alexander learned of the criminal investigation in early July 2024.

The government also makes unwarranted conclusions about, and characterizations of, sexual activities, liberally describing the defendants' alleged conduct as "depraved" and "sadistic." It fails to mention that in two separate hearings, Magistrate Judges Reid and Sanchez both concluded that the combination of proposed conditions sufficiently addressed any risk of danger to the community for Mr. Alexander and codefendant Alon Alexander, respectively.[5] The government's opposition proffers no new information of any evidentiary value that should lead this Court to find differently.

In its opposition, the government for the first time proffers that during execution of a search warrant it purportedly recovered recordings of sexual acts from an electronic device. Opp. at 2, 5. The government refers to these videos as "trophies of the defendants' criminal conduct," yet fails to detail when the videos were taken, how many videos, if any, the defendants are in, whether the purported participants have been identified, or whether the videos even depict nonconsensual sexual activity. *Id.* at 5. The government even attempts to give weight to one video allegedly filmed in a bathroom stall that, by the government's own description, neither shows any of the defendants nor suggests they had anything to do with its recording. *Id.* This is not the first time the government has omitted key context and details of proffered information it wants this Court to consider in determining whether Mr. Alexander should be detained.[6] Instead, the government has seized several opportunities to plant inferences of misconduct by the defendants and then unabashedly argue that these innuendos support the "weight of the evidence" and the defendants' dangerousness.

---

[4] The government's reliance on *Smith v. United States*, 568 U.S. 106 (2013), is misplaced. In *Smith*, the Court considered whether a defendant charged with conspiracy bears the burden of proving a defense of withdrawal. *Id.* at 107 ("Withdrawal . . . provides a complete defense when the withdrawal occurs beyond the applicable statute-of-limitations period.").

[5] *See* 24-CR-04544 (LMR) (S.D. Fla.), ECF No. 28-1, at 72: 19-22 ("With respect to danger to the community, I will find that there are conditions and some combination of conditions that could alleviate the danger to the community."); ECF No. 20-3, at 22: 2-4 ("I think that conditions could be fashioned, a combination of conditions, to address any type of danger that is presented here.")

[6] In its detention letter, the government included an excerpt of a conversation, dated October 2016, in which "Male-1" sends several messages about "handl[ing] drugs" in advance of a group trip to Tulum, Mexico. ECF No. 4, at 5-7. The government has not alleged that any rape or nonconsensual sexual conduct occurred on this trip. The government does not even allege that drugs were brought on or purchased or used during this trip. It appears the excerpt was included only for its inflammatory value.

Although Mr. Alexander does not pose a risk to the safety of the community, the proposed conditions should eliminate any outstanding concern the Court has regarding dangerousness.

### C. The proposed bail conditions alleviated concerns about risk of flight and reasonably ensure the safety of the community.

As laid out in our initial submission, Mr. Alexander proposes the following bail conditions and is amenable to any modifications imposed by the Court. This proposal includes conditions presented at Mr. Alexander's December 13, 2024 Detention Hearing, additional measures that Mr. Alexander proffered in his motion to reopen (24-MJ-04544 (LMR) (S.D. Fla.), ECF Nos. 22, 28), as well as newly enhanced conditions. The home detention plan will be overseen by former senior members of federal law enforcement and former federal government officials who are leading experts in home detention and will ensure ample security.

   a. A bond secured by the entirety of the Alexander family's assets,[7] which is in excess of $115 million and includes Mr. Alexander's assets, and those of Oren Alexander, Alon Alexander, and Mr. Alexander's parents Shlomo and Orly Alexander, all of which will be forfeited if any defendant violates the terms set by this Court;
   b. Surrender of Mr. Alexander's U.S. passport, which is the only passport he has;
   c. Surrender of Oren and Alon Alexander's U.S. passports, which are the only passports they have, and the passports of their wives and children;
   d. Surrender of Shlomo and Orly Alexander's U.S. and Israeli passports;
   e. Executed waivers of extradition for Tal, Oren and Alon Alexander;
   f. Home detention with GPS monitoring at any location that is amenable to the Court;
   g. Requirement that private armed security be stationed at the home detention location at all times (i.e. 24 hours per day, every day);
   h. Private security personnel will install video cameras and door and window sensors and alarms, which they will monitor;
   i. Private security personnel will accompany Mr. Alexander for any necessary travel away from home detention as described below;
   j. Mr. Alexander will pay for all private security services;
   k. Mr. Alexander will consent to wiretapping and monitoring of his phone and computer activity, and private security personnel will report to the Court any violations of his bail conditions;
   l. Access to the home detention location will be restricted to a list of visitors approved by Pretrial Services and the Court;
   m. Government authorization to search the home detention location at any time to ensure Mr. Alexander's compliance with the bail conditions;
   n. Necessary travel for medical appointments and court appearances, limited to the Southern District of Florida and the Southern District of New York;

---

[7] A financial statement with the Alexander family's assets, including parents Shlomo and Orly Alexander, was submit to the Court via email for *in camera* review on January 10, 2025. *See* ECF No. 24-1.

  o. Requirement that Mr. Alexander have no contact with any alleged victims or witnesses in the case;
  p. Any other conditions that the Court deems appropriate; and
  q. Subject to Pretrial Supervision approval.

### D. The government ignores critical disclosure failures.

The government's dismissive summary of our request for Jencks material—as an "improper fishing exercise"—is nothing short of outrageous and effectively accuses the defense of engaging in a veiled attempt to obstruct justice. Opp. at 11, n. 6. At Mr. Alexander's detention hearing, FBI Special Agent Justine Atwood, the lead case agent, testified that she did not know when the last alleged act of the sex trafficking conspiracy, charged in Count 1, occurred; she claimed it was in 2021, but could not state in what month it occurred and "would have to go back to my notes." 24-CR-04544 (LMR) (S.D. Fla.), ECF No. 28-1, at 21:1-22:4. These notes, which clearly constitute Jencks material and to which we are statutorily entitled, are critical to a statute of limitations defense. *See* 18 U.S.C. § 3500(b); Fed. R. Crim. P. 46(j). That the government now emphasizes that "the charged sex trafficking conspiracy continued *at least* until 2021"—which contradicts Special Agent Atwood's testimony—further underscores our need for the requested Jencks material. Opp. at 5.

Notably, the government decided against making Special Agent Atwood available for Alon Alexander's detention hearing and procured an agent who had not read the superseding indictment, had no personal knowledge of any of the allegations, and relied entirely on the reports of interviews of an unidentified number of accusers as the source of her (hearsay) hearing testimony. *See, e.g.*, ECF No. 20-2, at 26:21-27:3. Those reports constitute "a written statement that the witness . . . adopt[ed] or approve[d]" (Fed. R. Crim. P. 26.2(f)(1)), which the government was obligated "to produce, for the examination and use of the moving party," because the report constitutes a "statement of the witness that is in [the government's] possession and that relates to the subject matter of the witness's testimony" (Fed. R. Crim. P. 26.2(a)).

### E. Conclusion

For the reasons set forth above and in the motion, we respectfully move this Court to revoke the detention orders and set conditions of pretrial release that the Court deems proper.

                Respectfully submitted,

                /s/ *Milton Williams*
                Milton L. Williams
                Deanna M. Paul
                Alexander Kahn
                *Attorneys for Defendant Tal Alexander*

cc:  All counsel via ECF