UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

TAL ALEXANDER,

               Defendant.

Case No. 24-CR-676 (VEC)

 

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT TAL ALEXANDER'S MOTION TO DISMISS THE INDICTMENT**

 

Date:  June 9, 2025

Milton L. Williams
Deanna M. Paul
Alexander Kahn
**WALDEN MACHT HARAN & WILLIAMS LLP**
250 Vesey Street, 27th Floor
New York, NY 10281
Tel: (212) 335-2030
mwilliams@wmhwlaw.com
dpaul@wmhwlaw.com
akahn@wmhwlaw.com

*Attorneys for Defendant Tal Alexander*

# <u>TABLE OF CONTENTS</u>

<u>PAGES</u>

INTRODUCTION .............................................................................................................1

BACKGROUND ..............................................................................................................4

I.     Factual Background .............................................................................................4

       A.    The Investigation ....................................................................................4

       B.    The U.S. Attorney's Press Conference ...................................................7

II.    Summary of the Charges....................................................................................10

ARGUMENT ..................................................................................................................11

I.     THE ABSENCE OF A COMMERCIAL SEX ACT REQUIRES DISMISSAL OF
THE SEX TRAFFICKING AND CONSPIRACY COUNTS (COUNTS ONE,
TWO, THREE, FIVE, SIX, SEVEN, AND EIGHT) ........................................11

       A.    The Required Causal Connection Between the Giving or Receipt of
Anything of Value and a Sex Act is Lacking ........................................12

       B.    Multiple Courts Have Rejected the Government's Theory ....................13

       C.    The Government's Interpretation of § 1591(a) is Contrary to Legislative
Intent and Would Effectively Federalize Any Type of Date Rape .......16

II.    THE COURT SHOULD DISMISS THE SEX TRAFFICKING COUNTS FOR
LACK OF SPECIFICITY (COUNTS ONE, TWO, THREE, FIVE, SIX, SEVEN,
AND EIGHT)....................................................................................................18

       A.    Applicable Law ....................................................................................19

       B.    The Statutory Trafficking Counts Lack Specificity................................20

       C.    The Conspiracy to Commit Sex Trafficking Count Lacks Specificity .................22

III.   THE COURT SHOULD DISMISS THE INDUCEMENT COUNTS BECAUSE
THEY FAIL TO DEFINE UNLAWFUL SEXUAL ACTIVITY (COUNTS
FOUR AND NINE) ...........................................................................................23

IV.   COUNTS THREE AND FOUR—WHICH RELATE TO VICTIM 2—MUST BE
DISMISSED FOR LACK OF SUFFICIENT EVIDENCE ...............................24

CONCLUSION...............................................................................................................27

**TABLE OF AUTHORITIES**

**PAGES**

**CASES**

*Bond v. United States*,
 572 U.S. 844 (2014) ............................................................................................................ 18

*Cochran v. United States*,
 157 U.S. 286 (1895) ........................................................................................................ 19, 21

*Jones v. United States*,
 529 U.S. 848 (2000) ............................................................................................................ 17

*Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc.*,
 No. 10-CV-4124, 2013 WL 6816174 (W.D. Ark. Dec. 24, 2013) .................................... 15, 16

*Melendez-Rojas v. United States*,
 145 S. Ct. 316 (2024) .......................................................................................................... 21

*Ramsbottom v. Ashton*,
 21-CV-00272, 2024 WL 4993391 (M.D. Tenn. Dec. 5, 2024) .................................. 13, 14, 16

*Reed v. Barnes*,
 No. 24-CV-1500-D, 2025 WL 963072 (N.D. Tex. Mar. 31, 2025) .................................. 14, 16

*Russell v. United States*,
 369 U.S. 749 (1962) ........................................................................................................ 19, 20

*United States v. Bass*,
 404 U.S. 336 (1971) ............................................................................................................ 18

*United States v. Brozyna*,
 571 F.2d 742 (2d Cir. 1978) ................................................................................................ 22

*United States v. Coreas*,
 419 F.3d 151 (2d Cir. 2005) ................................................................................................ 18

*United States v. Frey*,
 736 F. Supp. 3d 128 (E.D.N.Y. 2024) ................................................................................. 11

*United States v. Giovanelli*,
 464 F. 3d 346 (2d Cir. 2006) ............................................................................................... 20

*United States v. Gotti*,
 457 F. Supp. 2d 411 (S.D.N.Y. 2006) ............................................................................. 24, 25

*United States v. Johnson*,
 No. 19-CR-405-1, 2024 WL 4278071 (N.D. Ill. Sept. 24, 2024) ......................................... 12

*United States v. Lanzon*,
 No. 06-20783-CR, 2008 WL 3271092 (S.D. Fla. Aug. 8, 2008) ......................................... 24

*United States v. Maxwell*,
 No. 20-CR-330, 2021 WL 5999414 (S.D.N.Y. Dec. 18, 2021) .............................................. 27

*United States v. Melendez-Rojas*,
   No. 22-333, 2024 WL 1881491 (2d Cir. Apr. 30, 2024) ........................................ 21

*United States v. Peel*,
   14-CR-106, 2014 WL 3057523 (E.D. Cal. July 7, 2014) .................................... 24

*United States v. Pirro*,
   212 F.3d 86 (2d Cir. 2000) ................................................................ 18, 19, 23

*United States v. Raniere*,
   55 F.4th 354 (2d Cir. 2022) ..................................................................... 12

*United States v. Resendiz-Ponce*,
   549 U.S. 102 (2007) ............................................................................ 19

*United States v. Risk*,
   843 F.2d 1059 (7th Cir. 1988) ................................................................. 25

*United States v. Silverman*,
   430 F.2d 106 (2d Cir. 1970) ................................................................... 19

*United States v. Taylor*,
   44 F.4th 779 (8th Cir. 2022) ................................................................... 12

*United States v. Thompson*,
   141 F. Supp. 3d 188 (E.D.N.Y. 2015), *aff'd*, 896 F.3d 155 (2d Cir. 2018) ...................... 23, 24

*United States v. Urso*,
   369 F. Supp. 2d 254 (E.D.N.Y. 2005) ........................................................ 20, 23

*United States v. Walls*,
   784 F.3d 543 (9th Cir. 2015) ................................................................... 16

*United States v. Walsh*,
   194 F.3d 37 (2d Cir. 1999) ..................................................................... 19

*Vang v. Prataya*,
   No. 12-CV-1847, 2017 WL 401942 (D. Minn. Jan. 30, 2017) ................................... 15, 16

## **STATUTES**

18 U.S.C. § 1595 ....................................................................................... 13
18 U.S.C. § 2422 ................................................................................... passim
18 U.S.C. § 2423 ....................................................................................... 24
18 U.S.C. §1591 .................................................................................... passim
18 U.S.C. §1594 ....................................................................................... 10
22 U.S.C. § 7101 ................................................................................... 16, 17
N.Y. Penal Law § 130.25 .............................................................................. 23
N.Y. Penal Law § 130.30 .............................................................................. 23
N.Y. Penal Law § 130.35 .......................................................................... 23, 24
N.Y. Penal Law § 130.52 .............................................................................. 23

## **RULES**

Fed. R. Crim. P. 12 ................................................................................................ 11, 19, 23, 24
Fed. R. Crim. P. 7 .................................................................................................................... 19

Tal Alexander, by his attorneys, respectfully submits this Memorandum of Law in Support of his Motion to Dismiss the Superseding Indictment, ECF 63 (the "Indictment"), and joins in the arguments asserted in the motions to dismiss filed by Codefendants Alon and Oren Alexander to the extent they are applicable to Mr. Tal Alexander (hereinafter "Tal"). Similarly, Codefendants Alon and Oren Alexander adopt the arguments raised in Tal's motion to dismiss to the extent they are applicable to Codefendants.

