# EXHIBIT 32

AO 93C (08/18) SDNY Rev. Warrant by Telephone or Other Reliable Electronic Means ❒ Original ❒ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
432 Park Avenue, [redacted] New York, NY 10022 and Any Closed Containers/Items Contained Therein

**24 MAG 4233**
Case No.

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Southern District of New York *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

The search and seizure are related to violation(s) of *(insert statutory citations)*:

Title 18, United States Code, Sections 1591(a) and (b) (sex trafficking by force, fraud or coercion), 1591(d), (obstruction of a violation of Section 1591), 1594 (conspiracy to commit sex trafficking by fraud, force, or coercion), and 2422 (coercion and enticement)

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment A

**YOU ARE COMMANDED** to execute this warrant on or before December 22, 2024 *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m. ❒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Duty USMJ .
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❒ for ____ days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of ________ .

Date and time issued: 12/08/2024 4:12 p.m.

*Judge's signature*

City and state: New York, NY

Hon. Henry J. Ricardo, USMJ
*Printed name and title*



ATTORNEYS POSSESSION ONLY

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

Print | Save As... | Reset

## ATTACHMENT A

### I. Premises to be Searched—Subject Premises

The premises to be searched (the "Subject Premises") is described as follows, and include all locked and closed containers found therein:

The Subject Premises is particularly described as [redacted]n the building located at 432 Park Avenue, New York, NY 10022, which is a skyscraper residential building located between East 56th and East 57th Streets, just west of Park Avenue in Manhattan. The entrance to 432 Park Avenue is located on East 56th Street, west of the intersection with Park Avenue. Real estate listing records for the Subject Premises show that the apartment is accessed via a private entrance from an elevator landing. Pictures below show 432 Park Avenue, the entrance to the building, and the layout of the apartment as detailed in the real estate listing.








ATTORNEYS POSSESSION ONLY




## II. Items to Be Seized

### A. Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from the Subject Premises consist of the following evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1591(a) and (b) (sex trafficking by force, fraud or coercion), 1591(d) (obstruction of a violation of Section 1591), 1594 (conspiracy to commit sex trafficking by fraud, force, or coercion), and 2422 (coercion and enticement) (collectively, the "Subject Offenses") described as follows:

1. Evidence of the locations of ALON ALEXANDER, OREN ALEXANDER, and TAL ALEXANDER and the identities and locations of co-conspirators, victims, and witnesses involved in or related to the Subject Offenses.

2. Evidence concerning occupancy or control of the Subject Premises, including without limitation, rental agreements, payment records, utility and telephone bills, mail envelopes, addressed correspondence, diaries, statements, identification documents, address books, telephone directories, and keys.

3. Videos, photographs, and audio recordings, related to the Subject Offenses.

4. Calendar or other scheduling information relating to the Subject Offenses, including but not limited to travel itineraries, flight information, hotel records, home rental records, expense reports, receipts, ledgers, and meetings with co-conspirators, witnesses, and victims related to the Subject Offenses.

5. Evidence, including documents, spreadsheets, and ledgers, identifying and/or tracking co-conspirators, victims, and witnesses of the Subject Offenses.





ATTORNEYS POSSESSION ONLY

6. Evidence concerning identities and locations of victims of the Subject Offenses, including communications with victims, photos, videos, or other attachments, and address book information.

7. Evidence concerning identities and locations co-conspirators in the Subject Offenses, including communications with co-conspirators, photos, videos, or other attachments, and address book information.

8. Communications of any kind relating to the Subject Offenses, including but not limited to text, data, chat, email messages, or messages on social media or messaging applications saved in electronic devices (collectively, "messages"), any attachments to those messages, such as digital photographs and videos, and any associated information, such as the phone number or user ID from which the message was sent.

9. Bank records, checks, credit card bills, account information, and other financial records relating to the Subject Offenses.

10. Travel records, including flight information, itineraries, and hotel records, relating to the Subject Offenses.

11. Records related to the provision of travel, lodging, tickets, meals, and other gifts used to commit the Subject Offenses.

12. [redacted]

13. Evidence of the physical location of conspirators and victims during the planning and commission of the Subject Offenses, including but not limited to historical location data, including GPS data on electronic devices relating to the Subject Offenses (including but not limited to travel and meeting locations related to illicit sexual activity).

14. Evidence relating to the procurement and use of controlled substances and alcohol in connection with the Subject Offenses.

15. Any items or records, including literature, relating to the use of computers, technology, or the creation and/or destruction of electronic content. This includes, but is not limited to, evidence of counter-forensic programs (and associated data) that are designed to eliminate data from computer devices, storage media, and related electronic equipment.

16. Evidence of attempts to destroy evidence, intimidate witnesses, or otherwise obstruct the investigation of the Subject Offenses.

17. Evidence of the locations of other evidence of the Subject Offenses, including evidence concerning any online accounts used, owned, or controlled by TAL ALEXANDER, including any bank or financial accounts, or any electronic devices where evidence falling within the foregoing categories could be stored, including any passwords or encryption keys needed to access such evidence.





ATTORNEYS POSSESSION ONLY

**B. Search and Seizure of Electronically Stored Information**

The items to be seized from the Subject Premises also include any computer devices and storage media that may contain any electronically stored information falling within the categories set forth in Section II.A of this Attachment above, including, but not limited to, desktop and laptop computers, disk drives, modems, thumb drives, personal digital assistants, smart phones, digital cameras, and scanners (the "Subject Devices"). Evidence to be seized from the Subject Devices, in addition to the evidence described in Section II.A, includes evidence concerning the identity or location of the owner(s) or user(s) of the Subject Devices, including at the time the records and items described in this warrant were created, edited, or deleted, such as logs, address books, saved usernames and passwords, documents, photographs, videos, and browsing history.

In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

Included within the items to be seized from the Subject Premises are:

1. Any items or records needed to access the data stored on any seized or copied computer devices or storage media, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2. Any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3. Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied computer devices or storage media.

**C. Unlocking the Subject Devices**

During the execution of the warrant, law enforcement personnel are authorized to obtain from TAL ALEXANDER the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any electronic device seized pursuant to this warrant, including to (1) press or swipe the fingers (including thumbs) of TAL ALEXANDER to the fingerprint scanner of the device(s); (2) hold the device(s) in front of the face of TAL ALEXANDER to activate the facial recognition feature; and/or (3) hold the device(s) in front of the face of TAL ALEXANDER to activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

**D. Review of ESI**

Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant.





ATTORNEYS POSSESSION ONLY

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Sections II.A and II.B of this Attachment. However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.





ATTORNEYS POSSESSION ONLY

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

432 Park Avenue, Apartment [redacted], New York, NY 10022 and Any Closed Containers/Items Contained Therein

**24 MAG 4233**
Case No.

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Please see Attached Affidavit and its Attachment A

located in the Southern District of New York, there is now concealed *(identify the person or describe the property to be seized)*:

Please see Attached Affidavit and its Attachment A

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
| --- | --- |
| Title 18, United States Code, Sections 1591(a), (b), (d); 1594; 2422 | Sex trafficking by force, fraud or coercion; obstruction of a violation of Section 1591; Conspiracy to commit sex trafficking by fraud, force, or coercion; and coercion and enticement |

The application is based on these facts:

Please see Attached Affidavit and its Attachment A

☑ Continued on the attached sheet.

☐ Delayed notice of ______ days *(give exact ending date if more than 30 days:* ____________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Justine Atwood, with permission
*Applicant's signature*

Justine Atwood, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means).*

Date: 12/08/2024

*Judge's signature*

City and state: New York, NY

Hon. Henry J. Ricardo, USMJ
*Printed name and title*

Print | Save As... | Attach | Reset

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**24 MAG 4233**

In the Matter of the Application of the United States Of America for a Search and Seizure Warrant for the Premises Known and Described as 432 Park Avenue, [redacted], New York, NY 10022 and Any Closed Containers/Items Contained Therein, USAO Reference No. 2024R00643

**TO BE FILED UNDER SEAL**

**Agent Affidavit in Support of Application for Search and Seizure Warrant**

SOUTHERN DISTRICT OF NEW YORK) ss.:

Justine Atwood, being duly sworn, deposes and says:

## I. Introduction

### A. Affiant

1. I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") since June 6, 2021. I am currently assigned to the Child Exploitation, Human/Sex Trafficking Task Force in FBI's New York Field Office, which investigates child exploitation, human trafficking and sex offenses, among other offenses. During my tenure as a Special Agent with the FBI, I have conducted and participated in numerous investigations of sex trafficking, the sexual exploitation of women and children, coercion and enticement, Mann Act, Travel Act, and other related offenses. I have participated in obtaining and executing search warrants, including warrants to search premises, warrants for electronic communications, and warrants for cellphone location information. Over the course of the investigations I have been involved in, I have become familiar with the ways in which individuals engaged in criminal activity use electronic storage media in connection with these crimes, including to store documents, photographs, and other materials evidencing their involvement in such crimes. I have also received training regarding computer technology and the way electronic devices and email accounts are used to further criminal activity, including human trafficking, sexual violence, and other related offenses.