## INTRODUCTION

The Government's attempt to recast Tal's alleged conduct as federal sex trafficking rests on a dangerously overbroad theory—one that would, if accepted, convert nearly any accusation of date rape into a federal sex trafficking offense. That is not just a misreading of the statute; it's an abuse of it. The Court should dismiss the Indictment because the theory is wrong, and already has been rejected by several courts.

The Government alleges that Tal and his Codefendants, raped or sexually assaulted the victims described in the Indictment. Those alleged acts, if proven beyond reasonable doubt, would establish crimes under the laws of many states, including those where these acts allegedly occurred. But that is not enough to make them *federal crimes* over which *federal courts* exercise jurisdiction. That requires something more. And the something more that transforms a horrific state crime, which the states have ample legal tools to investigate, charge, and prosecute, into a federal crime under 18 U.S.C. §1591, is lacking here.

The statute requires a "commercial sex act," which it specifically defines as a "sex act, **on account of** which anything of value is given to or received by any person." *Id.* § 1591(3)(e) (emphasis added). Here, the indictment alleges a sex act and, arguably, by stretching the term to

its outer limit, if not beyond it, a "thing of value."  But critically, the Government does not allege and cannot satisfy the "on account of" element, *i.e.*, the requisite causal connection.

The Government alleges, as the "thing of value," that Defendants "lured" their victims with "promises of luxury experiences, travel, and accommodations."  But that is not enough to establish a "commercial sex act."  The alleged victims did not provide sex "on account of" those promises, as the statute requires: they did not agree to provide sex in exchange for the travel or accommodations; the alleged travel and accommodations were not conditioned, expressly or implicitly, on the victims' participation in the sex acts; and the travel and accommodations did not represent compensation for the sex acts.  As at least four separate district courts, in four different jurisdictions, have held, the absence of such a connection between the thing of value and the sex act means that the statutory "on account of" requirement is unsatisfied.

Similarly, while the Indictment alleges the use of force in the commission of each sex act, it does not charge that force was used to compel a *commercial* sex act, *i.e.*, that the victim or a third party received a "thing of value" on account of force being applied.  That critical difference distinguishes this case from cases upholding non-monetary consideration as the "thing of value."

While this is a technical argument, it is not a mere technicality or formality.  The "on account of" requirement is a substantive tool, legislated by Congress, that ensures that the Trafficking Victims Protection Act of 2000 ("TVPA") does not become an all-purpose vehicle for federalizing all sex crimes.

The Government's theory is at odds with this substantive legislative limitation and the plain meaning of the statute.  To summarize the Government's position: if a defendant invites a prospective victim to dinner at a restaurant, pays for dinner, and sexually assaults her after dinner, the defendant has committed federal sex trafficking.  If its theory is accepted, paying for dinner,

without more, is the "something more" that converts rape into federal sex trafficking because a "thing of value" was provided and forcible sex followed. If that is indeed how the statute reads and is intended by Congress to be read, the Indictment stands. If that is not the statute's actual and intended meaning, the Indictment must be dismissed, because there is no daylight between this simplified hypothetical and the Government's theory of the case. This Court should resist the Government's invitation to take an unprecedented view of these concepts and stretch the sex trafficking statute well beyond the plain meaning of the statute and the clear intent of Congress.

While the lack of a sustainable legal theory is the Indictment's central flaw, there are others. As detailed below, the pre-indictment prelude to this case was a rush for sensationalist headlines at the expense of meticulous sourcing of credible witnesses and forensic evidence. In its eagerness to prosecute a salacious story, the Government has cobbled together a pleading that fails to identify accusers, provide specific dates that Tal is alleged to have committed a crime, or identify when acts in furtherance of the alleged conspiracy occurred.

Thus, Counts One through Three, and Counts Five through Eight lack the particularity required to provide Tal with notice to mount a defense and to ensure that the Government, at trial, is held to the facts presented to the grand jury. Additionally, Counts Four and Nine (Inducement to Travel to Engage in Unlawful Sexual Activity) must be dismissed with prejudice for failing to define, as they must, the alleged unlawful sexual activity. Finally, based on the Government's proffer of the evidence, Counts Three and Eight lack sufficient evidence.

## BACKGROUND

I.    **Factual Background**

A.    **The Investigation[1]**

The origins and conduct of this criminal case raise stark questions about the integrity of the prosecutorial process.  The criminal investigation arose not from an organic law enforcement discovery, but rather from a private email exchange rooted in personal animus and political affinity.

On June 18, 2024, a Miami-based real estate broker—a business rival to Tal and Codefendant Oren Alexander—emailed her sister, who worked as a prosecutor at the Miami-Dade State Attorney's Office ("SAO"), urging her to pursue a case against Oren and Alon Alexander. Decl. Ex. 1-2.  Lacking any first-hand knowledge of misconduct, the broker simply cited social media and linked to an article published a day earlier. "I hope you guys can go after them," she wrote, "the comments on socials are outrageous. . . it seems everyone hates them – even their fellow Trumpers. . . Birds of a feather…" *Id.*  The article relied heavily on lawsuits against Tal's Codefendants and on the lawyer that brought them. *Id.*  Notably, the article quoted Evan Torgan, a plaintiff's attorney who filed the first two sexual assault lawsuits against Oren and Alon Alexander in November 2023, days before the Adult Survivor Act's lookback window expired. These litigations were first reported by The Real Deal, which published seven articles and shared seven Instagram posts between June 8, 2024 and June 18, 2024, all of which repeated the two lawsuits' allegations and included "rape" in the headline.  Six of the stories quoted Mr. Torgan. The New York Times and Wall Street Journal first published stories about the assault claims levied

---

[1] Materials were produced in response to Chapter 119 Florida State Public Records Requests ("119 Materials").

against the Alexanders on June 17, 2024, and June 18, 2024, respectively, again quoting Mr. Torgan.

The sister passed the email on to Natalie Snyder, Chief of the SAO's Sexual Battery Division, with a note: "My sister will not stop talking about these 2 brothers who make a practice of dosing and raping young women." *Id.*  Around the same time, Ms. Snyder forwarded the email to Jessica Pasqual, a detective in the Miami Beach Police Department's Special Victims Unit.  *Id.* That same day, Det. Pasqual began investigating a sexual assault allegation against Oren Alexander.