ATTORNEYS POSSESSION ONLY

2. I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises specified below (the "Subject Premises") for, and to seize, the items and information described in Attachment A. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**B. The Subject Premises**

3. The Subject Premises is particularly described as [redacted] in the building located at 432 Park Avenue, New York, NY 10022, which is a skyscraper residential building located between East 56th and East 57th Streets, just west of Park Avenue in Manhattan. The entrance to 432 Park Avenue is located on East 56th Street, west of the intersection with Park Avenue. Real estate listing records for the Subject Premises show that the apartment is accessed via a private entrance from an elevator landing. Pictures below show 432 Park Avenue, the entrance to the building, and the layout of the apartment as detailed in the real estate listing. TAL ALEXANDER, who has been indicted for sex trafficking by force, fraud, or coercion and conspiracy to commit sex trafficking by force, fraud, or coercion, rents and resides at the Subject Premises.





ATTORNEYS POSSESSION ONLY









### C. The Subject Offenses

4. For the reasons detailed below, I believe that there is probable cause to believe that the Subject Premises contains evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1591(a) and (b) (sex trafficking by force, fraud or coercion), 1591(d)





ATTORNEYS POSSESSION ONLY

(obstruction of a violation of Section 1591), 1594 (conspiracy to commit sex trafficking by fraud, force, or coercion), and 2422 (coercion and enticement) (collectively, the "Subject Offenses").

## II. Probable Cause

### A. Probable Cause Regarding the Commission of the Subject Offenses

Background of the Investigation and the Current Charges

5. Since approximately June 2024, the U.S. Attorney's Office for the Southern District of New York and the Federal Bureau of Investigation, Child Exploitation, Human/Sex Trafficking Task Force have been conducting a criminal investigation of ALON ALEXANDER ("ALON"), OREN ALEXANDER ("OREN"), and TAL ALEXANDER ("TAL") (collectively the "Alexander Brothers"), and others known and unknown, for their involvement in a long running conspiracy engaged in sex trafficking and coercion and enticement, among other offenses. As described herein, during the course of this conspiracy, the Alexander Brothers worked together and with each other's assistance to carry out and facilitate the offenses.

6. During the investigation, I and other law enforcement agents working with the FBI have interviewed dozens of victims of the Alexander Brothers who have described, in sum and substance, being sexually assaulted and raped by one or more of the Alexander Brothers. The dates of the attacks described by the victims date from approximately the early 2000s when the Alexander Brothers, and their victims, were still in high school, to as recently as 2021. The rapes described by the victims have occurred in, among other places, Florida, New Jersey, Massachusetts, Colorado, Manhattan, Long Island, and Israel. Many of the victims who have been raped by the Alexander Brothers have described experiences consistent with being drugged before they were assaulted. A copy of the affidavit I swore on August 29, 2024, in support of a warrant to search Facebook and Instagram accounts belonging to each of the Alexander Brothers (the "Prior Affidavit") is attached to this affidavit as Exhibit A and incorporated as if set forth again in

this affidavit. The Prior Affidavit describes in greater detail the accounts of many of the women who have been raped and assaulted by the Alexander Brothers. The Prior Affidavit does not describe all victim interviews that have been conducted by the FBI.

7. In addition to interviewing victims of the Alexander Brothers, I and other law enforcement agents working with the FBI have reviewed the contents of social media and electronic storage accounts belonging to each of the Alexander Brothers that are maintained by Meta (Instagram and Facebook accounts), Apple (iCloud accounts), and Raya (dating app accounts). The contents of these accounts were obtained pursuant to search warrants authorized by United States Magistrate Judges in the Southern District of New York. Pursuant to those warrants, law enforcement agents have reviewed or are in the process of reviewing records from the accounts used by the Alexander Brothers maintained by Meta, Apple, and Raya. Based on my familiarity with these service providers and their products, I am aware that the Alexander Brothers's accounts with Meta, Apple, and Raya are the types of accounts typically and regularly accessed from smartphones and computers.

8. On or about December 6, 2024, a grand jury sitting in the Southern District of New York returned a three-count indictment in case 24 Cr. 676 (the "Indictment") that charges the Alexander Brothers with committing the Subject Offenses. A copy of the Indictment is attached hereto and incorporated herein as Exhibit B. Specifically, the Indictment charges the following Offenses:

a. Count One charges all three Alexander Brothers—ALON ALEXANDER, OREN ALEXANDER, AND TAL ALEXANDER—in a conspiracy to commit sex trafficking from at least in or about 2010 to at least in or about 2021, in violation of 18 U.S.C. § 1594(c).





ATTORNEYS POSSESSION ONLY

b. Count Two charges TAL ALEXANDER with sex trafficking by fraud, force, and coercion, in or about July 2011, in violation of 18 U.S.C. § 1591(a) and (b)(1).

c. Count Three charges all three Alexander Brothers—ALON ALEXANDER, OREN ALEXANDER, AND TAL ALEXANDER—with sex trafficking by fraud, force, and coercion, in or about September 2016, in violation of 18 U.S.C. § 1591(a) and (b)(1).

The Alexander Brothers Recorded the Subject Offenses and Other Violent Sexual Assaults

9. As described above, during the investigation, the FBI has interviewed dozens of girls and women who were raped and sexually assaulted by the Alexander Brothers. Multiple of these victims have described that the Alexander Brothers video recorded the victims being sexually assaulted or that the victims learned about recordings of the Alexander Brothers committing sexual assaults. These descriptions include the following:

a. [redacted]

b. [redacted]





ATTORNEYS POSSESSION ONLY

c. [redacted]

d. [redacted]

e. [redacted]

10. In addition to information provided by victims, during the investigation of the Alexander Brothers, I have reviewed copies of digital photographs and videos recorded by OREN ALEXANDER that OREN saved to a computer maintained by his former real estate employer, and which were later obtained by the FBI. Among other files I have reviewed from these materials,

I have reviewed videos recorded in December 2013 that show OREN and ALON naked in a room with multiple naked women, engaging in various sex acts. Based on my review of the videos and from discussing the incident with one of the women depicted in the videos, I am aware that that [redacted]

The Alexander Brothers Used Electronic Communications to Commit the Subject Offenses

11. As described above, during the investigation of the Alexander Brothers, I have reviewed files from electronic accounts used by the Alexander Brothers, including from Meta (Instagram and Facebook accounts), Apple (iCloud accounts), and Raya (dating app accounts) that are accessible from mobile personal devices. From reviewing the contents of these electronic accounts, I am aware that the Alexander Brothers used these accounts, and therefore their phones, to plan, discuss, and carry out the Subject Offenses. For example:

a. [redacted]

i. In reviewing the contents of a Raya account that belongs to ALON ALEXANDER, I have reviewed messages between Victim-10 and ALON that were sent on or about August 28, 2016 and August 29, 2016. In substance, the communications show that ALON invited Victim-10 to the Hamptons for the upcoming Labor Day weekend at a home provided by ALON. After some back and forth, Victim-10 accepted the invitation to come to the Hamptons for the weekend. Victim-10 and ALON also discussed whether ALON would purchase Victim-10's flight from Chicago to New York and whether Victim-10 would bring a friend to the Hamptons for the weekend.

ii. In reviewing contents of an iCloud account that belongs to OREN ALEXANDER, I reviewed a group chat communication between OREN ALEXANDER, ALON ALEXANDER, and TAL ALEXANDER. In that communication thread, the following messages were sent on or about September 1, 2016, between 11:00 PM and 11:50 PM, during which the Alexander Brothers discussed purchasing and splitting flights for women with the goal of then "try[ing] to orgy then [sic] out.":[1]

ALON (11:04 PM): Are we booking flights? First 3 on left

ALON (11:12 PM): We split and try to orgy then out?

TAL (11:27 PM): For sure

TAL (11:27 PM): Last weekend

TAL (11:27 PM): Throw it up

ALON (11:39 PM): I agree. Oren?