State prosecutors quickly coordinated with their federal counterparts.  Rather than undertake an independent, objective investigation, law enforcement leaned on media coverage and private plaintiffs' attorneys to build their cases—specifically, Evan Torgan and Carissa Peebles. *See, e.g.,* Decl. Exs. 3-5.  These lawyers became integral members of the state and federal government's respective prosecution teams.  In addition to being advocates for their clients, they acted as de facto investigators, facilitators, and strategic partners of the government.  *See, e.g.,* Decl. Exs. 6-7.  Information was readily exchanged between federal and state law enforcement agencies and civil counsel, *see* Decl. Ex. 8; bond conditions were discussed collaboratively, *see* Decl. Exs. 8-9; and complainants were often sourced or funneled directly through civil litigation, *see* Decl. Ex. 3.  For example, Mr. Torgan provided federal agents with a USB drive containing hundreds of photographs, dozens of videos, and a trove of handpicked data.  Decl. Ex. 6.  Several weeks earlier, Ms. Snyder asked Mr. Torgan to contact potential accuser-witnesses because she worried that direct outreach from the Government might scare the women off and, around the same time, Mr. Torgan handed Florida prosecutors "a new victim in Miami Beach."  *See, e.g.*, Decl. Ex. 10.

Perhaps more troubling, the relationship was reciprocal and even transactional. Ms. Snyder solicited complainants through these plaintiffs' attorneys, *see, e.g., id.*; Mr. Torgan and Ms. Peebles brought accusers and evidence to Ms. Snyder; and Ms. Snyder referred potential clients to them. On one occasion, when a victim told Ms. Snyder she wanted to sue one of Tal's Codefendants, Ms. Snyder referred her directly to Mr. Torgan and Ms. Peebles.[2] Decl. Ex. 7.

The investigative process—rather than filtering out weak or unreliable allegations—appears to have amplified them. Indeed, the first federal warrant, dated August 16, 2024, detailed allegations from 11 accusers, most of whom were either represented by counsel (primarily, by Mr. Torgan) or had their stories published by the media in June 2024. It is telling that not one of those women appear in the original or superseding indictments. And for good reason: their claims and credibility would not withstand scrutiny in any courtroom. This background matters.

By the Government's own admission, this was a rushed indictment. In the words of the lead federal case agent, less than four months into investigating a purported 12-year conspiracy: The U.S. Attorney's Office "is looking to charge asap." Decl. Ex. 11. In its haste, the Government presented one-sided and misleading evidence in its warrant applications and failed to wall off decision-making from outside actors with vested interests. Then, with little concern for the limits

---

[2] This referral may run afoul of nationally recognized standards for prosecutors, which warns against making referrals. The American Bar Association Criminal Justice Standards for the Prosecution Function provides: "The prosecutor should not recommend the services of particular defense counsel to accused persons or witnesses in cases being handled by the prosecutor's office. If requested to make such a recommendation, the prosecutor should consider instead referring the person to the public defender, or to a panel of available criminal defense attorneys such as a bar association lawyer-referral service, or to the court. . . In the rare case where a specific recommendation is made by the prosecutor, the recommendation should be to an independent and competent attorney, and the prosecutor should not make a referral that embodies, creates or is likely to create a conflict of interest." Standard 3-1.7(i).

of statutory language, it marketed Defendants' alleged misconduct as a series of federal crimes and continued the partnership with the press that has driven this case.

### B.    The U.S. Attorney's Press Conference

Around 6:00 am, on December 11, 2024, federal and state law enforcement arrived at the Alexanders' Florida homes to execute federal search warrants and arrest the brothers.[3]  Miami-Dade State Attorney Katherine Rundle and Deputy U.S. Attorney for the Southern District of New York Edward Kim coordinated a synchronized show of force to coincide with a high-profile press conference—Damian Williams' final press conference as the U.S. Attorney for the Southern District of New York.[4]  *See* Decl. Ex. 12.  Such media attention around this indictment was of paramount importance to the Government.

A grand jury had already returned a three-count indictment against the Alexanders on December 6, 2024, which was filed under seal on December 10, 2024.  ECF 1; USAO_00000745-48.  Five days later, the Government publicly filed a superseding indictment.  ECF 3.  It did not add charges, correct errors, or provide missing details.  Instead, it simply added a 4.5-page narrative calculated to garner media attention at the press conference scheduled to coincide with the announcement of the raid and the indictment's public unveiling.

Upon learning of the Alexanders' arrests, defense counsel contacted the Assistant U.S. Attorneys handling the case and requested a call.  Defense counsel was contacted next *not* by the

---

[3] Further underscoring the collaboration between the SAO and SDNY, Tal was not charged in any Florida state prosecution.  However, he was arrested by Florida law enforcement, not by federal agents, who transferred Tal into the custody of Special Agent Justine Atwood, the lead federal case agent.

[4] *See* https://www.youtube.com/watch?v=3Q77_xFuyN8 (last visited May 29, 2025).  Mr. Williams left his position two days later, on December 13, 2024.

Government, but by a Wall Street Journal reporter.  This was *before* the U.S. Attorney's Office Press Office ("SDNY Press Office") had even circulated a media advisory about the Alexanders.[5]

Before defense lawyers even had a chance to speak with the Government, the SDNY Press Office (1) circulated a media advisory announcing the Alexander Brothers' arrests, advertising an afternoon press conference and providing a link to watch the webcast live; (2) emailed a separate "press guidance" advisory, and (3) posted similar details on social media.  Decl., Exs. 13-15. Another media advisory with the indictment attached followed soon after.  Decl., Ex. 16.  The Government then further sensationalized the case by filing a "detention letter" containing titillating details, which it directed journalists to during the press conference.  *See* n. 4, *supra* ("I would refer you to the detention memo that we filed. It has some details including some very specific details."); ECF 4.

The press reaction was swift and predictable.  Media outlets nationwide published the Government's remarks.[6]  Journalists updated those stories to include details from the detention letter.  Outrageously, the letter included several lines from a 2016 group chat that led to widespread and false reporting that the Alexanders engaged in international sex trafficking of women to Mexico.  *See, e.g.,* Chris Spargo, *Wealthy Brothers, Secret Predators? Monsters of Miami*, People

---

[5] Details of the federal investigation had previously been leaked to the media in June 2024. *See, e.g.*, Emily Glazer, et al., *FBI Probe Rape Allegations Against Star Real Estate Brokers*, Wall Street Journal, Jul. 8, 2024 (citing "people familiar with the matter"), available at https://www.wsj.com/us-news/fbi-probing-rape-allegations-against-star-real-estate-brokers-482fbab9?st=w9a45e&reflink=desktopwebshare_permalink.

[6] At the press conference, the Government spoke of details that appear nowhere in the indictment, specifically that the Alexanders procured and provided women with drugs, "including cocaine, mushrooms, and GHB."  These sensational details were widely published, including by the New York Times and the Wall Street Journal, two of the most influential media outlets in the world.