OREN (11:50 PM): All 4? Why not

[1] Unless otherwise noted, times have been converted into in Eastern Time.

iii. As described in the Prior Affidavit, [redacted]

iv. From reviewing contents of an iCloud account that belongs to ALON ALEXANDER, I am aware that photographs taken on or about September 2, 2016 and September 3, 2016 that appear to depict Victim-9 and Victim-10 in the Hamptons are saved to the account. Also shown in the photographs with Victim-9 and Victim-10 are, among other people, CC-1, TAL ALEXANDER, and ALON ALEXANDER.[3]

v. From reviewing contents of an iCloud account that belongs to TAL ALEXANDER, I am aware that the same weekend that Victim-9 was sex trafficked in the Hamptons, TAL arranged for other women to be brought to the Hamptons home rented by the Alexander Brothers. The following messages were found in TAL's iCloud account and appear to be copies of a WhatsApp group message that were sent on or about August 31, 2016 around 8:20 PM. [redacted]

---

[2] [redacted]

[3] ALON ALEXANDER and OREN ALEXANDER are identical twins, and while I believe the photographs I have reviewed show ALON, they may show OREN.





ATTORNEYS POSSESSION ONLY

| | |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

b. While reviewing contents of an iCloud account that belongs to TAL ALEXANDER, I have reviewed copies of other messages sent on WhatsApp that show the Alexander Brothers used WhatsApp communications to commit the Subject Offenses.

i. I have reviewed the contents of a WhatsApp group chat that was used between September 2016 and October 2016 and had nine participants, including all three Alexander Brothers and a particular co-conspirator in the sex trafficking described in the messages ("CC-4"). The title of the group chat was "Lions in Tulum," and the messages begin less than two weeks after Victim-9 was sex trafficked and raped in the Hamptons. Using this WhatsApp chat, the participants discussed "imports" of women to Tulum for an upcoming trip and discussed, among other things, splitting the cost of lodging and flights for the women that they planned to "import" and providing drugs to the women that would make them more likely to engage in sex, including "coke, shrooms, and G." Below are select messages from that chat:





ATTORNEYS POSSESSION ONLY

*September 16, 2016*

| | |
|---|---|
| CC-4 (1:10 PM): | Put a pot together to bring chicks unless you want to bring your own. Then you don't have to throw down |
| CC-4 (1:13 PM): | I don't mind if you bring chicks. Up 2 you though. We have 35 rooms. Almost 20 are account for without any of your reservations yet. |
| ALON (1:13 PM): | Strong work so far. Keep itgoing |

*October 3, 2016*

| | |
|---|---|
| CC-4 (4:17 PM): | Going to start collecting for the pot to fly bitches down. |
| ALON (4:20 PM): | There should be a fee per bang and after bang |
| CC-4 (8:23 PM): | Starting to collect venmo for girls flights |
| OREN (8:23 PM): | O yea. What's the lineup. Need to pick winners. |
| OREN (8:24 PM): | Can't be sponsor girls like Isis |
| CC-4 (8:24 PM): | Lol. It's gonna be hard to get girls up to your standard |
| OREN (8:27 PM): | Just warn him ur boys are hungry |
| TAL (10:23 PM): | Girls look fresh |

*October 4, 2016*

| | |
|---|---|
| ALON (6:00 PM): | I think we should all bring chicks and not rely only on promoter since we never met the girls. We need fun girls with good attitude, I'm sure we all met many recently this summer. [redacted] I know you know some winners. |
| ALON (6:01 PM): | Hail mary pass. Should be overload. |
| ALON (6:07 PM): | I say yes chip in and yes bring others |
| CC-4 (6:07 PM): | I don't want anyone being upset if they don't run a 10 man train |

| | |
|---|---|
| ALON (6:07 PM): | I'm trying to cover all bases |
| CC-4 (6:12 PM): | I just need to handle drugs |
| TAL (6:12 PM): | Yes |
| CC-4 (6:12 PM): | I don't want X around too much |
| CC-4 (6:12 PM): | Nothing gets done with that |
| CC-4 (6:13 PM): | Coke, shrooms and G |
| CC-4 (6:13 PM): | X makes the girls wanna chase the fucking party |

*October 13, 2016*

| | |
|---|---|
| TAL (1:38 PM): | Photographers? Drugs? |
| CC-4 (1:50 PM): | All getting worked on |
| OREN (3:46 PM): | Are all girls getting shipped out on Sunday? |
| CC-4 (3: 48 PM): | Yeah |
| ALON (3:50 PM): | Nut returns end of trip |
| OREN (3:50 PM): | Just trying to make sure I get max returns. Was going to come for that Sunday night tax and make sure all girls make quota |
| CC-4 (3:50 PM): | Lol. The whole $500 dollars on a flight? |
| OREN (3:50 PM): | No free rides under my watch |
| OREN (3:51 PM): | That's more than most of us ever spent on girls. Just want to make sure we get a good ROI. |

ii. In reviewing a saved WhatsApp communication thread between TAL ALEXANDER and OREN ALEXANDER, I observed the following communications from August 24, 2018, made around 11:20 PM during which OREN ALEXANDER discussed his intent to have sex with a woman and that he needed to get "ambien and a condom":

OREN (11:14 PM): Can you clear the room for a bit





ATTORNEYS POSSESSION ONLY

| | |
|---|---|
| TAL (11:16 PM): | No |
| TAL (11:17 PM): | Grab another one no biggie |
| OREN (11:19 PM): | Bro it's killing my vibe. You should come handle it |
| OREN (11:19 PM): | So I can be smooth and just go in room |
| TAL (11:20 PM): | You still hungry after last night. I'm getting on a flight in 4 hours. Bargain with the guy behind the desk tell him you want an hourly rate |
| TAL (11:20 PM): | Crashing |
| OREN (11:20 PM): | He's not playing |
| OREN (11:20 PM): | Spending 550. Charging you for it |
| OREN (11:23 PM): | Need to get ambien and condom |
| OREN (11:23 PM): | What room is it |

iii. In reviewing a saved WhatsApp communication thread between TAL ALEXANDER and OREN ALEXANDER, I observed the following communications from February 17, 2021 made around 11:45 PM that related to TAL flying women to Tulum:

| | |
|---|---|
| TAL (11:44 PM): | [Attaches Instagram screenshot of two young women in bikinis] |
| TAL (11:44 PM): | Can I put these two girls in the quarantine room |
| TAL (11:44 PM): | If they act up I'll send them home |
| OREN (11:44 PM): | When |
| TAL (11:44 PM): | Tomorrow till Sun |
| OREN (11:45 PM): | Why? |
| TAL (11:46 PM): | Why not |
| TAL (11:46 PM): | I'm flying them in for tummy |
| TAL (11:46 PM): | Tulum |
| OREN (11:46 PM): | No need storing Trip rats |





ATTORNEYS POSSESSION ONLY

| | |
|---|---|
| OREN (11:46 PM): | They look like they live in Tulum |
| TAL (11:46 PM): | I'll put them in hotel |
| OREN (11:47 PM): | These girls are pros at trips don't need your help |

c. [redacted]





ATTORNEYS POSSESSION ONLY

[redacted] [redacted]

12. Based on public reporting, I am aware that in or about June 2024, civil lawsuits naming all three Alexander Brothers as defendants and alleging that the Alexander Brothers had raped and sexually assaulted victims were reported in the press. Since then, additional public reporting has detailed accounts of additional victims of the Alexander Brothers, beyond those victims that have filed lawsuits against the Alexander Brothers. During the review of ALON ALEXANDER's iCloud account, investigators have identified files saved by ALON that include files saved to the account that contain detailed personal and contact information for several victims who have sued ALON and OREN. The folder names in the files and the documents and records saved in the folders further indicate that the Alexander Brothers are actively collecting information related to victims and witness of the Subject Offenses beyond those victims that have sued the Alexander Brothers.

**B. Probable Cause Justifying Search of the Subject Premises**

13. Since approximately 2019, TAL ALEXANDER has resided at the Subject Premises. In a public Facebook post made on or about March 8, 2024, TAL wrote: "Five years ago I made a lifestyle decision to move into 432 Park Avenue. I had long admired the building as representing the pinnacle lifestyle and product in New York and believed centering myself on Billionaire's Row could elevate my business to new heights." A review of WhatsApp messages from TAL's iCloud confirms he resides in [redacted]. On November 6, 2018, TAL wrote to OREN, with whom he was living at the time that "Looks like we're moving. We move to [redacted] we're getting 300k commish and 100k in expenses."