Magazine, Jun. 9, 2025.[7]  The excerpt—which concerns "Male-1" planning his birthday in Tulum, Mexico—shows "Male-1" (not any of the Defendants) stating that he "just need[s] to handle drugs," including "[c]oke, shrooms and G."  ECF 4, at 5-7; *see also* ECF 27 at n. 6.  No such allegations appear in the indictment, confirming that the letter was calculated to inflame rather than inform the public.

Having relied heavily on the press to build its case, the Government then ignited and fanned the media spectacle that has transformed the Alexanders into supervillains.  The detention letter is just one example of this type of conduct—where the Government cherry picks details, omits crucial context, and misleads this Court and the public into deciding, months before trial, that the Alexanders are guilty.[8]  The recent People Magazine cover story—which refers to the Alexanders, who have not been convicted of anything, but merely charged in an indictment, as "Monsters of Miami"—is the latest example of the immense and far-reaching consequences of the Government's words and actions.

---

[7] When asked by defense counsel to correct the story, the People Magazine reporter responded: "The Tulum text messages are included in the federal filing."

[8] In another filing prepared for public consumption, the Government referred to recordings of sexual acts as "trophies of the defendants' criminal conduct" before investigators had even identified the videos' participants or determined whether the videos depicted nonconsensual sexual activity.  ECF 26, at 5.  Again, when prosecutors make bold accusations, whether in open court or in motion papers, the media amplifies them.  The Government's claims about these purported keepsakes of criminality were reported nationwide. *See, e.g.,* Mollie Markowitz, *Wealthy Florida real estate brothers' 'trophies' uncovered as judge denies bail: feds*, Fox News (Jan. 18, 2025), available athttps://www.foxnews.com/us/wealthy-florida-real-estate-brothers-trophies-uncovered-judge-denies-bail; Mauricio Maldonado, *Videos found in apartment link Alexander brothers to sex assaults, prosecutors say*, CBS News (Jan. 16, 2025), available at https://www.cbsnews.com/miami/news/videos-found-in-apartment-links-alexander-brothers-to-sex-assaults-prosecutors-say/.



Labels like "serial rapist," "serial conduct," and "serial sexual violence," repeated half a dozen times in a single hearing, do not stay within the four walls of the courtroom; they ripple into headlines, soundbites, and public perception. *See* Det. Hrg. Tr., Dec. 13, 2024. Defendants are presumed innocent and entitled to a fair trial in a court of law, not a one-sided trial in the court of public opinion.

## II.    Summary of the Charges

Count One of the Indictment charges Tal, his Codefendants, and unnamed others with engaging in a 13-year sex trafficking conspiracy, in violation of 18 U.S.C. 1594(c). The gravamen is that Defendants lured women with the promise of luxury travel and accommodations to locations where they were raped or sexually assaulted, stringing together a patchwork of scenarios, offering multiple versions of where and how Defendants supposedly met their alleged victims, and conflicting accounts of how the alleged assaults were planned or carried out. *See, e.g.,* ¶¶ 1, 5(a), (c), (e).

10

In addition to conspiracy, the Indictment charges Tal with six counts of sex trafficking—Counts Two, Three, Five, Six, Seven, and Eight—each relating to a different purported victim (Victims 1-6), one of which was a minor (Victim 4) (collectively the "Statutory Trafficking Counts").  Counts Four and Nine of the Indictment charge Tal, pursuant to 18 U.S.C. § 2422, with inducing two of the six victims (Victims 2 and 6) to travel to New York to engage in illegal sexual activity (the "Inducement Counts").

## ARGUMENT

### I.    THE ABSENCE OF A COMMERCIAL SEX ACT REQUIRES DISMISSAL OF THE SEX TRAFFICKING AND CONSPIRACY COUNTS (COUNTS ONE, TWO, THREE, FIVE, SIX, SEVEN, AND EIGHT)

As the Government has tacitly conceded, the sex trafficking counts in the Indictment rest on an entirely novel and untested criminal theory.  We are aware of no indictment charging sex trafficking on the grounds that "promises of luxury experiences, travel, and accommodations"—*i.e.*, a weekend invitation to a summer beach house and the means to get there—provide the "commercial" basis for a sex trafficking charge.  ECF 63 ¶ 1.  The novelty is unsurprising because the theory is wrong, which helps explain why it appears no previous prosecutor has charged such a case.  Because the Government fails to allege a "commercial sex act" within the meaning of 18 U.S.C. § 1591, this Court should dismiss the sex trafficking counts under Federal Rule of Criminal Procedure 12(b)(3)(B)(v) for failure to state an offense.

Under 18 U.S.C. § 1591(a), the Government must prove that (1) Tal knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited a victim; (2) he did so while knowing or recklessly disregarding that force, threats of force, fraud, coercion, or any combination of such means would be used to cause the victim to engage in a commercial sex act; and (3) the conduct occurred in or affected interstate commerce.  *See* 18 U.S.C. § 1591(a)(1); *United States v. Frey*, 736 F. Supp. 3d 128, 143 (E.D.N.Y. 2024).  The statute

specifically requires proof of an intent to use (or knowing disregard that others would use) force, fraud, or coercion to compel the victim to engage in a commercial sex act—the element that distinguishes sex trafficking from offenses under the Mann Act (*i.e.* 18 U.S.C. § 2422; *see* the Inducement Counts).  "[F]orce, fraud, or coercion" is a key element of the offense.  But so is the requirement that it have occurred in the context of a "commercial sex act." *See United States v. Taylor,* 44 F.4th 779, 791 (8th Cir. 2022).  As shown below, the Indictment fails to allege a "commercial sex act" within the meaning of 18 U.S.C. 1591(e)(3).

### A.   The Required Causal Connection Between the Giving or Receipt of Anything of Value and a Sex Act is Lacking

Under § 1591, a "commercial sex act" is defined as "any sex act, **on account of** which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3) (emphasis added). As the Second Circuit has interpreted the phrase "on account of," it "require[s] a causal connection between the sexual act and the giving or receiving of anything of value." *United States v. Raniere*, 55 F.4th 354, 365 (2d Cir. 2022).  That causal connection is absent here.

The "prototypical fact pattern for sex-trafficking claims" involves "a three-way interaction between a pimp, a victim, and a client."  *United States v. Johnson*, No. 19 CR 405-1, 2024 WL 4278071, at *3–4 (N.D. Ill. Sept. 24, 2024).  In this scenario, "the pimp forces, defrauds, or coerces the victim to engage in sex (or sexual behavior) with the client in exchange for money (or other value)."  *Id.*

*Raniere* involved a baroque version of this paradigm, but really the same scheme.  There, certain members of an organization, called "masters," assigned female victims, called "slaves," to engage in sexual activity with and in the presence of the defendant, who stood at the head of the organization.  55 F.4th at 364-645.  The evidence showed that a "master" funneled victims to the defendant in order to maintain a privileged position in the organization, and received (non-

monetary) rewards for her success in furnishing sexual victims to the defendant. Thus, the defendant (the client) rewarded a thing of value (privileged position in the hierarchy) to the master (the pimp) as a reward, i.e., on account of, the sexual activity of the victim.