14. In July 2021, TAL and ALON exchanged WhatsApp messages about TAL's apartment. ALON wrote, "Hey I'll be at your building tomorrow around 11 to leave my stuff change and going to office," "what apt again?" TAL responded "[redacted]"





ATTORNEYS POSSESSION ONLY

15. On or about November 27, 2024, the Honorable Barbara Moses, United States Magistrate Judge for the Southern District of New York, authorized warrants for historic and prospective cellphone location information for phone numbers belonging to each of the Alexander Brothers ("the November 27, 2024 Warrants"). I have reviewed the historic and real-time cellphone location data for the phone number bellowing to TAL ALEXANDER provided by AT&T pursuant to that warrant. The cellphone location data is consistent with TAL residing at the Subject Premises and spending the evenings at the Subject Premises.

16. Based on my training and experience, my participation in this investigation, and my conversations with other law enforcement officers, I know the following, among other things:

a. Individuals who commit crimes of sexual abuse and assault—particularly those who repeatedly commit such crimes—often retain information and objects relating to their victims. For example, perpetrators of rape, sexual assault, and sexual abuse often hold onto photographs of their victims, information about their victims, or other items (commonly referred to as "tokens" or "memorabilia") that remind the perpetrator of the victim and the sex offenses committed. As described above, during the investigation, the FBI has obtained and reviewed videos that OREN ALEXANDER saved to a work computer and which depict OREN and ALON engaging in sex acts with women—including at least one woman who has no memory of being recorded by the Alexander Brothers—and which offered access to the women in exchange for a flight.

b. Individuals who commit crimes involving victims, including crimes of sexual assault, will often retain information relating to the victims, such as photographs, videos, and personal identifying information, as leverage against the victims. For example, perpetrators of sexual assault or abuse may keep sexual and/or potentially embarrassing photographs or videos





ATTORNEYS POSSESSION ONLY

of a victim that can later be used to coerce or persuade the victim from reporting the assault so that the photograph, video, or other information will not be shared. As discussed above, multiple victims of the Alexander Brothers have reported being videoed during the sexual assaults committed by the Alexander Brothers. Multiple victims have also learned that the Alexander Brothers were showing and selling videos of the Alexander Brothers sexually assaulting other victims, and Victim-8 learned that others who had been raped by the Alexander Brothers were being threatened with the release of videos.

c. Individuals who commit sex trafficking and enticement offenses often pay for expenses related to the commission of the offenses, including among other things, by paying for travel and accommodations of the victims. Individuals committing these offenses will also collect payment from their co-conspirators for expenses arising from the commission of the offenses. Moreover, individuals committing these offenses may do so for financial gain, including direct payments from others for access to victims or indirect receipt of future business or other favors. As described above, the Alexander Brothers and their co-conspirators repeatedly arranged for travel and accommodations for their victims to facilitate the sex trafficking of the victims. The Alexander Brothers and their co-conspirators also exchanged money among themselves to finance the sex trafficking of victims, including for the procurement of drugs used to facilitate sex trafficking. [redacted]

**C. Probable Cause Justifying Search of ESI**

17. As described above, the Alexander Brothers used electronic devices to commit and facilitate the Subject Offenses, and search warrants for electronic accounts belonging to the Alexander Brothers have yielded evidence of the Subject Offenses. Evidence found in electronic storage and electronic accounts has included, among other things, photos and videos, as well as





ATTORNEYS POSSESSION ONLY

communications with both victims and co-conspirators of the Subject Offenses. Based on information obtained from the November 27, 2024 Warrants, I know that at least one electronic device associated with the phone number for Tal Alexander is expected to be located at the Subject Premises.

18. Searches of electronic accounts belonging to the Alexander Brothers have showed that the Alexander Brothers used their various electronic accounts to discuss, plan, and commit the Subject Offenses. Based on my familiarity with the services provided by Meta, Raya, and Apple, I am aware that those companies' software is accessible on cellphones and other devices that can access the internet. Accordingly copies of the data provided by those providers, which constitutes evidence of the Subject Offenses, is likely to be found on cellphones and other electronic devices used by the Alexander Brothers.

19. Additional evidence of Subject Offenses, beyond evidence found during the execution of search warrants of online accounts used by the Alexander Brothers, is likely to be found on cellphones and other electronic devices used by the Alexander Brothers. From reviewing the iCloud account of TAL ALEXANDER, I have identified that the Alexander Brothers frequently used WhatsApp to discuss, plan, and execute the Subject Offenses. Of the iCloud accounts belonging to the Alexander Brothers that I have reviewed to date, backed up WhatsApp messages have been found only on TAL's iCloud account, and many of those messages have been saved in a manner that has limited my ability to align message attachments with the corresponding messages. Searches of electronic devices used by the Alexander Brothers would capture all WhatsApp messages that are saved on the devices used by the Alexander Brothers, in addition to those backed up to iCloud, and would provide additional evidence of the Subject Offenses. Searches of electronic devices used by the Alexander Brothers would also yield copies of photos,

videos, electronic communications, and other electronic records stored in the electronic devices that relate to the Subject Offenses in addition to those saved by the Alexander Brothers to online accounts.

20. Photos, videos, documents, and other media that are evidence of the commission of the Subject Offenses are likely to be found on phones, computers, and other electronic storage devices kept by the Alexander Brothers. As described above, multiple of the Alexander Brothers's victims have described being recorded while they were assaulted, and the FBI has viewed additional photos and videos that OREN ALEXANDER saved to a work computer. Based on this, I believe that additional evidence of the Subject Offenses is likely to be found on computers, phones, and other electronic storage devices used by the Alexander Brothers.

21. Based on my training and experience, I also know that, where computers are used in furtherance of criminal activity, evidence of the criminal activity can often be found months or even years after it occurred. This is typically true because:

- Electronic files can be stored on a hard drive for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future.

- Even when a user does choose to delete data, the data can often be recovered months or years later with the appropriate forensic tools. When a file is "deleted" on a home computer, the data contained in the file does not actually disappear, but instead remains on the hard drive, in "slack space," until it is overwritten by new data that cannot be stored elsewhere on the computer. Similarly, files that have been viewed on the Internet are generally downloaded into a temporary Internet directory or "cache," which is only overwritten as the "cache" fills up and is replaced with more recently viewed Internet pages. Thus, the ability to retrieve from a hard drive or other electronic storage media depends less on when the file was created or viewed than on a particular user's operating system, storage capacity, and computer habits.

- In the event that a user changes computers, the user will typically transfer files from the old computer to the new computer, so as not to lose data. In addition, users often keep backups of their data on electronic storage media such as thumb drives, flash memory cards, CD-ROMs, or portable hard drives.





ATTORNEYS POSSESSION ONLY

22. In addition to there being probable cause to believe that computer devices will be found on the Subject Premises that contain evidence of the Subject Offenses, there is also probable cause to believe that these computers constitute instrumentalities of the Subject Offenses in that they were used to entice victims or coordinate with co-conspirators of the Subject Offenses.

23. Based on the foregoing, I respectfully submit there is probable cause to believe that ALON ALEXANDER, OREN ALEXANDER, and TAL ALEXANDER are engaged in the Subject Offenses and have committed those Subject Offenses together, and that evidence of this criminal activity is likely to be found in the Subject Premises and on computers and electronic media found in the Subject Premises. In particular, because the Alexander Brothers committed the Subject Offenses together, and with the assistance of each other on multiple occasions, there is probable cause that evidence relating to all three Alexander Brothers—ALON ALEXANDER, OREN ALEXANDER, and TAL ALEXANDER—will be found at the Subject Premises.

## III. Procedures for Searching ESI

### A. Execution of Warrant for ESI

24. Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant to search for and seize property "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information . . . for later review." Consistent with Rule 41, this application requests authorization to seize any computer devices and storage media and transport them to an appropriate law enforcement facility for review. This is typically necessary for a number of reasons:

- First, the volume of data on computer devices and storage media is often impractical for law enforcement personnel to review in its entirety at the search location.
- Second, because computer data is particularly vulnerable to inadvertent or intentional modification or destruction, computer devices are ideally examined in a controlled environment, such as a law enforcement laboratory, where trained personnel, using

specialized software, can make a forensic copy of the storage media that can be subsequently reviewed in a manner that does not change the underlying data.

- Third, there are so many types of computer hardware and software in use today that it can be impossible to bring to the search site all of the necessary technical manuals and specialized personnel and equipment potentially required to safely access the underlying computer data.