The Indictment does not allege such a fact pattern. Even accepting the factual basis of the Government's theory—that the offer of a weekend in the Hamptons, say—is a "thing of value," the Indictment fails to allege that the victim received such accommodations "on account of" the subsequent rape. Nor were the victims coerced into traveling to or receiving "luxury accommodations." They did so voluntarily. The Government does not charge that they accepted, or agreed to accept, these "inducements" in exchange for providing sexual services, and we do not expect it to do so.

The absence of the requisite causal connection would be apparent on a plain language analysis even if the Court were writing on a blank slate. Fortunately, however, the slate is not blank, as multiple courts have considered, and rejected, similar fact patterns as a basis for a violation of 18 U.S.C. §1591.

### B.    Multiple Courts Have Rejected the Government's Theory

While criminal cases alleging the payment of travel and lodging to satisfy the "commercial" aspect of this element appear to be nonexistent, numerous courts, construing the same statute, have examined the same fact pattern in civil suits. That is because a putative violation of § 1591 may give rise not only to criminal liability, but also civil liability under 18 U.S.C. § 1595(a), which states that "[a]n individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator" or coconspirators.

The same theory as the Government's was most recently rejected in *Ramsbottom v. Ashton*, 21-CV-00272, 2024 WL 4993391 (M.D. Tenn. Dec. 5, 2024). There, defendant met a minor

victim on social media, allegedly "groomed" her, and the victim then traveled three separate times to meet him in person to engage in sexual activity. *Id.* at *5.

On one such occasion, after the sexual activity, the defendant gave the victim a "wad of money" in the room directly after the sexual activity. *Id.* at *6. The Court had little difficulty finding that a "commercial sex act" under § 1591 had occurred in this instance.

On the next two occasions, however, the victim traveled to meet the defendant. The defendant paid for her hotel room and food over the course of the respective weekends. The Court ruled that no commercial sex act occurred on the latter two occasions. *Id.* at *7. The Court found that "nothing about the interaction suggest[ed] that his payment for lodging and food was because of—or 'on account of'—any sex act." *Id.* Additionally, the victim had "traveled of her own accord to meet up with" the defendant, and plaintiff did not "allege that [defendant] ever threatened to withhold food or lodging—or threatened to require her to foot the bill—if she did not engage in sex acts with him." *Id.*

Nor is *Ramsbottom* an isolated, one-off decision. Other courts have drawn exactly the same line. In *Reed v. Barnes*, a TVPA lawsuit stemming from the alleged sex trafficking of Jane Doe, a minor, the defendant arranged for Jane Doe's transport from her residence in Indianapolis to Texas, where she spent several days with defendant during which he paid for Jane Doe's travel, meals, accommodations, and experiences, and had sex with Jane Doe several times. No. 24-CV-1500-D, 2025 WL 963072, at *1 (N.D. Tex. Mar. 31, 2025). The Court concluded that plaintiff had not sufficiently alleged that Jane Doe was caused to engage in a commercial sex act or that these things of value (*i.e.*, food, shelter, and transportation) were provided "on account of" any sex act. *Id.*, at *3 ("[T]he amended complaint does not allege any facts that enable the court to draw the reasonable inference that Jane [Doe] was provided food, shelter, and transportation "on account

of" the sex acts that occurred. . . it is necessary that there be a causal connection between the sex

act and the exchange of the thing of value.").

Similarly, in *Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc.*,

plaintiffs—who were minors at the time—alleged that they were sexually abused by defendant

during out-of-state trips organized by his ministry, that the abuse constituted a "commercial sex

act" because their living expenses were paid by the ministry's businesses, and that those expenses

indirectly funded or rewarded the abuse, in violation of the TVPA.  No. 10-CV-4124, 2013 WL

6816174, at *16 (W.D. Ark. Dec. 24, 2013).  The Court held that there was no causal link between

the sexual acts and the financial support provided, and (2) the mere fact that plaintiffs' expenses

were paid while abuse occurred was not enough to establish a "commercial sex act" under the law.

*Id.* ("Plaintiffs have not offered any evidence showing that Plaintiffs' living expenses were paid

as some sort of *quid pro quo* for the sex acts that occurred with [defendant].  Nor have Plaintiffs

offered evidence to show that Defendants were compensated "on account of" the sex acts.  In sum,

Plaintiffs offer no evidence of a causal relationship between the sex acts and the payment of

expenses.").

Finally, in *Vang v. Prataya*, No. 12-CV-1847, 2017 WL 401942, at *2 (D. Minn. Jan. 30,

2017), the defendant met the minor victim on a trip to Laos, they had sexual intercourse, and the

victim became pregnant.  On the trip, the defendant paid for meals, lodging, clothing, and

transportation for the victim.  *Id.* at *6.  The defendant then brought the victim and the victim's

child to the United States.  *Id.* at *2.  The Court found that there was no "commercial sex act"

because plaintiff had not established that the "expenses were paid, or that the clothing was given

to her, on account of the sex acts in which he engaged with [the victim]" and denied defendant's

summary judgment motion.  *Id.*

True, the case at bar involves (with one exception) allegations of forcible rape, not sex with a minor. But that is a distinction without a difference. Sex with a minor is a form of statutory rape because any consent provided by the minor is deemed to be ineffective. And the sex in those cases was presumably premeditated by the defendant (as evidenced, for example, by the allegations of "grooming" in *Ramsbottom*). But the inquiry remains the same: Did the victim receive travel, food, or lodging "on account" of the sex? Was the former conditioned on the sex? Was the former provided as a form of remuneration for the sex? As in *Ramsbottom*, *Reed*, *Kolbek*, and *Vang*, the Government alleges no such commercial exchange, and thus fails to allege a central element of a "commercial sex act"-based sex trafficking offense. The Government alleges no such commercial exchange, and therefore—as in *Ramsbottom*, *Reed*, *Kolbek*, and *Vang*—fails to allege a central element of a "commercial sex act"-based sex trafficking offense.

### C.    The Government's Interpretation of § 1591(a) is Contrary to Legislative Intent and Would Effectively Federalize Any Type of Date Rape

Not only does the Indictment run afoul of the plain text of 18 U.S.C. § 1591, it is antithetical to Congress's intent behind the statute. Legislative history for 18 U.S.C. § 1591, enacted as part of the TVPA, makes clear that Congress intended to bring federal law enforcement power to the "modern manifestation of slavery," not date rape, as the Government alleges here. 22 U.S.C. § 7101(a); *see United States v. Walls*, 784 F.3d 543, 548 (9th Cir. 2015) (TVPA "criminalizes and attempts to prevent slavery, involuntary servitude, and human trafficking for commercial gain.").