- Fourth, many factors can complicate and prolong recovery of data from a computer device, including the increasingly common use of passwords, encryption, or other features or configurations designed to protect or conceal data on the computer, which often take considerable time and resources for forensic personnel to detect and resolve.

**B. Review of ESI**

25. Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained therein for information responsive to the warrant.

26. In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses. Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by “opening” or reading the first few “pages” of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- “scanning” storage areas to discover and possibly recover recently deleted data or deliberately hidden files; and





ATTORNEYS POSSESSION ONLY

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of data potentially related to the subject matter of the investigation[4]; and
- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

27. Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant. Depending on the circumstances, however, law enforcement personnel may need to conduct a complete review of all the ESI from seized devices or storage media to evaluate its contents and to locate all data responsive to the warrant.

**C. Biometric Unlock**

28. Based on my training and experience, I know that electronic devices found on or in the Subject Premises (the "Subject Devices") may use biometric unlocking features, such as facial recognition unlocking.

29. The warrant I am applying for would permit law enforcement to compel TAL ALEXANDER to unlock Subject Devices belonging to him using the device's biometric features. I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These

[4] Keyword searches alone are typically inadequate to detect all relevant data. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.

biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. In order to activate this unlocking mechanism, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.

d. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric

features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

f. The passcode or password that would unlock a given device recovered during execution of the requested warrant likely will not be known to law enforcement. Thus, in attempting to unlock any such devices for the purpose of executing the search authorized by the requested warrant, it will likely be necessary to press the finger(s) of the user of the fingerprint reader, or hold the device in front of the face of the user, of any device capable of biometric unlocking. The Government may not otherwise be able to access the data contained on the Subject Devices for the purpose of executing the search authorized by this warrant.

g. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.

30. Due to the foregoing, if the Subject Devices may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to:

a. Press or swipe the fingers (including thumbs) of TAL ALEXANDER with respect to the Subject Devices, against the fingerprint scanner of the device, or





ATTORNEYS POSSESSION ONLY

b. Hold the Subject Devices up to the face of TAL ALEXANDER to activate any facial recognition features or iris recognition features.

31. Law enforcement officers will select which fingers to press to the Subject Devices. The warrant does not authorize law enforcement to compel TAL ALEXANDER to identify the specific biometric characteristics (including unique fingerprint(s) or other physical features) that may be used to unlock or access the Subject Devices.[5]

**D. Return of ESI**

32. If the Government determines that the electronic devices are no longer necessary to retrieve and preserve the data, and the devices themselves are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return these items, upon request. Computer data that is encrypted or unreadable will not be returned unless law enforcement

---

[5] In the course of my training and experience, I have become familiar with federal court decisions standing for the proposition that government agents may compel individuals to provide biometric data in order to effectuate a search of devices lawfully seized pursuant to a warrant. For example, in *In re Search Warrant Application*, 279 F. Supp. 3d 800, 801 (N.D. Ill. 2017), a district court in the Northern District of Illinois reversed a magistrate judge's decision that the Fifth Amendment's privilege against self-incrimination barred a portion of a search warrant that would have required "residents of a home to apply their fingers and thumbs (as chosen by government agents) to the fingerprint sensor on any Apple-made devices found at the home during the search." The district court noted that the Fifth Amendment "only prevents the government from compelling a person from being a 'witness' against himself" and that, since "[w]itnesses provide *testimony*, [ ] that is the forbidden compulsion; the government cannot force someone to provide a communication that is 'testimonial' in character." *Id.* at 803 (emphasis in original). On the other hand, "the Supreme Court has distinguished between compelling a communication versus compelling a person to do something that, in turn, displays a physical characteristic that might be incriminating." *Id.* (citing *United States v. Hubbell*, 530 U.S. 27, 34 (2000), and collecting cases). Applied in the context of biometric data, the court held that, especially where government agents select the fingers to be pressed on the Touch ID sensor, thereby eliminating the "need to engage the thought process of any of the residents at all in effectuating the seizure," "[t]he application of the fingerprint to the sensor is simply the seizure of a physical characteristic, and the fingerprint by *itself* does not communicate anything." Id. at 803-04 (emphasis in original). Recently, similar reasoning supported a search warrant that would compel biometric data not only from an individual's fingerprints but from his face and irises as well. *See In re Search of [Redacted Text]*, Case No. 18-SW-0122 (GMH), 2018 U.S. Dist. LEXIS 109572 (D.D.C. June 26, 2018).

personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

**IV. Conclusion and Ancillary Provisions**

33. Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.

34. In light of the confidential nature of the continuing investigation, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

/s/ Justine Atwood, with permission
Justine Atwood
Special Agent
FBI

Sworn to me by reliable electronic means
on December 8, 2024

HON. HENRY J. RICARDO
UNITED STATES MAGISTRATE JUDGE





ATTORNEYS POSSESSION ONLY

## ATTACHMENT A

### I. Premises to be Searched—Subject Premises

The premises to be searched (the "Subject Premises") is described as follows, and include all locked and closed containers found therein:

The Subject Premises is particularly described as [redacted] in the building located at 432 Park Avenue, New York, NY 10022, which is a skyscraper residential building located between East 56th and East 57th Streets, just west of Park Avenue in Manhattan. The entrance to 432 Park Avenue is located on East 56th Street, west of the intersection with Park Avenue. Real estate listing records for the Subject Premises show that the apartment is accessed via a private entrance from an elevator landing. Pictures below show 432 Park Avenue, the entrance to the building, and the layout of the apartment as detailed in the real estate listing.








## II. Items to Be Seized

### A. Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from the Subject Premises consist of the following evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1591(a) and (b) (sex trafficking by force, fraud or coercion), 1591(d) (obstruction of a violation of Section 1591), 1594 (conspiracy to commit sex trafficking by fraud, force, or coercion), and 2422 (coercion and enticement) (collectively, the "Subject Offenses") described as follows:

1. Evidence of the locations of ALON ALEXANDER, OREN ALEXANDER, and TAL ALEXANDER and the identities and locations of co-conspirators, victims, and witnesses involved in or related to the Subject Offenses.

2. Evidence concerning occupancy or control of the Subject Premises, including without limitation, rental agreements, payment records, utility and telephone bills, mail envelopes, addressed correspondence, diaries, statements, identification documents, address books, telephone directories, and keys.

3. Videos, photographs, and audio recordings, related to the Subject Offenses.

4. Calendar or other scheduling information relating to the Subject Offenses, including but not limited to travel itineraries, flight information, hotel records, home rental records, expense reports, receipts, ledgers, and meetings with co-conspirators, witnesses, and victims related to the Subject Offenses.

5. Evidence, including documents, spreadsheets, and ledgers, identifying and/or tracking co-conspirators, victims, and witnesses of the Subject Offenses.





ATTORNEYS POSSESSION ONLY

6. Evidence concerning identities and locations of victims of the Subject Offenses, including communications with victims, photos, videos, or other attachments, and address book information.

7. Evidence concerning identities and locations co-conspirators in the Subject Offenses, including communications with co-conspirators, photos, videos, or other attachments, and address book information.

8. Communications of any kind relating to the Subject Offenses, including but not limited to text, data, chat, email messages, or messages on social media or messaging applications saved in electronic devices (collectively, "messages"), any attachments to those messages, such as digital photographs and videos, and any associated information, such as the phone number or user ID from which the message was sent.

9. Bank records, checks, credit card bills, account information, and other financial records relating to the Subject Offenses.

10. Travel records, including flight information, itineraries, and hotel records, relating to the Subject Offenses.

11. Records related to the provision of travel, lodging, tickets, meals, and other gifts used to commit the Subject Offenses.

12. [redacted]

13. Evidence of the physical location of conspirators and victims during the planning and commission of the Subject Offenses, including but not limited to historical location data, including GPS data on electronic devices relating to the Subject Offenses (including but not limited to travel and meeting locations related to illicit sexual activity).

14. Evidence relating to the procurement and use of controlled substances and alcohol in connection with the Subject Offenses.

15. Any items or records, including literature, relating to the use of computers, technology, or the creation and/or destruction of electronic content. This includes, but is not limited to, evidence of counter-forensic programs (and associated data) that are designed to eliminate data from computer devices, storage media, and related electronic equipment.

16. Evidence of attempts to destroy evidence, intimidate witnesses, or otherwise obstruct the investigation of the Subject Offenses.