Congress expressly found that the "sex industry," which the statute seeks to redress, "involves sexual exploitation of persons . . . involving activities related to prostitution, pornography, sex tourism, and other commercial sexual services." *Id.* § 7101(b)(2). In defining the conduct targeted by the statute, Congress explained: "Traffickers primarily target women and girls, who are disproportionately affected by poverty, the lack of access to education, chronic

16

unemployment, discrimination, and the lack of economic opportunities in countries of origin" whereby "[t]raffickers lure women and girls into their networks through false promises of decent working conditions at relatively good pay as nannies, maids, dancers, factory workers, restaurant workers, sales clerks, or models." *Id.* § 7101(b)(4).

In contrast, the Government's overly broad interpretation of § 1591(a) would extend the statute's coverage to include any type of date rape. If a perpetrator met a woman on a dating app, invited her to dinner, paid for the dinner, and then sexually assaulted her later that night, it would constitute sex trafficking under the Government's theory. This simply does not square with the letter of the statute or Congress's intent in enacting 18 U.S.C. § 1591 as part of the TVPA. Tal is not alleged to have used "force, fraud, or coercion" to compel any women to engage in prostitution, involuntary servitude, or any other commercial act. Nor does the Government allege that he or anyone else acted for or received commercial gain. It alleges only that the victims received travel, food, or lodging before they were raped, and that a *federal* crime occurred for that reason. Inviting a woman and her friends to a beach house for a single weekend—the general fact pattern for each of the Statutory Trafficking Counts—does not come close to meeting the type of commercial trafficking that the statute intends to criminalize.

Any ambiguity about the reach of the TVPA, must be resolved against so extending the statute. When interpreting the federal arson statute to cover "only property currently used in commerce or in an activity affecting commerce," the Supreme Court noted that to do otherwise would "make virtually every arson in the country a federal offense." *Jones v. United States,* 529 U.S. 848, 859 (2000). In so reasoning, the Court drew on a long line of authority counseling against reading federal criminal statutes to "render [] 'traditionally local criminal conduct . . . a matter for federal enforcement." *Id.* at 858 (quoting *United States v. Bass*, 404 U.S. 336, 350

(1971)).  This is a line the Court has since extended.  *See Bond v. United States*, 572 U.S. 844, 860 (2014) ("insist[ing] on a clear indication that Congress meant to reach purely local crimes, before interpreting the statute's expansive language in a way that intrudes on the police power of the States").

This Court should resist the Government's invitation to stretch the sex trafficking statute into territory Congress never contemplated.  Further, the Court should not accept the Government's overreach in charging this case—which was premised on a tainted investigation, the result of which was not a fact-driven inquiry but a reactive and highly coordinated campaign shaped by media narratives and civil litigation interests.  Sex trafficking, like child pornography, "is so repulsive a crime that those entrusted to root it out may, in their zeal, be tempted to bend or even break the rules."  *United States v. Coreas*, 419 F.3d 151, 151 (2d Cir. 2005).

The Indictment in this case speaks at length about how Defendants used "the promise of luxury experiences, travel, and accommodations" to lure victims to locations where they were forcibly raped. What it does not allege, and cannot, is that these were "commercial sex acts," involving some exchange of material benefits for sex. Its failure to do so is fatal to the sex trafficking counts in this case and requires that they be dismissed.

## II.   THE COURT SHOULD DISMISS THE SEX TRAFFICKING COUNTS FOR LACK OF SPECIFICITY (COUNTS ONE, TWO, THREE, FIVE, SIX, SEVEN, AND EIGHT)

An independent reason for dismissing the sex trafficking counts is their wholly inadequate specification of the offenses alleged to have occurred. The U.S. Constitution commands that the Indictment must "fulfill the functions of notifying the defendant of the charges against him and of assuring that he is tried on the matters considered by the grand jury." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000).  The Indictment has not done so here.  The Indictment fails to identify accusers, specific dates that Tal is alleged to have committed a crime, or provide any details beyond

generic statutory terms. The Court should dismiss these Counts pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(iii) for lack of specificity.

### A.     Applicable Law

Federal Rule of Criminal Procedure 7(c)(1) requires, among other things, that an indictment contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." This requirement performs three constitutionally required functions: (i) it fulfills the Sixth Amendment right "to be informed of the nature and cause of the accusation;" (ii) it prevents a person from being subject to double jeopardy as required by the Fifth Amendment; and (iii) it serves the Fifth Amendment protection against prosecution for crimes based on evidence not presented to the grand jury. *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999); *see also United States v. Silverman,* 430 F.2d 106, 110 (2d Cir. 1970) (listing these three functions), *modified,* 439 F.2d 1198 (2d Cir.1970), *cert. denied,* 402 U.S. 953, 91 S. Ct. 1619, 29 L.Ed.2d 123 (1971). To accomplish this, the indictment must "contain some amount of factual particularity," *Walsh*, 194 F.3d at 45, and also "serve[] [the] important corollary purpose" of "inform[ing] the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had." *Russell v. United States*, 369 U.S. 749, 768 (1962) (internal quotation marks and citations omitted).

Courts have recognized that there are "limitations" to the oft-cited proposition that an indictment that merely tracks statutory language is sufficient. *Pirro*, 212 F.3d at 93; *United States v. Resendiz-Ponce*, 549 U.S. 102, 109 (2007) ("[T]here are crimes that must be charged with greater specificity."). An indictment must not only allege the essential elements of the offense, but it must also contain sufficient factual detail that "apprises the defendant of what he must be prepared to meet." *Cochran v. United States*, 157 U.S. 286, 290 (1895); *see also United States v.*

19

*Giovanelli*, 464 F.3d 346, 352 (2d Cir. 2006) (defendant raised specificity challenge in terms of "due process and vagueness"). Where the statutory terms are "generic," descending into particulars is required to inform the accused of the specific offense. *Id.*; *Russell*, 369 U.S. at 765; *see also United States v. Urso*, 369 F. Supp. 2d 254, 267 (E.D.N.Y. 2005) (each allegation, read in context of the whole indictment, must be "pled with sufficient factual particularity").

### B.    The Statutory Trafficking Counts Lack Specificity

With respect to the Statutory Trafficking Counts (Two, Three, Five, Six, Seven, Eight), the Indictment does nothing more than parrot the statutory text.  Without constitutionally-required specificity, these counts should be dismissed. The Indictment fails to provide any particulars that would give Tal constitutionally adequate notice of the sex trafficking counts.  For example:

- None of the Statutory Trafficking Counts provide any specificity regarding the means by which Tal "did recruit, entice, harbor, transport, provide, obtain, and maintain" any of the victims.

- The Statutory Trafficking Counts rely on unspecified and conclusory allegations of force, fraud, or coercion.

- The Statutory Trafficking Counts fail to provide any specificity as to the nature of the alleged commercial sex acts, who performed them, what value was given on account of them, and to whom it was given.

- The Statutory Trafficking Counts fail entirely to specify where the commercial sex acts allegedly occurred, other than "in the Southern District of New York and elsewhere."