17. Evidence of the locations of other evidence of the Subject Offenses, including evidence concerning any online accounts used, owned, or controlled by TAL ALEXANDER, including any bank or financial accounts, or any electronic devices where evidence falling within the foregoing categories could be stored, including any passwords or encryption keys needed to access such evidence.





ATTORNEYS POSSESSION ONLY

### B. Search and Seizure of Electronically Stored Information

The items to be seized from the Subject Premises also include any computer devices and storage media that may contain any electronically stored information falling within the categories set forth in Section II.A of this Attachment above, including, but not limited to, desktop and laptop computers, disk drives, modems, thumb drives, personal digital assistants, smart phones, digital cameras, and scanners (the "Subject Devices"). Evidence to be seized from the Subject Devices, in addition to the evidence described in Section II.A, includes evidence concerning the identity or location of the owner(s) or user(s) of the Subject Devices, including at the time the records and items described in this warrant were created, edited, or deleted, such as logs, address books, saved usernames and passwords, documents, photographs, videos, and browsing history.

In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

Included within the items to be seized from the Subject Premises are:

1. Any items or records needed to access the data stored on any seized or copied computer devices or storage media, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2. Any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3. Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied computer devices or storage media.

### C. Unlocking the Subject Devices

During the execution of the warrant, law enforcement personnel are authorized to obtain from TAL ALEXANDER the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any electronic device seized pursuant to this warrant, including to (1) press or swipe the fingers (including thumbs) of TAL ALEXANDER to the fingerprint scanner of the device(s); (2) hold the device(s) in front of the face of TAL ALEXANDER to activate the facial recognition feature; and/or (3) hold the device(s) in front of the face of TAL ALEXANDER to activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

### D. Review of ESI

Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Sections II.A and II.B of this Attachment. However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

# Exhibit A
# Affidavit of Special Agent Justine Atwood Dated August 29, 2024 (the "Prior Affidavit")

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of A Warrant for All Content and Other Information Associated with Six Electronic Accounts Maintained at Premises Controlled by Meta Platforms, Inc., USAO Reference No. 2024R00643

**24 MAG 3152**

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

**Agent Affidavit in Support of Application for Three Search Warrants for Stored Electronic Communications**

STATE OF NEW YORK )
) ss.
COUNTY OF NEW YORK )

JUSTINE ATWOOD, being duly sworn, deposes and states:

## I. Introduction

### A. Affiant

1. I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") since June 6, 2021. I am currently assigned to the Child Exploitation, Human/Sex Trafficking Task Force in FBI's New York Field Office, which investigates child exploitation, human trafficking and sex offenses, among other offenses. During my tenure as a Special Agent with FBI, I have conducted and participated in numerous investigations of sex trafficking, the sexual exploitation of women and children, coercion and enticement, Mann Act, Travel Act, and other related offenses. I have participated in obtaining and executing search warrants, including warrants to search premises as well as warrants for electronic communications. I have reviewed and assisted in reviewing information obtained from electronic storage media of the type sought herein. Over the course of the investigations I have been involved in, I have become familiar with the ways in which individuals engaged in criminal activity use electronic storage media in



ATTORNEYS POSSESSION ONLY

connection with these crimes, including to store documents, photographs, and other materials evidencing their involvement in such crimes. I have also received training regarding computer technology and the way electronic devices and email accounts are used to further criminal activity, including human trafficking, sexual violence, and other related offenses.

**B. The Provider, the Subject Accounts, and the Subject Offenses**

2. I make this affidavit in support of an application for a search warrant pursuant to 18 U.S.C. § 2703 for all content and other information associated with the following Instagram and Facebook accounts maintained and controlled by Meta Platforms, Inc. ("Meta," or the "Provider"), headquartered at 1 Meta Way, Menlo Park, CA 94025:

| **Subject Account** | **Service** | **Account Identifier** | **Meta Target Number** | **Target Subject** |
|---|---|---|---|---|
| 1 | Instagram | [redacted] | [redacted] | ALON ALEXANDER |
| 2 | Instagram | [redacted] | [redacted] | OREN ALEXANDER |
| 3 | Instagram | [redacted] | [redacted] | TAL ALEXANDER |
| 4 | Facebook | [redacted] | [redacted] | ALON ALEXANDER |
| 5 | Facebook | [redacted] | [redacted] | OREN ALEXANDER |
| 6 | Facebook | [redacted] | | TAL ALEXANDER |

(each a "Subject Account," and collectively the "Subject Accounts"). The information to be searched is described in the following paragraphs and in Attachment A to each of the proposed warrants.

3. As detailed below, there is probable cause to believe that the Subject Accounts contain evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1962(d) (racketeering conspiracy); 1591 and 1594 (sex trafficking and sex trafficking conspiracy); 2421 (transportation to engage in illegal sexual activity); 2422 and 2423 (coercion and enticement,

and transportation of a minor to engage in illegal sexual activity); and 1512 and 1591(d) (obstruction of justice) and 2 (aiding and abetting) (the "Subject Offenses"). This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers, as well as my training and experience concerning the use of email in criminal activity. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**C. Services and Records of the Provider**

Instagram

4. I have learned the following about Instagram:

a. Instagram is a service owned by Meta, a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510. Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the target account(s) listed in Attachment A, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

b. Meta collects basic contact and personal identifying information from users during the Instagram registration process. This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account number, and other personal identifiers. Meta keeps records of changes made to this information.

c. Meta also collects and retains information about how each user accesses and uses Instagram. This includes information about the Internet Protocol ("IP") addresses used to

create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

d. Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time. Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

e. Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account. Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality. For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account, or transfer an image from Instagram to a connected image printing service. Meta maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

f. Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers). Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments. Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

g. Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users. Meta retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions. Users can similarly allow Meta to search an associated Facebook account for friends who are also Instagram users. Users can also manually search for friends or associates.

h. Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings. Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

i. One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos. Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location. These appear as posts on the user's profile. Users can remove posts from their profiles by deleting or archiving them. Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

j. Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram. Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@"). An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

k. An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours. Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted. The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

l. Instagram allows users to broadcast live video from their profiles. Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

m. Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups. These messages may include text, photos, videos, posts, videos, profiles, and other information. Participants to a group conversation can name the group and send invitations to others to join. Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings. Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot. Instagram Direct also enables users to video chat with each other directly or in groups.

n. Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps. Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

o. Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag. Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram. Meta retains records of a user's search history and followed hashtags.

p. Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

q. Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content. Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers. This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

r. In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

s. For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

Facebook

5. I have learned the following about Facebook:

a. Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com. Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

b. Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter. This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Each Facebook user is assigned a user identification number and can choose a username.

c. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

d. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these

privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

e. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

f. Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video, and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

g. Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

h. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

i. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

j. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

k. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

l. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

m. In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

n. Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

o. Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

p. Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

**D. Jurisdiction and Authority to Issue Warrants**

6. Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

7. A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

8. When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3). Additionally, the Government may obtain an order precluding

the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation. 18 U.S.C. § 2705(b).

## II. Probable Cause

### E. Probable Cause Regarding the Subject Offenses

9. Since approximately June 2024, the U.S. Attorney's Office for the Southern District of New York and the Federal Bureau of Investigation, Child Exploitation, Human/Sex Trafficking Task Force have been conducting a criminal investigation of ALON ALEXANDER ("ALON"), OREN ALEXANDER ("OREN"), and TAL ALEXANDER ("TAL") (collectively the "Alexander Brothers"), and others known and unknown, for their involvement in a wide-ranging racketeering enterprise engaged in sex trafficking of minors and adults; and the enticement of minors and adults to travel in interstate and foreign commerce to engage in illegal sex acts, among other offenses.

Rapes While the Alexander Brothers Were Minors

10. As discussed in paragraphs 11 through 12 below, based on my participation in interviews of victims and witnesses, I have learned, among other things, that the Alexander Brothers attended high school in Miami, Florida, and during that time, they raped and sexually assaulted[1] female minor victims. The Alexander Brothers engaged in these assaults alone, with each other, and with other teenage boys.

*Minor Victim-1*

11. Based on my participation in interviews of Minor Victim-1, I have learned, among other things, the following:

---

[1] Throughout this affidavit, including in descriptions of information provided by victims, the terms "rape" and "sexual assault" are used to describe conduct that, as currently understood, meets legal definitions of the terms. This terminology is used regardless of whether the victims would characterize their experiences using these terms.