Moreover, the Indictment fails to provide adequate dates for any of the alleged conduct. The Indictment provides broad date ranges for each of the Statutory Trafficking Counts: "in or about July 2011" (Count Two), "in or about September 2016" (Count Three), "in or about May 2009" (Count Five), "in or about June 2009" (Counts Six and Seven), and "in or about August 2014" (Count Eight).  While courts have upheld this level of specificity, it is particularly problematic in this case because, unlike nearly all other sex trafficking indictments, the alleged

trafficking amounts to singular incidents of sexual assault for each victim. This stands in stark contrast to other indictments we have seen, which charge sex trafficking as a continued course of conduct, most often comprised of forced prostitution with numerous commercial sex acts involving the same victim, and typically involving an ongoing relationship between the defendant and victim. *See, e.g.*, *United States v. Melendez-Rojas*, No. 22-333, 2024 WL 1881491, at *1 (2d Cir. Apr. 30, 2024), *cert. denied sub nom. Melendez-Rojas v. United States*, 145 S. Ct. 316 (2024) (use of "fraud, brutal beatings, threats of violence, and psychological manipulation to force the victims into prostitution, an arrangement from which Defendants benefitted financially").

The Government also cannot rely on the kitchen-sink allegations provided under Count One of the Indictment to save the conclusory Statutory Trafficking Counts. While the allegations under Count One give generalized descriptions of a variety of conduct, there is nothing connecting these general descriptions to the remaining counts. These details do nothing to advance the Government's obligation to provide notice of the charges. And because the crimes alleged stem from vaguely stated, non-criminal acts—including attending social events, traveling domestically and internationally, and meeting women at bars, nightclubs, and on dating applications—it is impossible to know what acts Tal needs to defend against at trial and properly investigate.

The flaws in the Statutory Trafficking Counts are further compounded by the decision to allege that this unspecified conduct violated both prongs of 18 U.S.C. § 1591(a) (*see, e.g.,* ECF 63 ¶ 8 (alleging violation of 18 U.S.C. § 1591(a)(1) and 1591(a)(2))). The inclusion of both subsections, each of which exposes a defendant to liability under different types of conduct, exacerbates the lack of specificity contained in the other portions of the Indictment, making it impossible for Tal to prepare his defense. *See, e.g.*, *Cochran*, 157 U.S. at 290 (indictment must contain sufficient factual detail that "apprises the defendant of what he must be prepared to meet");

*United States v. Brozyna*, 571 F.2d 742, 746 (2d Cir. 1978) (indictment should be sufficiently clear so that defendant "will not be misled while preparing his defense").

### C.    The Conspiracy to Commit Sex Trafficking Count Lacks Specificity

Like the Statutory Trafficking Counts, the conspiracy count is facially inadequate.  The Indictment fails to identify when the unlawful agreement was made; where it was made; who was part of the conspiracy (though the Indictment makes vague reference to "others"); and what specifically the agreement entailed.  Moreover, the only dates referenced in Count One are the years 2009 to 2021, often combined with phrases such as "from at least in or about" and "up to and including."[9]  ECF 63 ¶¶ 4, 7.

The Government's voluminous discovery—by the government's estimate, 10 terabytes— does not shed much more light on the nature of the Government's proof or the specifics of the alleged conduct, including when and where the alleged commercial sex acts took place.[10]  The Government has provided folders with limited discovery from its witnesses, however, it has failed to inform us which witness folders correspond with which (if any) victims in the indictment.  The Government has also failed to provide the metadata associated with many of these materials, which would shed light on relevant dates. Without this, the discovery is too voluminous to properly put Tal on notice of when and where the alleged trafficking took place or who was allegedly present, nor can he identify relevant witnesses or documents that he may wish to obtain to prepare his defense.

---

[9] The Statutory Trafficking Counts include the year and month of alleged conduct.  However, the Conspiracy to Commit Sex Trafficking claim is not limited to these accusers.  *See, e.g.,* ECF 63 ¶ 7 ("including but not limited to Victim-1, Victim-2 . . .").

[10] To the contrary, the Government has ignored repeated requests to provide Tal with the metadata for materials collected from witnesses.

The Indictment's barebones recitations deprive Tal of fair notice regarding his charges and strip him and the Court of the confidence that "the government's case at trial will reflect the evidence presented to the grand jury." *See Urso*, 369 F. Supp. 2d at 267. These counts should be dismissed for a lack of specificity in violation of Rule 12(b)(3)(B)(iii) and the Fifth and Sixth Amendments.

## III. THE COURT SHOULD DISMISS THE INDUCEMENT COUNTS BECAUSE THEY FAIL TO DEFINE UNLAWFUL SEXUAL ACTIVITY (COUNTS FOUR AND NINE)

To prove a violation of 18 U.S.C. § 2422(a), it is sufficient to show that the defendant intended to persuade, induce, entice, or coerce the victim to travel to engage in "sexual activity for which any person can be charged with a criminal offense." Merely pleading that the defendant intended to induce travel for "illegal sexual activity" is not enough. An indictment must allege with specificity the "*particular* sexual activity for which any person can be charged with a criminal offense." *United States v. Thompson*, 141 F. Supp. 3d 188, 195-96 (E.D.N.Y. 2015), *aff'd*, 896 F.3d 155 (2d Cir. 2018) (emphasis added). *Id.* Generally, courts hold that "if a statute makes it a crime to engage in certain conduct 'contrary to law,' it is not enough simply to cite that statute and recite in the pleading that the act was contrary to law—the pleading must show what other law was violated, either by citation to the other statute or by sufficient factual allegations." *Id.* (quoting Charles Alan Wright, et. al., 1 Fed. Prac. & Proc. Crim. § 124 (4th ed. 2014); s*ee United States v. Pirro,* 212 F.3d 86, 93 (2d Cir. 2000) ("Where an indictment charges a crime that depends in turn on violation of another statute, the indictment must identify the underlying offense.").

Here, the Indictment states that the "unlawful sexual activity" is in violation of four distinct sections of the New York Penal Law—P.L. §§ 130.35, 130.30, 130.25, and 130.52. Each of these statutes has multiple subsections, which vary dramatically and criminalize materially different conduct. As just one example, Rape in the First Degree, Penal Law § 130.35, alone has 12 total

subsections covering a range of criminal conduct, including: rape by forcible compulsion (P.L. § 130.35(1)(a)), sexual contact with a person who is unconscious (P.L. § 130.35(1)(b)), sexual contact of a person less than eleven years old  (P.L. § 130.35(1)(c)), and sexual contact of a person less than thirteen years old where the actor is eighteen years old or greater (P.L. § 130.35(1)(d)).