[redacted]

[redacted]

[redacted]

[redacted]

*Minor Victim-2, Minor Victim-3, and Witness-1*

12. Based on my participation in interviews of Minor Victim-2, Minor Victim-3, and Witness-1, I have learned, among other things, the following:

a. [redacted]

[redacted]







ATTORNEYS POSSESSION ONLY

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Sexual Assaults by the Alexander Brothers as Adults

13. As discussed in paragraphs 14 through 22 below, based on my participation in interviews of multiple victims and my review of open-source material, documents and photographs, I have learned, among other things, that after graduating from college, the Alexander Brothers moved to Manhattan, New York, where OREN and TAL worked as real estate agents. OREN and TAL initially worked at the real estate company, Douglas Elliman, before starting their own company, Official Partners. While living in New York, the Alexander Brothers sexually assaulted multiple women, alone and together, often after giving the women drugs. On some occasions, the Alexander Brothers transported women across state lines in order to sexually assault them.

*Victim-1*

14. Based on my participation in an interview of Victim-1 and my review of documents and Facebook messages, I have learned, among other things, the following:

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

*Victim-2*

15. Based on my participation in an interview of Victim-2, I have learned, among other things, the following:

[redacted]

[redacted]

*Victim-3 and Victim-4*

16. Based on my participation in an interview with Victim-3, I have learned among other things, the following:

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

*Victim-5*

17. Based on my participation in an interview with Victim-5, I have learned among other things, the following:

[redacted]

[redacted]

*Victim-6*

18. Based on my interview of Victim-6 and my review of documents and photographs, I have learned among other things the following:

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

*Victim-9 and Victim-10*

19. Based on my participation in an interview with Victim-9 and my review of documents and photographs and other materials, I have learned among other things, the following:

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

*Minor Victim-4*

20. Based on my participation in an interview with Minor Victim-4, I have learned among other things, the following:

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

*Victim-8*

21. Based on my interview of Victim-8 and my review of documents and photographs, I have learned among other things the following:

[redacted]

[redacted]

[redacted]

[redacted]

*Victim-7*

22. Based on my interview of Victim-7 and my review of documents and photographs, I have learned among other things the following:

[redacted]







ATTORNEYS POSSESSION ONLY

[redacted]

F. **Probable Cause Regarding the Subject Accounts**

23. There is probable cause to believe that the Alexander Brothers have used Subject Account-1, Subject Account-2, Subject Account-3, Subject Account-4, Subject Account-5, and Subject Account-6 based on the following information from records maintained by Meta Platforms, Inc., among other things:

a. Subject Account-1 is the Instagram account with account identifier "[redacted]r" and Meta target number 3[redacted]. Subject Account-1 is subscribed in the name Alon Alexander. The registered email address for Subject Account-1 is [redacted], which, according to records provided by Google, is subscribed to by Alon Alexander. The telephone number associated with Subject Account-1 is [redacted] which, according to records provided by Verizon, is subscribed to Alon Alexander.

b. Subject Account-2 is the Instagram account with account identifier "[redacted]" and Meta target number [redacted]. According to records from Meta, an alternative account identifier listed for a preserved copy of Subject Account-2 is [redacted], and the vanity name is orenalexander. Subject Account-2 is subscribed in

the name Oren Alexander. The telephone number associated with Subject Account-2 is [redacted], which according to records from AT&T, is subscribed to Oren Alexander.

c. Subject Account-3 is the Instagram account with account identifier "[redacted]" and Meta target number [redacted]. Subject Account-3 is subscribed in the name Tal Alexander. The telephone number associated with Subject Account-3 is [redacted], which, according to records provided by AT&T, is subscribed to Tal Alexander. The email address associated with Subject Account-3 is [redacted], which, according to records provided by Google, is subscribed to Tal Alexander.

d. Subject Account-4 is the Facebook account with account identifier [redacted] and Meta target number [redacted]. Subject Account-4 is subscribed to Alon Alexander. The registered email address for Subject Account-4 is [redacted], which according to records provided by Google is subscribed to Alon Alexander. The telephone number associated with Subject Account-4 is [redacted], which according to records provided by Verizon, is subscribed to Alon Alexander. The email address and telephone number associated with Subject Account-4 are the same as those associated with Subject Account-1, also used by ALON.

e. Subject Account-5 is the Facebook account with account identifier Facebook.com/orenalexander and Meta target number [redacted]. Subject Account-5 is subscribed to Oren Alexander. The email addresses associated with Subject Account-5 include [redacted], which, according to records provided by Google, is subscribed to Oren Alexander, and [redacted] Based on publicly reported information and based on information learned during the investigation, including information provided by victims who know OREN, I am aware that OREN previously worked at the real estate company Douglas

Elliman. The telephone number associated with Subject Account-5 is [redacted], which, according to records provided by AT&T, is subscribed to Oren Alexander, and is the same telephone number associated with Subject Account-2.

f. Subject Account-6 is the Facebook account with account identifier [redacted] and Meta target number [redacted]. Subject Account-6 is subscribed to Tal Alexander. The email address associated with Subject Account-6 is [redacted] which, according to records provided by Google, is subscribed to Tal Alexander. The telephone number associated with Subject Account-6 is [redacted], which, according to records provided by AT&T, is subscribed to Tal Alexander, and is the same telephone number associated with Subject Account-3.

24. There is further probable cause to believe that evidence of the Subject Offenses is contained in Subject Account-1, Subject Account-2, Subject Account-3, Subject Account-4, Subject Account-5, and Subject Account-6, because, as described below and above, the Alexander Brothers communicated with their Victims through Instagram and Facebook, and the Subject Accounts are the Instagram and Facebook accounts used by the Alexander Brothers. Multiple victims described communicating with the Alexander Brothers via Instagram and Facebook, for example:

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]. As further described above, the three Alexander Brothers often participated in sexual assaults and rapes together and identified and found multiple Victims using the Subject Accounts. The messages sent by the Alexander Brothers to their victims that could reasonably be expected to be found in the Subject Accounts include messages that the Alexander Brothers sent their victims to convince Victims to meet the Alexander Brothers for the purpose of sexually assaulting and raping the victims, and the messages that the Alexander Brothers sent to victims after the assaults.

25. In addition to the Alexander Brothers using their Facebook and Instagram accounts to communicate with their victims, there is also probable cause to believe that the Subject Accounts will contain evidence of the Alexander Brothers' locations on particular dates when they committed rapes and sexual assaults and show who they were with on those particular occasions. Based on my review of previously public photographs[8] from the Subject Accounts, the Alexander Brothers regularly posted photos of themselves and others at parties and events and at various locations around the world where they committed rapes and sexual assaults.

26. There is also probable cause to believe that the Alexander Brothers communicated with each other about sexually assaulting and raping the Victims and that those communications will similarly be found in the Subject Accounts. As noted above, the Alexander Brothers used Facebook and Instagram's messaging features to communicate regularly. Also as described in detail above, ALON, OREN, and TAL began raping and sexually assaulting women and girls together beginning in high school and continued to do so until at least as recently as 2021. The attacks described by victims that included multiple of the Alexander Brothers demonstrated that

[8] The Alexander Brothers' have subsequently made the Subject Accounts private and/or deactivated their accounts, after the Government preserved the Subject Accounts with Meta.

the Alexander Brothers coordinated their attacks, and therefore likely communicated about their execution. For example, as described by [redacted] This coordinated attack, [redacted] could not happen without electronic communication between geographically separated conspirators. Similarly, [redacted] Based on the coordination necessary for all three Alexander Brothers to know when and where to meet to carry out the assault, there is probable cause to believe that electronic communications were used in furtherance of that assault. Based on my training and experience, individuals who carry out sexual assaults and rapes together on an ongoing basis, communicate with each other to coordinate and plan opportunities to meet victims, coordinating meeting up with victims for the purpose of sexually assaulting and raping them, and to arrange travel with and to meet victims across state and international borders.

27. Based on my training and experience, I know that individuals who engage in crimes like the Subject Offenses commonly use electronic messaging on social media platforms such as Instagram and Facebook to communicate with victims; establish and use online accounts on those platforms to facilitate their crimes; or maintain photographs, videos, or screenshots, emails, text messages, records of purchases, travel records, among other similar materials. For example, the stored communications and files connected to an Instagram or Facebook account may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in

furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

28. Based on my training and experience, providers of electronic communications platforms such as Instagram and Facebook typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, providers of electronic communications platforms often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

29. Based on my training and experience, in some cases, communications account users will communicate directly with a platform about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers of electronic communications platforms typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

30. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account

may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

31. Based on my training and experience, for each of the Subject Accounts described above, historical location data collected by a user's electronic accounts can be relevant to establishing that user's participation in certain events related to the Subject Offenses, such as trips or meetings with victims. These records can be easily moved between an individual's electronic storage accounts, such as by email and file sharing and transfers between accounts.