The Indictment makes no attempt to specify which subsections are applicable.  As a result, the scope of possible conduct is so broad, it is the functional equivalent of pleading "any sexual activity for which a person could be charged with a criminal offense," which is deficient because it encompasses a multitude of state and federal crimes.  *Thompson,* 141 F. Supp. 3d at 197 (E.D.N.Y. 2015) (dismissing charges); *see also United States v. Lanzon*, No. 06-20783-CR, 2008 WL 3271092, at *1 (S.D. Fla. Aug. 8, 2008) (dismissing indictment charging 18 U.S.C. § 2422 that cited Fla. Stat. § 800.04 because that statute "codifies multiple types of prohibited conduct within different subsections"); *United States v. Peel*, 14–CR–106, 2014 WL 3057523 (E.D. Cal. July 7, 2014) (requiring charges under 18 U.S.C. §§ 2422 and 2423 to cite a specific statute or describe particular sexual activity).  This alone warrants dismissal of the Inducement Counts.  *Id.*

## IV.    COUNTS THREE AND FOUR—WHICH RELATE TO VICTIM 2—MUST BE DISMISSED FOR LACK OF SUFFICIENT EVIDENCE

Dismissal of Counts Three and Four, each relating to Victim 2, is warranted as a matter of law because the undisputed facts—which the government has now proffered numerous times—do not establish that Tal violated 18 U.S.C. § 1591 or 18 U.S.C. § 2422.

Federal Rule of Criminal Procedure 12(b)(2) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue."  Where, as here, the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial, a district court may appropriately address the sufficiency of the evidence on a pretrial motion to dismiss.  *Id.*; *see also United States v. Gotti*, 457 F. Supp.

2d 411, 421 (S.D.N.Y. 2006) (dismissing the indictment and determining, as a matter of law, that the elements of the crime had not been met based on the government's full proffer of the evidence at two previous trials).  Additionally, where the facts of the prosecution's case are not in dispute, a pretrial determination whether to dismiss the indictment is appropriate.  *Gotti*, 457 F. Supp. 2d at 61; *see also United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988) (affirming district court's dismissal of the indictment because "the government's characterization of the undisputed facts did not constitute a violation of any statute").

In addition to the Indictment, the Government has proffered facts about Victim-2's allegations numerous times: at Tal's December 13, 2024 detention hearing in the Southern District of Florida, *see* Decl. Ex. 17, at 10:24-12:17; at Alon Alexander's December 30, 2024 detention hearing in the Southern District of Florida, *see* Decl. Ex. 18-1, at 13:14-15:6; at Defendants' combined detention hearing on January 15, 2025, in the Southern District of New York, *see* Decl. Ex. 19, at 79:11-22, 80:17-81:16; and in its detention letter, ECF 4, at 4-6, which the government previously told the public included "very specific details" about allegations concerning Victim-1 and Victim-2, "not only leading up to the incident that we allege but also following the incident." *See* n. 4, *supra*.  Whether the evidence is sufficient to sustain a conviction under 18 U.S.C. § 1591 or 18 U.S.C. § 2422(a) is ripe for this Court to consider pretrial.

According to these proffers, Victim-2 and her friend, Individual-1, allegedly matched with Tal's brothers, Alon and Oren Alexander, on a dating application.[11]  Then, the Government alleges that "Alon and Oren invited Victim-2 and Individual-1, who were located in Illinois, to travel to stay with them in the Hamptons over Labor Day weekend and offered to pay for flights for Victim-

---

[11] ECF 4, at 4; Decl. Ex 17, at 10:14-17; Decl. Ex 18-2, at 10:2-11:2.

2 and Individual-1.   Individual-1 and Victim-2 agreed to go."[12]   Subsequently, Defendants purportedly messaged each other about trying to have an orgy with the women.[13]   During the weekend, as the Government proffered, Oren Alexander allegedly sexually assaulted Victim-2.[14] The Government has never referenced, nor will it, Tal's involvement in any sexual assault that weekend.[15]

To prevail on either count, the Government must prove that Tal knowingly induced, enticed, or persuaded Victim-2 to travel from Illinois to New York.   Count Three and Count Four each require an additional element: Count Three requires proof that Tal did so while knowing or recklessly disregarding that force, threats of force, fraud, or coercion would be used to cause her to engage in a commercial sex act.   18 U.S.C. § 1591(a).   Meanwhile, Count Four requires that Tal intended to engage and attempted to engage in unlawful sexual activity with Victim-2.   18 U.S.C. § 2422(a); ECF 63 ¶ 10.   For the following reasons, the Government has adequately alleged neither.

*First*, by the Government's own proffer, Tal never met or communicated with Victim-2 (or Individual-1) prior to her arrival in the Hamptons.

*Second*, the Government cannot prove a necessary element of either count—that Tal knowingly took action to cause the victim to travel.   By the time Tal spoke with his brothers about

---

[12] ECF 4, at 4-5; *see also* Decl. Ex 17, at 11:3-8; Decl. Ex 18-1, at 13:18-23.

[13] ECF 4, at 4; Decl. Ex 17, at 11:14-20; Decl. Ex 18-1, at 14:3-8; Decl. Ex 18-3, at 88:3-7 ("Their explicit agreement in advance was to orgy the women.").

[14] ECF 4, at 5; Decl. Ex 17, at 12:5-17; Decl. Ex 18-1, at 14:16-15:6; Decl. Ex 19, at 79:18-22.

[15] The Government gratuitously included that on an unspecified date, "around that same time," Tal exchanged messages with a party promoter to arrange for "hot" women to stay at the Hamptons house.   *See* Decl. Ex 18-1, at 14:9-11; ECF 4 at 4-5.   The Government does not allege that these messages relate to Victim-2.   To the contrary, Tal "was engaged in communications with a promoter **to make sure that there were other** hot girls present," confirming that this conversation had nothing to do with Victim-2.   *Id.* at 88:8-10 (emphasis added).

an orgy, Victim-2 and Individual-1 had already agreed to travel to the Hamptons (*i.e.*, been "persuaded, induced or enticed"). *See* ECF 4, at 4.

*Third*, as it relates to Count Four, "a *significant or motivating purpose* of encouraging [Victim-2] to travel across state lines" must be that she would engage in illegal sexual activity. *United States v. Maxwell*, No. 20-CR-330, 2021 WL 5999414, at *9 (S.D.N.Y. Dec. 18, 2021) (emphasis in original). At best, the Government proffered evidence that Tal and his brothers were planning an "orgy," and consensual group sex is not a crime.

The Government's own facts proffered to Defendants and the District Court simply do not conform to the allegations in the Indictment. Accordingly, Counts Three and Four must be dismissed as a matter of law.

## <u>CONCLUSION</u>

For the foregoing reasons, Tal respectfully requests that this Court dismiss the Superseding Indictment in its entirety with prejudice and grant additional relief that the Court deems just and proper.

Dated:     New York, New York                Respectfully submitted,
           June 9, 2025

                                             **WALDEN MACHT HARAN & WILLIAMS LLP**

                               By:     /s/ *Milton L. Williams*
                                       _____
                                       Milton L. Williams
                                       Deanna M. Paul
                                       Alexander Kahn
                                       250 Vesey Street, 27th Floor
                                       New York, New York 10281
                                       Tel: (212) 335-2963
                                       mwilliams@wmhwlaw.com
                                       dpaul@wmhwlaw.com
                                       akahn@wmhwlaw.com

                                       *Attorneys for Defendant Tal Alexander*