32. Based on my training and experience, I also know that, where electronic messages or other electronic files are used in furtherance of criminal activity, evidence of the criminal activity can often be found months or even years after it occurred. This is typically true because electronic files can be stored on computer servers for years at little or no cost and users thus may have little incentive to delete data that may be useful to consult in the future.

**G. Evidence, Fruits and Instrumentalities**

33. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Providers' servers associated with the Subject Accounts will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to each of the proposed warrants.

34. In particular, I believe the Subject Accounts are likely to contain the following information:

- Evidence concerning the identity or location of the owner(s) or user(s) of the Subject Accounts, including at the time the records and items described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, photographs, videos, and browsing history;

- Communications with co-conspirators or other participants in the Subject Offenses;
- Communications about commission of the Subject Offenses;
- Communications with victims of the Subject Offenses;
- Calendar or other scheduling information relating to the commission of the Subject Offenses (including but not limited to travel itineraries and meetings with co-conspirators);
- Digital photographs and videos relating to the commission of the Subject Offenses;
- Evidence concerning knowledge of the commission of the Subject Offenses by co-conspirators;
- Location information related to the commission of the Subject Offenses;
- Evidence regarding motivations for committing the Subject Offenses;
- Evidence regarding consciousness of guilt with respect to the Subject Offenses;
- Evidence concerning any online accounts or any electronic devices where evidence of the Subject Offenses could be stored, including any passwords or encryption keys needed to access such evidence;
- Evidence of the acquisition, distribution, or use of controlled substances to commit the subject offenses; and
- Evidence of attempts to evade arrest or destroy evidence.

**III. Review of the Information Obtained Pursuant to the Warrants**

35. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records. Accordingly, the warrants requested herein will be transmitted to the Providers, which shall be directed to produce a digital copy of any responsive records to law

enforcement personnel within 30 days from the date of service. The Government requests that, notwithstanding Title 18, United States Code, Section 2252A, the Court order that the Providers shall be authorized to deliver encrypted files responsive to the proposed warrants by delivering encrypted files electronically. Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Section III of Attachment A to each of the proposed warrants.

36. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails within the Subject Accounts. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

## IV. Request for Non-Disclosure and Sealing Order

37. The existence and scope of this ongoing criminal investigation is not publicly known. As a result, premature public disclosure of this affidavit or the requested warrants could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation. As is set forth above, the targets of this investigation are known to have participated in intimidation or threatening of other individuals in furtherance of and to conceal their criminal activities, and alerting these targets to the existence and scope of the investigation may lead the targets to endanger the life or physical safety of others. *See* 18 U.S.C. § 2705(b)(1), (4). [redacted] Additionally, as is set forth above, the targets of this investigation appear to have the financial means that would facilitate their flight from prosecution, and have traveled internationally in the past to jurisdictions where extradition to the United States for purposes of prosecution is unlikely or impossible. *See* 18 U.S.C. § 2705(b)(2), (5).

38. The targets of this investigation are also known to use computers and electronic communications in furtherance of their activity and thus could easily delete, encrypt, or otherwise conceal such digital evidence from law enforcement were they to learn of the Government's investigation. *See* 18 U.S.C. § 2705(b)(3).

39. Accordingly, there is reason to believe that, were the Providers to notify the subscribers or others of the existence of the warrants, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Providers not to notify any person of the existence of the warrants for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

40. For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrants and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

## V. Conclusion

41. Based on the foregoing, I respectfully request that the Court issue the warrants sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the relevant provisions of Federal Rule of Criminal Procedure 41.

/s/ Justine Atwood, by SDA with permission
Justine Atwood, Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 41(d)(3) and
4.1, this 29th day of August, 2024

HONORABLE STEWART D. AARON
United States Magistrate Judge
Southern District of New York

# Exhibit B

# Indictment 24 Cr. 676 (the "Indictment")

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ALON ALEXANDER,<br>OREN ALEXANDER, and<br>TAL ALEXANDER,<br><br>Defendants. | **SEALED INDICTMENT**<br><br>24 Cr.<br><br>24 CRIM 676 |

**COUNT ONE**
**(Conspiracy to Commit Sex Trafficking)**

The Grand Jury charges:

1. From at least in or about 2010, up to and including at least in or about 2021, in the Southern District of New York and elsewhere, in and affecting interstate commerce, ALON ALEXANDER, OREN ALEXANDER, and TAL ALEXANDER, the defendants, and others known and unknown, knowingly, did combine, conspire, confederate and agree to recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, and solicit, by any means, persons, and to benefit, financially and by receiving anything of value, from participation in a venture which has engaged in any such act, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, as described in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause the persons to engage in commercial sex acts, in violation of Title 18, United States Code, Section 1591(a)(1) and (b)(1), to wit, ALON ALEXANDER, OREN ALEXANDER, and TAL ALEXANDER, and others known and unknown, agreed to recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, and solicit women, including but not limited to Victim-1 and Victim-2, as alleged in Counts Two and Three respectively, knowing and in reckless disregard of the fact that



ATTORNEYS POSSESSION ONLY

force, threats of force, fraud, and coercion, would be used to cause the women, including but not limited to Victim-1 and Victim-2, to engage in commercial sex acts.

(Title 18, United States Code, Section 1594(c).)

**COUNT TWO**
**(Sex Trafficking of Victim-1 by Force, Fraud, and Coercion)**

2. In or about July 2011, in the Southern District of New York and elsewhere, TAL ALEXANDER, the defendant, knowingly, in and affecting interstate and foreign commerce, did recruit, entice, harbor, transport, provide, obtain, and maintain by any means a person, and did benefit, financially and by receiving anything of value, from participation in a venture which has engaged in any such act, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, as described in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause the person to engage in commercial sex acts, to wit, TAL ALEXANDER recruited, enticed, harbored, transported, provided, obtained, and maintained, and aided and abetted the recruitment, enticement, harboring, transportation, obtaining, and maintaining of, Victim-1, and caused Victim-1 to engage in at least one commercial sex act, knowing, and in reckless disregard of the fact that Victim-1 was engaging in the commercial sex act as result of force, fraud and coercion.

(Title 18, United States Code, Sections 1591(a) and (b)(1), and 2.)

**COUNT THREE**
**(Sex Trafficking of Victim-2 by Force, Fraud, and Coercion)**

3. In or about September 2016, in the Southern District of New York and elsewhere, ALON ALEXANDER, OREN ALEXANDER, and TAL ALEXANDER, the defendants, knowingly, in and affecting interstate and foreign commerce, did recruit, entice, harbor, transport,





ATTORNEYS POSSESSION ONLY

provide, obtain, advertise, maintain, patronize, and solicit by any means a person, and did benefit, financially and by receiving anything of value, from participation in a venture which has engaged in any such act, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, as described in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause the person to engage in commercial sex acts, in violation of Title 18, United States Code, Section 1591(a)(1) and (b)(1), to wit ALON ALEXANDER, OREN ALEXANDER, and TAL ALEXANDER recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, and solicited, and aided and abetted the recruitment, enticement, harboring, transportation, obtaining, maintaining, patronizing, and soliciting of, Victim-2, and caused Victim-2 to engage in at least one commercial sex act, knowing, and in reckless disregard of the fact that Victim-2 was engaging in the commercial sex act as result of force, fraud and coercion.

(Title 18, United States Code, Sections 1591(a) and (b)(1), and 2.)

**FORFEITURE ALLEGATIONS**

4. As a result of committing the offenses alleged in Counts One through Three of this Indictment, ALON ALEXANDER, OREN ALEXANDER, and TAL ALEXANDER, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1594, any and all property, real and personal, involved in, used, or intended to be used to commit or to facilitate the commission of said offenses; any and all property, real and personal, constituting or derived from proceeds obtained, directly or indirectly, as a result of said offenses; and any and all property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense and proceeds traceable to the commission of said offenses.





ATTORNEYS POSSESSION ONLY

**Substitute Assets Provision**

5. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third person;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m) and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 1594;
Title 21, United States Codes, Section 853; and
Title 28, United States Code, Section 2461.)

[redacted]
FOREPERSON 12/6/24

Damian Williams
DAMIAN WILLIAMS
United States Attorney





ATTORNEYS POSSESSION ONLY