UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA,                                    No. S3:24-CR-676 (VEC)

                                                            **ORAL ARGUMENT
                                                            REQUESTED**

            v.


TAL ALEXANDER, ALON ALEXANDER,
and OREN ALEXANDER

*Defendants.*

--------------------------------------------------------X


**DEFENDANTS'
MOTIONS *IN LIMINE***

**BLACK SREBNICK**
Howard Srebnick
Jackie Perczek
201 South Biscayne Blvd. Suite 1300
Miami, FL 33131
(305) 371-6421

**AGNIFILO INTRATER LLP**
Marc Agnifilo
Zach Intrater
Teny R. Geragos
140 Broadway, Suite 2450
New York, NY 10005
(646) 205-4350

*Counsel for Oren Alexander*

**THE LAW OFFICES OF JASON GOLDMAN**
Jason Goldman
275 Madison Avenue, 35th Floor
New York, NY 10016
(212) 466-6617
jg@jasongoldmanlaw.com

*Counsel for Alon Alexander*

**WALDEN MACHT HARAN & WILLIAMS LLP**
Milton L. Williams
Alexander Kahn
Deanna M. Paul
250 Vesey Street, 27th Floor
New York, New York 10281
(212) 335-2381

*Counsel for Tal Alexander*

**TABLE OF CONTENTS**

I.    THE COURT SHOULD PRECLUDE TESTIMONY OF DR. LISA ROCCHIO AND
      DR. STACEY HAIL .................................................................................................. 1

      A.    Background ................................................................................................ 2

            1.    Dr. Lisa Rocchio .............................................................................. 2

            2.    Dr. Stacey Hail ................................................................................. 4

      B.    Argument ................................................................................................... 5

            1.    Hail's Testimony Should Be Precluded Given the Government's Untimely
                  Notice ............................................................................................... 5

            2.    Rocchio and Hail's Opinions Are Not Applicable to the Facts of This Case
                  as Required by Rule 702(d) and Therefore Cannot "Help" the Jury
                  Understand the Evidence as Required by Rule 702(a) ............................. 6

            3.    Rocchio Will Opine on Topics Well Within the Jury's Everyday
                  Knowledge ........................................................................................ 8

            4.    Rocchio and Hail's Opinions About "Typical" or "Common" Fact Patterns
                  Are Not Applicable to the Facts of This Case............................................11

            5.    Rocchio and Hail Will Improperly Invade the Province of the Jury......... 16

            6.    The Proposed Expert Testimony Does Not Meet the Reliability
                  Requirement of Rule 702 ...................................................................... 18

            7.    Rocchio And Hail's Opinions Should Be Excluded Pursuant to Rule 403.
                  ......................................................................................................... 21

II.   ███████ TESTIMONY AND RELATED PHOTOGRAPHS SHOULD BE EXCLUDED 23

      A.    Introduction ............................................................................................. 23

      B.    Argument ................................................................................................. 24

            1.    The Court Should Exclude ██████ s Testimony and Related Exhibits......... 24

            2.    The Court Should Preclude Admission of Any Photographs or Evidence
                  Relating to ██████████████████ ............................... 29

III.  PORTIONS OF ALLEGED VICTIM 4'S PROPOSED TESTIMONY SHOULD BE
      EXCLUDED ....................................................................................................... 31

A.    Background .......................................................................................... 31

B.    The Evidence Is Inadmissible Under Rules 404(b) and 403.................................. 31

IV.    TESTIMONY SURROUNDING ALLEGED VICTIMS' MEDICAL AND MENTAL
HEALTH TREATMENT AND DIAGNOSES YEARS AFTER THE CHARGED
CONDUCT SHOULD BE EXCLUDED .......................................................... 32

A. Argument .......................................................................................... 33

1.    Testimony Regarding Post-Incident Medical and Mental Health Diagnoses
Is Not Relevant Pursuant to Rule 401 ....................................................... 34

2.    Testimony Regarding Purported Health Diagnoses is Inadmissible Hearsay
........................................................................................................ 36

3.    The Alleged Victims Are Not Qualified and Have Not Been Offered to
Provide Expert Opinion Testimony Regarding Medical Findings and
Diagnoses .......................................................................................... 36

4.    Testimony Regarding Health Diagnoses is Unduly Prejudicial................ 37

B.    In the Alternative the Defense Requests Rule 17 Subpoenas for Actual
Evidence – the Underlying Medical Records ........................................ 38

V.    DEFENSE EVIDENCE USED FOR IMPEACHMENT ON CROSS-EXAMINATION
SHOULD NOT BE REQUIRED TO BE PRODUCED BEFORE TRIAL ..................... 41

CONCLUSION.................................................................................................. 47

The defense moves *in limine* to exclude certain evidence and for a ruling relating to the production of impeachment material.[1]

In Point One, we seek to exclude the testimony of the government's proposed experts.  In Point Two, we seek to exclude the testimony of, and evidence related to, a proposed witness with the initials ███  In Point Three, we seek to exclude portions of alleged ███ 's testimony.  In Point Four, we explain why testimony about medical or mental health treatment long after the charged conduct should be excluded.  And in Point Five, we seek a ruling that defense evidence, to be used as impeachment on cross-examination, should not have to be produced pre-trial.

## I.    THE COURT SHOULD PRECLUDE TESTIMONY OF DR. LISA ROCCHIO AND DR. STACEY HAIL

The government has noticed two expert witnesses: Dr. Lisa Rocchio ("Rocchio") and Dr. Stacey Hail ("Hail").[2] Rocchio intends to testify broadly about concepts surrounding interpersonal violence, trauma, defense mechanisms, and memory. Hail intends to testify about the use of sedative hypnotic drugs in sexual assaults, based on her experience as an emergency room physician.

The testimony of Rocchio and Hail fails the requirements of <u>Daubert</u> and therefore, respectfully, should be excluded by this Court.  The government seeks to introduce, with the imprimatur of learned experts, general concepts that – while unfairly prejudicial – have not been tailored to the facts of this case.  Neither of the proposed experts have examined or spoken to any

---

[1] Defendants are receiving 3500 materials on a rolling basis and do not yet have a witness list from the government.  Defendants reserve, respectfully, their rights to file additional motions on other grounds.  Defendants also request, respectfully, oral argument on each of our motions.

[2] On November 4, 2025, the government represented to defense counsel that it no longer presently plans to call Dr. Gail Cooper (whom it had also initially noticed as an expert witness).  Accordingly, we do not here present arguments to exclude Cooper.  In the event the government changes its plan, we respectfully reserve the right to move to preclude Cooper's testimony, and the government has agreed not to oppose any such motion as untimely.

of the alleged victims in this case. Neither has reviewed any medical, psychological, toxicological, or other scientific evidence related to these victims, nor has the government sought this evidence.

The government plans to use Rocchio to testify that rape can cause trauma. But Rocchio, having failed to speak with any of the witnesses who will be testifying, cannot properly describe anything outside the jury's ken. There is no technical expertise needed for the jury to understand that if assaulted, and traumatized, people use coping mechanisms.

The government's planned use of Hail is improper for similar reasons. The government has not obtained as much as a single toxicology report in this case. Simply, there is no forensic evidence that a drug was ever administered to anyone. The government should not be able to bolster their case by using experts to put before the jury purely speculative testimony about drugs that have absolutely no relevance or connection to this case. Again, this danger is particularly acute here, where there is exactly zero actual forensic evidence. By offering the jury dozens of drugs to choose from, the government hopes that the experts' testimony will allow the jury to associate some of their spectrum of effects with some witnesses' vague testimony, and rely on it to convict. This is improper and the Court should preclude the testimony of Rocchio and Hail in its entirety.

### A. Background

#### 1. Dr. Lisa Rocchio

Rocchio is a clinical and forensic psychologist who "specializes in the assessment and treatment of interpersonal violence and traumatic stress." Declaration of Deanna M. Paul ("Decl.") Ex. 10 at 1. Rocchio has "specialized training" and has "specialized her clinical and forensic practice" to focus on the "assessment and treatment of patients who have experienced traumatic stress and interpersonal violence." Id.

Rocchio's disclosure concedes that she has not evaluated, assessed, or treated any of the alleged victims in this case. Id. In fact, Rocchio does not intend to opine on any specific accuser,

their history, mental state, memory, or their alleged experiences as victims. Id. Instead, Rocchio will offer opinions on broad topics including interpersonal violence, sexual abuse, defense mechanisms, and memory.

Rocchio intends to opine and instruct the jury on the ways in which perpetrators of interpersonal violence generally execute their crimes. For example, Rocchio would opine that "[p]erpetrators can force a victim into penetrative sex in a variety of ways, including the use of physical force or by the administration of alcohol or other drugs . . ." Decl. Ex. 10 at 2. She would further opine that "[p]erpetrators often exploit preexisting power differentials between themselves and their victims for the purpose of committing rape and sexual assault and preventing disclosure." Id. But what competent juror does not already know this?

Rocchio also proposes to tell the jury how victims "typically" or "commonly" respond to violence. For example, Rocchio opines that, during an assault, the "*majority* of individuals report experiencing some form of freeze response" and that victims "*commonly* describe episodes in their mind going 'blank' and report feelings of confusion about what is happening to them." Id.  She further opines that victims "*may* utilize a broad range of defense mechanisms and exhibit a wide variety of behaviors during and in response to rape and sexual assault." Id. She notes that "*common* responses include freezing or falling back on habitual responses to power, such as attempting to please or placate the abuser or remaining silent" and that some victims "*may* remain in contact with perpetrators for a broad range of reasons." Id. Rocchio notes that staying in touch with a perpetrator "*can be* a coping mechanism for a victim as a way to better understand what happened, as a way of regaining control, or to prevent further loss of their social circle." Id. Moreover, Rocchio would inform the jury that, "*[o]n some occasions* a victim may engage in flirtatious behavior or consensual sexual activity with a perpetrator . . . as a way to normalize the relationship,

protect themselves from retaliation, or in an effort to convince themselves that the sexual assault was a one-time aberration in the perpetrator's behavior." Id. at 3.

In describing the "coping strategies" and "psychological defenses" employed by victims, Rocchio will explain that these "*commonly*" involve "avoidance, compartmentalization, minimization, directed forgetting, making excuses for others, self-blame and denial, and non-labeling of the experience as a rape or sexual assault." Id. As far as labeling is concerned, Rocchio would explain that "the *majority* of individuals who have experienced rape or sexual assault do not label it at such." Id. She would opine that "delayed disclosure [] is *common*" due to "both external and internal barriers. Id. Rocchio would also opine that victims "commonly recall the gist or overall description" of what happened to them, though "trauma can narrow [their] focus of attention." Id. at 4.

If allowed, Rocchio also will be used to impermissibly define legal concepts for the jury. Rocchio would tell the jury that "sexual assault and rape refer to sexual interactions without an individual's consent," that "sexual assault is an abuse of power . . .," Id. at 2, and that sexual abuse is "nonconsensual behaviors that do not involve physical contact between perpetrator and victim, such as exposing oneself or taking sexually explicit photographs without consent." Id.

### 2.    Dr. Stacey Hail

The government seeks to offer Hail to opine about which drugs have a "sedative-hypnotic toxidrome" and are "*commonly* used to commit drug-facilitated sexual assaults." Declaration of Deanna M. Paul ("Decl.") Ex. 11 at 1. Hail will explain that GHB, Ambien, benzodiazepines, and MDMA are "*commonly*" used to commit drug-facilitated sexual assaults. Id. 2-3. Quaaludes, Hail will opine, have "*historically been used*" to commit these assaults. Id. at 3. But Hail has not examined any medical records relating to this case.

### B.    Argument

#### 1.    Hail's Testimony Should Be Precluded Given the Government's Untimely Notice

The government provided notice of Hail as a rebuttal expert in October, but now seeks to use Hail as an expert in their case-in-chief. But the government's deadline for expert notices in their case in chief was August 15, 2025. ECF No. 66. Hail's testimony should be excluded on this threshold basis.

"The purpose of the expert disclosure requirement is to 'minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination.'" United States v. Ulbricht, 858 F.3d 71, 114 (2d Cir. 2017) (quoting Fed. R. Crim. P. 16, advisory committee's note to 1993 amendment), overruled on other grounds by Carpenter v. United States, 585 U.S. 296 (2018). "With increased use of both scientific and nonscientific expert testimony, one of counsel's most basic discovery needs is to learn that an expert is expected to testify." Fed. R. Crim. P. 16, advisory committee's note to 1993 amendment.

"If a party fails to comply with Rule 16, the district court has 'broad discretion in fashioning a remedy,' which may include granting a continuance or 'ordering the exclusion of evidence.'" Ulbricht, 858 F.3d at 115 (quoting United States v. Lee, 834 F.3d 145, 158 (2d Cir. 2016)); see also United States v. Mahaffy, 2007 U.S. Dist. LEXIS 30077, at *6-7 (E.D.N.Y. Apr. 24, 2007).

Although exclusion of expert evidence is a "harsh sanction," courts have found it appropriate in certain circumstances to ensure the parties "'comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" Ulbricht, 858 F.3d at 117 (quoting Chambers v. Mississippi, 410 U.S. 284, 302 (1973)).

Rather than disclosing Hail as a proposed expert in its August 15, 2025 disclosure, the government noticed Hail as a rebuttal witness, then disclosed that it intended to use Hail as an expert witness in its case in chief – more than two months after the deadline for its case-in-chief experts had passed.

This undue delay is prejudicial to defendants' preparation for trial in several ways. Had defense counsel been aware of Hail as a principal, case-in-chief witness, we may have secured different rebuttal witnesses for her testimony. The delay has prevented the defendants from identifying a proper rebuttal expert to Hail's testimony (including on drugs such as quaaludes) and has forced the defense to switch preparation from motions *in limine* and investigation of the Jencks Act material that was just disclosed, to preparation on drugs of which there is no evidence in this case.

### 2. Rocchio and Hail's Opinions Are Not Applicable to the Facts of This Case as Required by Rule 702(d) and Therefore Cannot "Help" the Jury Understand the Evidence as Required by Rule 702(a)

A district court's evaluation of a proffered expert is governed by Federal Rules of Evidence 403, 702, and 703. Under Rule 702, a district court can admit testimony by "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" if "it is more likely than not" that the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue" and if the expert's opinion is applicable "to the facts of the case." Fed. R. Evid. 702(a), (d).[3] Rule 703 similarly notes that "[a]n expert may base an opinion on facts or data in the case." Finally, Rule 403 provides that the proposed expert testimony, even if relevant and properly qualified, "may be excluded if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues [or] misleading the jury."

---

[3] Rule 702 additionally requires that the expert's testimony be "based on sufficient facts or data" (Rule 702(b)) and that it be "the product of reliable principles and methods (Rule 702(c)).

Expert testimony is appropriately admitted "when the untrained layman would be unable intelligently to determine the particular issue in the absence of guidance from an expert." United States v. Mejia, 545 F.3d 179, 189 (2d Cir. 2008) (internal quotations marks omitted); see also Fed. R. Ev. 702(a) (expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue"). "An opinion is unhelpful and therefore may not be received in evidence" if it addresses subject matters which are "within 'the ken of the average juror.'" United States v. Collins, 581 F. App'x 59, 60 (2d Cir. 2014) (quoting United States v. Castillo, 924 F.2d 1227, 1232 (2d Cir. 1991)). Expert testimony which has "at best, tangential relevance" to the case should also not be admitted. United States v. Zhong, 26 F.4th 536, 556 (2d Cir. 2022).

District courts must carefully exercise a "gatekeeping role" to guard against the significant risks posed by expert testimony. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993). District courts must exclude "junk science" by undertaking a "rigorous" examination of the expert's opinions to ensure they are both helpful, and reliable "at every step." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002).

In reviewing proposed expert testimony, the Court must "look to see if it will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." United States v. Lumpkin, 192 F.3d 280, 289 (2d Cir. 1999). Moreover, Rule 403 plays a "uniquely important role … in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations." Nimely v. City of New York, 414 F.3d 381, 397 (2d Cir. 2005).

Rocchio's broad testimony on matters already familiar to the jury will not help the jury understand the evidence or any facts at issue in the case. Further, Rocchio and Hail propose to offer testimony which is, at best, tangentially related to the facts of the case. They offer generalized

testimony about high-level concepts like trauma, defense mechanisms, memory, and drug interactions. Their proposed testimony is disconnected from the actual facts of this case and will only serve to improperly bolster otherwise lacking witness testimony by filling in the gaps and validating their otherwise vague narratives. The Court should exclude the proposed experts from testifying.

### 3.    Rocchio Will Opine on Topics Well Within the Jury's Everyday Knowledge

Rocchio's opinion covers subjects that are neither complex nor technical. Her opinions address matters that are within the ken of the average juror and, as such, would not assist them in assessing the evidence or determining a fact in issue.

Expert testimony is only admissible if it is "directed to matters within the witness' scientific, technical, or specialized knowledge and not to lay matters which a jury is capable of understanding and deciding without the expert's help." Andrews v. Metro N. Commuter R. Co., 882 F.2d 705, 708 (2d Cir. 1989) (jury needed no expert assistance to understand that bright lights of an oncoming train may cause disorientation). Where expert testimony merely tells the jury which inferences to draw in matters of common sense, it usurps the factfinder's role and is inadmissible. See Nimely, 414 F.3d at 397.

Therefore, "a district court may commit manifest error by admitting expert testimony where . . . the subject matter of the expert's testimony is not beyond the ken of the average juror." Zhong, 26 F.4th at 555 (internal citation omitted); see also Mejia, 545 F.3d at 194 ("Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own.").

Expert testimony regarding "general dynamics of sexual abuse" is only admissible under Rule 702 "'when it provides jurors with information to assist them in evaluating, and placing into

perspective, conduct that may be the result of complex interpersonal relationships that could be difficult for a jury to understand on its own.'" United States v. Thomas, No. 23-CR-00481 (NSR), 2025 WL 2860312, at *4 (S.D.N.Y. Oct. 9, 2025) (quoting United States v. Pollok, 139 F.4th 126, 140-141 (2d Cir. 2025)).

First, Rocchio's generalized testimony about trauma and coping strategies is completely within the understanding of the average juror. Rocchio's opinion regarding "a broad range of defense mechanisms" (Decl. Ex. 10 at 2), the existence of "a number of factors that may influence the ways individuals talk about their experiences of rape and sexual assault" (id. at 3), and the fact that "memories of experiences . . . can be influenced by a number of factors" (id. at 4), are not technical, complex, or so unfamiliar such that jurors could not comprehend an accuser's testimony without assistance.

Rocchio's proposed testimony is also replete with assertions that may be true in some instances and untrue in others – and in either event, do not touch upon the facts of this case. For example, Rocchio intends to opine that some victims "may remain in contact with perpetrators for a broad range of reasons" including as "a coping mechanism for a victim as a way to better understand what happened, as a way of regaining control, or to prevent further loss of their social circle." Id. at 2. Evaluating witness testimony through the lens of their own personal experience is what jurors do best, however. Rocchio further seeks to explain that, when addressing the nature of the assault, victims "may disclose a varying level of detail about the experience, depending on the context or their level of trust in the person to whom they are speaking." Id. at 4. Again, this may be true in some cases and is obvious to anyone who has ever suffered regret, shame, or embarrassment and had to share that experience with another person. Again, this is something that

a properly charged and attentive jury does as a matter of course. We do not need an expert telling the jury what is obvious.

Much of Rocchio's proposed testimony rests on assumptions about what jurors don't understand. She seeks to offer testimony that sexual assault is common, that most sexual assault is committed by assailants known to the victim, and that some sexual assault victims do not report the assault or do so after some delay. All of this is predicated on the notion that jurors harbor "rape myths." But Rocchio does not provide any empirical evidence demonstrating that such myths are widely prevalent in society today. It will come as a surprise to no one that sexual violence is often perpetrated within relationships and by persons known to the victim. Moreover, Rocchio's testimony as to delayed disclosure is also unnecessary and prejudicial. The witnesses in this case are capable of providing reasons for their delayed or piecemeal disclosures and the jury does not need help or improper bolstering from an expert to evaluate their explanations.

<u>Second</u>, Rocchio seeks to testify about how "[p]erpetrators often exploit preexisting power differentials between themselves and their victims for the purpose of committing rape and sexual assault and preventing disclosure." Decl. Ex. 10 at 2. But concepts including control, power imbalances and their related dynamics are not present here, nor are they alleged. The vast majority of the allegations in this case relate to one-night stands. There is no evidence and there are no allegations of long-standing relationships rooted in a power dynamic that prevented the accuser from escaping the perpetrator or which placed the accuser at some greater risk for interpersonal violence. The fact that these defendants were successful in their careers in their late 20s does not automatically turn any relationship that they developed or any sexual encounter they had during the course of their social life into one based on power imbalance. There is no need for an expert to testify about such dynamics which are plainly inapplicable here. <u>Cf</u>. <u>Zhong</u>, 26 F.4th at 555-56

(holding that expert testimony is appropriate to help explain forced labor scheme operations); United States v. Halamek, 5 F.4th 1081, 1088-89 (9th Cir. 2021) (affirming use of expert testimony to explain the nature of grooming in child sexual abuse case); United States v. Johnson, 860 F.3d 1133, 1140-1141 (8th Cir. 2017) (affirming decision to admit expert testimony which addressed "a scientific study highlighting the power and control that propels abusive domestic relationships"); United States v. Brinson, 772 F.3d 1314, 1319 (10th Cir. 2014) (expert testimony was appropriate to explain "the relationship between pimps and their prostitutes," "how pimps recruit prostitutes," and "how pimps control prostitutes"); United States v. Romero, 189 F.3d 576, 584 (7th Cir. 1999) (affirming use of expert testimony where it addressed "sophisticated psychological techniques to 'seduce'" victims and where it helped to explain "a complicated criminal methodology").

The jury is fully capable of evaluating the relationships and connections between the various parties. There is nothing exotic or unfamiliar about young men renting houses near a beach or a vacation destination, throwing parties and trying to win over women. A jury of savvy New Yorkers can readily understand the dynamic at hand without an expert.

### 4. Rocchio and Hail's Opinions About "Typical" or "Common" Fact Patterns Are Not Applicable to the Facts of This Case

Discussion of common coping mechanisms of trauma victims and typical reactions to various drugs may be relevant in an academic psychology or toxicology course, but they have no place in this criminal trial without some connection to the actual facts of this case.

The Supreme Court has explained why it is important for an expert to apply her principles and methods to the facts of the case. The reliability inquiry is not focused solely on the "reasonableness *in general*" of the expert's methodology. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153 (1999). Rather, a court must examine the reasonableness of applying that approach in the

particular case "to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant*." Id. at 154; see also Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

This requirement of a reliable application was incorporated as Rule 702(d) in the 2000 amendments to Rule 702. The rule was amended again in 2023 to emphasize again that an "opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. As the Second Circuit has explained, "[i]n deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, *and how the expert applies the facts and methods to the case at hand*." Amorgianos, 303 F.3d at 267 (emphasis added).

Moreover, "determining the weight and credibility of a witness's testimony . . . belongs to the jury," and the Second Circuit "has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702." Nimely, 414 F.3d at 397-98. This also goes for general sociology-style testimony not tied to a particular witness. In United States v. Lumpkin, for example, an expert would have testified that, in general, a witness's level of confidence in making an identification "bears little or no relationship to accuracy." 192 F.3d at 289. The Court of Appeals held that this testimony was properly excluded because it "intrudes too much on the traditional province of the jury to assess witness credibility." Id. Likewise, in United States v. Dugue, the Court of Appeals affirmed the district court's exclusion of proposed expert testimony on the motivations of cooperating witnesses because "even general testimony … would represent an evaluation of witness credibility . . . impermissible under Rules 702 and 403." 763 F. App'x 93, 96 (2d Cir. 2019).

12

By offering expert opinions that seek to validate and bolster the testimony of fact witnesses, the experts will effectively be telling the jury what result to reach in their decision-making and fact-finding process. See United States v. Amuso, 21 F.3d 1251, 1263 (2d Cir. 1994) (Courts commit "manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses."); United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994) ("[T]he use of expert testimony is not permitted if it will usurp . . . the role of the jury in applying th[e] law to the facts before it. When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." (emphasis in original) (internal citations and quotation marks omitted)); United States v. Teman, 465 F. Supp. 3d 277, 329 (S.D.N.Y. 2020) ("An opinion is unhelpful and therefore may not be received in evidence if . . . the testimony would merely tell the jury what result to reach.") (internal citations and quotation marks omitted).

### i.    Dr. Rocchio

Rocchio is being offered as a "blind" witness because she has never evaluated any of the accusers in this case and is unfamiliar with the circumstances surrounding their allegations. While this makes her testimony both irrelevant and inapplicable, it presents a further danger – by testifying to generic, high-level descriptors of trauma victims, she will be mirroring the testimony of the accusers, bolstering their testimony, and telling the jury what findings to make in evaluating the evidence.

Rocchio's testimony is intended to convey that the accusers in this case have the psychological characteristics of abuse victims generally—and that the defendants have the characteristics of predators. But these inferences are not supported by any actual forensic examination, and the lack of such an examination renders her proposed testimony fundamentally unreliable. Without any independent evaluation of these victims, Rocchio cannot possibly offer

any useful insight or opinion about how *these particular individuals* would have behaved or responded to stress or trauma on a given occasion.

Rocchio's proposed opinion testimony does not even comply with the APA's specialty guidelines that apply to the practice of forensic psychology. See APA, Specialty Guidelines for Forensic Psychology, in American Psychologist (Oct. 1, 2012). These specialty guidelines emphasize that when possible, forensic examinations should be conducted to ensure that assessments and opinions are well-grounded, and based on specific individualized data rather than broad generalizations. See §§ 2.05, 2.08, 9.01-.03, 10.01-.03, 11.01, 11.04. In particular, the guidelines state: "Forensic practitioners recognize their obligations to only provide written or oral evidence about the psychological characteristics of particular individuals when they have sufficient information or data to form an adequate foundation for those opinions or to substantiate their findings." § 9.03.

### ii.    Dr. Hail

The government seeks to call Hail as an "all-purpose" witness, to cover every possible drug interaction or side effect that could plausibly apply to sexual assaults. Dr. Hail's opinion discusses drugs like GHB, benzodiazepines, opiates, Ambien, MDMA, quaaludes, and more. Such opinions are not relevant to the facts of this case—where there is no evidence of the defendants procuring or distributing these drugs to the alleged victims—and will cause the jury to believe that alleged victims were given these drugs, when there is no evidence of the sort. This Court should deny such impermissibly broad expert testimony that will only serve to bolster improperly the accusers' testimony and confuse the jury.

Recognizing that their fact witnesses present vague, uncorroborated testimony regarding sexual encounters in which they felt "weird" or "different," the government seeks to throw the

kitchen sink of drugs at the jury in order to increase their chances at securing a conviction. But that is plainly impermissible.

Anecdotal evidence of drug use, drug reactions, and drug-facilitated sexual assaults in other contexts are irrelevant and unhelpful in assessing what happened *in this case*. The propounded opinion lacks any focus on the relevant facts at issue. Instead, Hail proposes to opine on the "common" symptoms and reactions associated with drugs like GHB, MDMA, quaaludes, opiates, or benzodiazepines.

So what fact in issue will Hail's testimony help to resolve? There are no factual disputes regarding the physiological effects of benzodiazepines, opiates, GHB, quaaludes, etc. among recreational and non-recreational drug users.[4]

The answer here is simple – the prosecution seeks to have an expert witness offer a seal of approval on the otherwise lacking testimony of fact witnesses. The expert will testify, and the prosecution hopes the jury will conclude, that the accusers' narratives appear similar to some drugs and associated interactions that Hail describes. In turn, the prosecution hopes that the jury will find that the accusers' testimony is consistent with the generally typical, psychological and physiological reactions of a "drug-facilitated sexual assault" victim.

Such conclusions cannot be drawn by an expert (nor should they be suggested to a jury) who failed to examine even one of the alleged victims in this case or any records associated with them. Hail knows nothing about the accusers, their relevant history, their mental state, their

---

[4] ██████████████████████████████████████████████████

recreational (or prescription) drug use, or their alcohol use both generally and on the dates in question.

The lack of any examination makes this testimony fundamentally unreliable. The jury cannot be asked to weigh how *these* alleged victims behaved, responded, or interacted on a given date years ago, simply by reference to academic measures of how victims typically, commonly, or often behave under similar circumstances.

### 5.    Rocchio and Hail Will Improperly Invade the Province of the Jury

The Second Circuit has "consistently held … that expert testimony that usurps … the role of the trial judge in instructing the jury as to the applicable law … by definition does not aid the jury in making a decision." United States v. Grote, 961 F.3d 105, 121 (2d Cir. 2020). Courts should exclude expert opinions that "instruct the jury as to applicable principles of law," United States v. Scop, 846 F.2d 135, 140 (2d Cir. 1988), and those that "embod[y] legal conclusions that encroach upon the court's duty to instruct on the law." United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991); see also United States v. Stewart, 433 F.3d 273, 311 (2d Cir. 2006) ("Clearly, an opinion that purports to explain the law to the jury trespasses on the trial judge's exclusive territory.").

Moreover, expert opinions are inadmissible where they offer definitions of concepts that are different from the legal definitions that must be applied by the jury. An expert cannot "compete with the judge in the function of instructing the jury" on legal definitions. Hygh v. Jacobs, 961 F.2d 359, 364 (2d Cir. 1992).

Each of the proposed expert witnesses begins her opinion with a series of definitions pertaining to legal terms. Medical professionals defining legal terms can and will confuse the jury.

Rocchio's testimony begins by offering various definitions of interpersonal violence and sexual assault. Rocchio defines interpersonal violence as "violence committed between individuals, including rape, sexual assault, childhood sexual abuse, sexual harassment, or intimate

partner violence, among others." Decl. Ex. 10 at 1. Rocchio proceeds to offer a dual definition of "sexual assault and rape" which she opines "refer to sexual interactions without an individual's consent." Id. at 2. Separately, Rocchio seeks to define sexual assault as "an abuse of power that occurs when one individual has physical contact with another in a sexual manner without the second individual's consent, either because the individual has not given consent or because they are incapable of consent for some reason, such as age or some other impairment." Id. Rape, she opines, is "a form of sexual assault" which "refers specifically to penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim." Id.

Hail provides further refined definition of "drug-facilitated sexual assault." Hail proposes to offer the jury a definition provided by the Drug Enforcement Administration, which defines this concept as "sexual assault [that] occurs when alcohol or drugs are used to compromise an individual's ability to consent to sexual activity." Decl. Ex. 11 at 1.

Perhaps most concerning is Rocchio's attempt at providing the jury a legal definition of force. The S3 Indictment alleges multiple counts of Sex Trafficking by Force, Fraud or Coercion, in violation of 18 U.S.C. § 1591. The Court will be providing the definition of "force," but the government seeks to usurp the Court's role and call an expert who will provide her own definition. Rocchio's opinion suggests that, "[p]erpetrators can force a victim into penetrative sex in a variety of ways, including the use of physical force or by the administration of alcohol or other drugs to the point where the victim is incapable of providing consent because they are unconscious or otherwise mentally or physically incapacitated." Id. This is improper; the Court must define force for the jury, as a matter of law. A competing definition from an expert witness is unnecessary and confusing.

### 6.    The Proposed Expert Testimony Does Not Meet the Reliability Requirement of Rule 702

Rule 702 charges the district court "with the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Amorgianos, 303 F.3d at 265 (quoting Daubert, 509 U.S. at 597). The court must ensure that "an expert. . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Nimely, 414 F.3d. at 396. If an expert's opinions rest "on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of the unreliable opinion testimony." Amorgianos, 303 F.3d at 266.

The Supreme Court in Daubert set forth several factors for the court to consider in determining reliability: "(1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation." Amorgianos, 303 F.3d at 266 (quotations and citations omitted). Although Daubert dealt with "scientific knowledge," the Supreme Court in a later case made clear that "Rule [702] applies its reliability standard to all 'scientific,' 'technical,' or 'other specialized' matters within its scope." Kumho Tire Co., 526 U.S. at 147-48. For example, a mental health expert may not comment on the credibility of a sexual assault victim when there is no demonstrated reliability for this type of expert testimony. United States v. Charley, 189 F.3d 1251 (10th Cir. 1999); see also United States v. Schneider, 2010 US Dist. LEXIS 99662 (E.D. Pa. Sept. 22, 2010).

In addition to her proposed testimony about an individual's response to and disclosure of a sexual assault, Rocchio proposes to testify about how memory is encoded, stored, and retrieved, how memory storage and retrieval mechanisms are altered during a traumatic event, and how a

specific recalled memory is accurate or inaccurate based on encoding / retrieval science. Rocchio should be precluded from offering this testimony.

Rocchio intends to testify on memory and the "correlation between experiences and memories." Decl. Ex. 10 at 4. It is unclear, however, what Rocchio relies upon to reach her conclusions regarding memory, "the general principles of memory" or the "retrieval of memories." Rocchio, who "specializes in assessment and treatment of interpersonal violence and traumatic stress," does not have any research background in memory, and cites to only three articles of review regarding memory. This hardly makes her a reliable expert regarding memory.

Although Rocchio is an experienced clinical psychologist with advanced training and practice in trauma treatment, Rocchio does not have the education, research, publication record, and professional training in the scientific field of human memory to offer an expert opinion on memory encoding, retrieval, or reliability. Without specialized study, research, or training on memory, Rocchio lacks the qualifications required by Rule 702 and Daubert to offer her proposed opinions on the accessibility of memories, memory encoding, memory recall or retrieval, memory timelines and sequencing, errors in memory order processes, and that "traumatic memories have not been shown to be less reliable than memories for other types of events." Decl. Ex. 10 at 4.

Rocchio's CV shows the following:

- Education and Research: Rocchio holds a Ph.D. in clinical psychology and has devoted her career to psychotherapy and trauma. It does not appear from Rocchio's CV that she has graduate or post-graduate training on how memory is encoded, stored, retrieved, or distorted.  Rocchio's Master's thesis was on *Moral Reasoning Related to Gender and Dilemma Content*, and her doctoral dissertation was *The Pursuit of Beauty Through Thinness and The Impact of Advertising on College*

*Women's Studies.* Thus, Rocchio's research training appears to have been on gender, not memory. Rocchio's subsequent research experience also does not appear to include the study of human memory or the reliability, encoding, or reconstruction of memory. Instead, Rocchio's CV shows that she has researched eating disorders, the behavior of developmentally disabled children, and trauma.

- <u>Publications</u>: Rocchio has not published peer-reviewed research on memory and does not appear to have taught or held an academic position dealing with memory science. She has two peer-reviewed papers, both published in *Psychological Injury and the Law*, addressing ethical and professional issues in forensic assessment of trauma (i.e., evaluations for litigation), and the effects of repeated psychological injury. Rocchio's book chapters are on feminist psychology, sexism, women and discrimination, and child and adolescent psychiatry. Rocchio has published three newsletters, all of which address ethics in her profession, not the process of memory.

- <u>Teaching</u>: Rocchio's teaching courses include "Psychology of Women," "Towards Self Understanding," "Eating Disorders Prevention," "Psychology of Sexual Equality," "Women's Studies," and teaching 2-3 classes for a psychiatry seminar. These courses center on clinical psychology, gender, and mental health. And Rocchio's professional presentations and invited talks all seem to address anxiety / stress; women, beauty, and weight; trauma; and ethics. Rocchio's CV lists one presentation in 2025 at a judicial conference where she collaborated with two other individuals on "[t]he neuroscience of trauma and the causes and symptoms of

secondary trauma – invited presentation on addressing judicial challenges with primary and secondary trauma."

- <u>Funding</u>: Rocchio's sole listed grant, by Blue Cross / Blue Shield, was "to help local behavioral health practices better anticipate patient needs."

- <u>Professional experience</u>: Rocchio's clinical record–her externships, internships, and her private practice—appear to be focused on clinical assessment and treatment such as psychotherapy and trauma therapy, and on forensic assessments for litigation. It does not appear that any of this experience involves research or study of memory.

In conclusion, Rocchio's record demonstrates her expertise in clinical trauma treatment, ethics, and forensic assessment for litigation, but no training, research, or publication history in memory science. Under Rule 702 and <u>Daubert</u>, Rocchio is not qualified to offer expert opinions on the mechanisms of memory.

The government's disclosure regarding Hail also fails to set forth any of the reliability factors described in <u>Daubert</u>. Hail's conclusion is that drugs "with a sedative-hypnotic toxidrome" are commonly used to commit drug-facilitated sexual assaults. This summary conclusion has no nexus to the facts of *this* case and is not a reliable opinion for the jury to conclude what happened here. Accordingly, the defendants respectfully submit that the testimony of Rocchio and Hail should be precluded as failing to meet the reliability standard set forth in <u>Daubert</u>.

### 7.    Rocchio And Hail's Opinions Should Be Excluded Pursuant to Rule 403.

Both experts' testimony should be excluded as unreliable; Hail's testimony should also be excluded because of the untimely notice. But if the Court finds otherwise, portions of the proposed testimony should nonetheless be precluded as unduly prejudicial under Federal Rule of Evidence

403. Even testimony that satisfies Rule 702 may be excluded "it its probative value is substantially outweighed by . . . the danger of unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403; see also, Nimely, 414 F.3d at 397 (noting "the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberation"). This testimony includes Hail's opinions that ingestion of certain drugs led to certain alleged victim's responses, with no corroborative evidence; as well as Rocchio's opinion that perpetrators exploit pre-existing power dynamics for the purposes of committing sexual assault. See e.g., United States v. Forest, 429 F.3d 73, 81 (4th Cir. 2005) (finding the trial court's admission of expert testimony "describ[ing] a general profile of a serial child molester that closely resembled [the defendant's] behavior" to be "troubling," but concluding that any error in its admission was harmless).

In terms of the ingestion of drugs, unless the government indicates otherwise, it appears (i) there is no toxicology evidence of the presence of any substance being administered to anyone, (ii) no witness will testify that he or she saw any substance be put in a drink or administered in another way, (iii) no witness will testify that he or she tasted or smelled anything that caused them to believe a substance was in a beverage or administered another way, or (iv) there is no evidence in the countless written messages and communications of the defendants that they discussed drugging anyone or arranging for someone to be drugged. On the other hand, there is ample evidence of young people voluntarily drinking alcohol and possibly voluntarily ingesting other substances as part of their consensual knowing conduct. Given this factual record, the government should not be permitted to offer expert testimony as to a fact that is so lacking in the actual evidence.

The risk of prejudice and confusion that would result from Rocchio and Hail's testimony is significant. For all of the reasons highlighted above, the proposed experts' testimony would

consist of overly generalized, inapplicable, and purely anecdotal information regarding interpersonal violence and side effects of certain drugs.

This case requires the jury to resolve one issue – what was the nature of the relationship between these defendants and the alleged victims who take the stand. The jury will make this assessment by weighing the witness's credibility, the absence of any corroborative evidence, and the nature of their contemporaneous communications. Testimony about the typical behaviors or common drug reactions among the population-at-large are entirely devoid of relevance here. But even if the Court were to find some marginal relevance in this sweeping testimony, the prejudicial effect of its admission cannot be overlooked.

This testimony will invade the jury's fact-finding and credibility weighing province. The proposed testimony will ensure that the academic descriptions of trauma symptoms and drug reactions are sufficiently broad so as to necessarily incorporate and match the victims' testimony. Such broad descriptors will mislead the jury by focusing their attention on generalized concepts rooted in national statistics, rather than assisting them in evaluating the facts, testimony, and witness credibility *in this case*.

The Court should exclude the opinion testimony of each of the proposed experts as the risk of prejudice is severe, and the purely academic concepts proposed by these experts would do nothing more than mislead and confuse the jury.[5]

**II.      ████  TESTIMONY AND RELATED PHOTOGRAPHS SHOULD BE EXCLUDED**

### A.  Introduction

Defendants respectfully move *in limine* to preclude the government from introducing at trial any testimony from, or evidence relating to, ████████████, including testimony

---

[5] Alternatively, the defendants respectfully submit that this Court should conduct a <u>Daubert</u> hearing to determine the reliability of Rocchio or Hail's testimony.

about █████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████ This evidence is

inadmissible under Federal Rules of Evidence 403 and 404(b). ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

The Court should similarly preclude testimony that Victim 4 ████████

█████████████████████████████. The government did not include this alleged

conduct in its Rule 413 and 404(b) disclosures, and even if it had, the evidence is inadmissible

under Rule 403. ████████████████████████████████████████

████████████████████████████████████████ This evidence is

inadmissible under Rule 404(b) and must be excluded under Rule 403.

    **B.**    **Argument**

        **1.**  **The Court Should Exclude** █████ **s Testimony and Related Exhibits**

            **i.**  **Background**

At the January 15, 2025 detention hearing, the government proffered that it had a strong

case supported not just by victim accounts, but by other witnesses and prompt outcries. Det. Hrg.

Tr., Jan. 15, 2025: 80:2-16. The Court inquired how many outcry witnesses the government had,

and in response, the government volunteered details of a purported ear-witness █████████

█████████████████████████████ " . . . there is a percipient witness to that

assault who . . . hears somebody being assaulted, hears the request to stop, hears the cries, so does

not see the assault, but does overhear the reaction of the victim." Id. at 80:17; 81:17-23.[6]

The government has since learned that this cannot possibly be true.



[BLACK] Both [BLACK] 's testimony and the photographs should be excluded. [BLACK]

---

[6] An excerpt of the detention hearing transcript is included as Exhibit 1 in the Declaration.
[7] [BLACK]

██████████████████████████████████████████████████████

███████████

###### ii.    The Testimony Is Not Proof of the Charged Conspiracy

The indictment charges a conspiracy to commit sex trafficking through force, fraud, or coercion. ████'s account has no bearing on that charge. She does not describe an act of trafficking, commercial sex, or coercion. ████████████████████████████████████████

███████████████████████████████████████████████████

To be sure, a "trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment." United States v. Shin, 19 CR. 552 (JPC), 2022 WL 153184, at *4 (S.D.N.Y. Jan. 15, 2022) (internal quotations and citations omitted); see also United States v. Baez, 349 F.3d 90, 93 (2d Cir. 2003) (holding that when a conspiracy is charged, "uncharged acts may be admissible as direct evidence of the conspiracy itself"). But courts have repeatedly emphasized that when it is not "manifestly clear that the evidence in question is intrinsic proof of the charged crime," the government must proceed, if at all, under Rule 404(b). United States v. Nektalov, 325 F. Supp. 2d 367, 372 (S.D.N.Y. 2004).

Here, the government has never contended that ████'s account constitutes direct proof of the charged sex trafficking conspiracy. To the contrary, ██████████████████████████

████████████████████████████████████████████████████

---

[8] ███████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████



This evidence is therefore irrelevant to proving whether defendants participated in or committed the alleged sex trafficking offenses.  <u>See</u> Fed. R. Evid. 401-402.  It cannot serve as proof of the alleged conspiracy and should be excluded.

### iii.    The Court Should Preclude ███ 's Testimony

#### a.    The testimony is inadmissible under Rules 404(b) and 403.

Not only is ███ 's testimony inadmissible as evidence of the charged conspiracy, but it also does not fall within Rule 404(b). To start, the government failed to provide notice of this testimony in its Rule 404(b) disclosure.  It should be rejected on this basis alone.  But aside from untimeliness, ███ 's testimony of an uncharged act does not satisfy Rule 404(b)'s requirements.

Rule 404(b)(1) flatly bars the admission of "[e]vidence of any other crime, wrong, or act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  The limited exceptions in Rule 401(b)(2) apply only to genuinely non-propensity purposes, and even then, only where "the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403."  <u>United States v. Greer</u>, 631 F.3d 608, 614 (2d Cir. 2011).

The Second Circuit has cautioned that a district court may not freely admit evidence of conduct simply because it relates to the charged crimes or because the government offers it for a non-propensity purpose.  Zhong, 26 F.4th at 551. As the Court explained, "[o]ur inclusionary rule is not a carte blanche to admit prejudicial extrinsic act evidence that is offered to prove propensity, or otherwise to allow propensity evidence in sheep's clothing."  Id.  Likewise, district courts "should not presume that [other act] evidence is relevant or admissible."  United States v. Curley, 639 F.3d 50, 56 (2d Cir. 2011).   **Such evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor.**"  Shin, 2022 WL 153184, at *4 (quoting Huddleston v. United States, 485 U.S. 681, 689 (1988)) (emphasis added).

Even if the Court were to find some marginal non-propensity purpose for ███ 's testimony, Rule 403 requires exclusion.  Whatever minimal probative value ███ 's testimony might have is substantially outweighed by the dangers of unfair prejudice, confusion, and misleading the jury.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

      **b.**      **The testimony would improperly bolster other witnesses and create cumulative prejudice.**

Permitting ████ 's testimony would also serve to impermissibly bolster the credibility of

████████████████████████████████████████████████████

████████ That is not corroboration, it is propensity evidence. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

The Second Circuit has repeatedly warned that "other acts" evidence may not be used to inflame the jury. See Curley, 639 F.3d at 57 ("If the other acts tend to prove a fact not in issue or to excite emotions against the defendant, they create a prejudicial effect.") (internal quotations omitted). Where, as here, the alleged act is uncorroborated, speculative, and temporally adjacent to the charged offense, the danger that jurors will treat it as corroboration is acute. See Fed. R. Evid. 403. Allowing such testimony would enable the government to fill evidentiary gaps through insinuation of other uncharged but horrible-sounding conduct. As such, the Court should preclude ████ 's testimony and related evidence in their entirety.

      **2.**   **The Court Should Preclude Admission of Any Photographs or Evidence Relating to** ████████████████████

The government has produced photographs ████████████████████████████

████████████████████████████████████████████████████

These photographs should likewise be excluded.

As with ████ 's testimony, the photographs have no probative value. ████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████ See, e.g., United States v.

Dickinson, 16 F. Supp. 3d 230, 234 (W.D.N.Y. 2014) (defining "unfair prejudice" as "an undue

tendency to suggest decision on an improper basis commonly, though not necessarily, an emotional

one") (quoting Advisory Committee's Notes on Rule 403) (internal citation omitted). ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████

     Nor can the government admit these photographs as "other act" evidence under Rule

404(b). ████████████████████████████████████████████████

████████████████████████████████████ It proves nothing about defendants' conduct or

intent and would serve only to invite improper propensity reasoning.

**III.       PORTIONS OF ALLEGED VICTIM 4'S PROPOSED TESTIMONY SHOULD BE EXCLUDED**

    **A.  Background**



    **B.       The Evidence Is Inadmissible Under Rules 404(b) and 403**

This testimony should be excluded for reasons similar to those supporting the exclusion of ██████'s testimony. The government did not notice this conduct in its 404(b) disclosure. ███████ ████████████████████████████████████████████████████████████████████, the probative value of this evidence is exceedingly low and substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury.

United States v. Johnson provides useful insight with respect to the necessary 404(b)(2) analysis. See 22-CR-0494 (JS), 2025 WL 2959272, at *7-8 (E.D.N.Y. Oct. 17, 2025). In Johnson, the court allowed testimony about the defendant's violent sexual conduct with a deceased woman because it was highly probative of whether the defendant used force, fraud, or coercion to compel victims to engage in commercial sex acts. Id.

There, unlike here, a living witness was prepared to testify at trial that she observed the defendant "forcibly rape her roommate—a fellow sex worker in [the defendant's] employ," and that those observations "contributed to her continued engagement in commercial sex." Id. at 8.

Victim 4 will testify to no such thing. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

## IV. TESTIMONY SURROUNDING ALLEGED VICTIMS' MEDICAL AND MENTAL HEALTH TREATMENT AND DIAGNOSES YEARS AFTER THE CHARGED CONDUCT SHOULD BE EXCLUDED

As noted, the government seeks to elicit testimony from multiple witnesses that ███

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████ This testimony should be precluded for several reasons. <u>First</u>, this testimony is irrelevant to the charges, none of which contain, as an element, that a victim suffered any particular effect. <u>Second</u>, this testimony, referring to purported medical or psychological diagnoses is inadmissible hearsay. <u>Third</u>, this testimony is in the nature of expert testimony, which the government has not noticed and which, in any event, is improper. <u>Fourth</u>, even if marginally relevant and admissible under other rules of evidence – which the defense disputes – such evidence is unduly prejudicial under Federal Rule of Evidence 403.

Finally, if the Court permits this line of questioning, defense counsel respectfully requests that the Court order the defense's requested Rule 17 subpoenas to all medical, psychological, and psychiatric providers of these witnesses for the years in question following their allegations to allow defense counsel to cross-examine the offered testimony.

### A.  Argument

Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Fed. R. Evid. 401.

Mental health history may also be relevant where it pertains to the underlying charges. See, e.g., United States v. Ray, 585 F. Supp. 3d 445, 459 (S.D.N.Y. 2022) (where the government alleged that the defendant exploited victims' mental health vulnerabilities, "[e]vidence that the alleged victims did, in fact, have mental-health vulnerabilities prior to meeting Ray would tend to support the proposition that they had the vulnerabilities they reported to Ray and thus would make that fact—of the mental health vulnerabilities and self-doubts" more probable under Rule 401(a)).

Evidence of a witness's mental condition or diagnosis which arose *after the allegations* is generally inadmissible as it will only serve to unfairly bolster the victim's account of what happened. See United States v. Arias, 936 F.3d 793, 798–99 (8th Cir. 2019) ("Arias I").

If allowed, evidence of medical or mental health diagnoses can, at times, be admissible through an expert witness. Rule 701 provides that a lay witness may only testify about opinions that are "rationally based on the witness's perception," and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(a), (c); see also United States v. Johnson, 16-CR-457-1 (NGG), 2017 WL 11490479, at *2 (E.D.N.Y. Aug. 4, 2017) ("Whether a witness is testifying as an expert or non-expert depends on whether his testimony is based on personal perceptions of the matters in issue on the one hand or his specialized knowledge of issues relevant to the case on the other."). For this reason, *"[m]edical diagnoses and their causes are highly technical and thus generally require specialized testimony*." Woolfolk v. Baldofsky, 19-CV-3815 (WFK) (ST), 2022 WL 2600132, at *4 (E.D.N.Y. July 8, 2022) (emphasis added).

Under Rule 403, a court may exclude relevant evidence if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Evidence is only probative "if it tends to prove or actually proves a proposition." United States v. Garnes, 102 F.4th 628, 638 (2d Cir. 2024) (quoting United States v. Jamil, 707 F.2d 638, 642 (2d Cir. 1983)). Evidence is deemed prejudicial "when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." United States v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980). "The prejudicial effect may be created by the tendency of the evidence to prove some adverse fact not properly in issue or unfairly to excite emotions against the defendant." Id.

This Court should preclude testimony from the alleged victims regarding uncorroborated collateral consequences of post-incident medical diagnoses, mental health diagnoses, and general opinions surrounding their medical and mental health condition.

### 1. Testimony Regarding Post-Incident Medical and Mental Health Diagnoses Is Not Relevant Pursuant to Rule 401

The proposed testimony is not relevant—there is no fact of consequence that is made more or less probable by the admission of this testimony. The proposed evidence concerning the victims' mental or emotional state in the years (and even decades) following the allegations is irrelevant to the elements of the charge. Unlike in civil matters, where testimony of medical diagnoses and injuries may be relevant to the underlying claims and related damages, the same cannot be said here. See, e.g., Miller-Harris v. County. of Onondaga, 22-CV-1363 (AJB) (DJS), 2025 WL 3022162, at *16 (N.D.N.Y. Oct. 29, 2025) (permitting a defendant's expert witness to testify about "post-incident diagnoses because this expert testimony may rebut or mitigate damages").

This is not a case where evidence concerning a witness's mental health is relevant because the defense is calling into question the accuser's psychological history or the accuser's mental health challenges, in which case, diagnoses can be relevant to an accuser's ability to testify. See, e.g., United States v. Sasso, 59 F.3d 341, 347 (2d Cir. 1995) ("Evidence of a witness's psychological history may be admissible when it goes to her credibility."); United States v. Wilson, 493 F. Supp. 2d 464, 467 (E.D.N.Y. 2006) (holding that defense counsel could question a witness about recently developed mental health challenges, as "[t]hese problems may be relevant to a witness's ability to testify coherently and accurately at trial"). To determine the probative value of such evidence, courts weigh "the nature of the psychological problem," "the temporal recency or remoteness of the history," and "whether the witness suffered from the problem at the time of the events to which she is to testify." Sasso, 59 F.3d at 347-348.

The Eighth Circuit's decision in United States v. Arias, *supra*, is instructive in understanding the dangers associated with the admission of this sort of testimony. Arias was convicted of aggravated sexual abuse of a child. Arias I, 936 F.3d at 795. During the trial, the government asked the alleged victim about any mental health diagnoses she had received after the alleged incident. Id. at 796. Arias' objection was overruled. Id. The victim testified that she had been diagnosed with anxiety and PTSD. Id. Arias moved for a mistrial, arguing his Confrontation Clause rights were violated by permitting the victim's testimony about post-incident diagnoses while denying him access to the mental health records. Id. He further argued that testimony of a PTSD diagnosis from a mental health professional unfairly bolstered the victim's credibility. Id. His motion was denied. Id. On appeal, the Eighth Circuit remanded for "an *in camera* review of the mental health records to determine whether refusal to allow access to the records was harmless." Id. at 795.

35

On remand, the District Court ruled that the refusal to require disclosure of the victim's mental health records was harmless. Arias appealed again to the Eighth Circuit. United States v. Arias, 74 F.4th 544 (8th Cir. 2023) ("Arias II"). The Court of Appeals reversed. Id. at 554. The court held that the prosecutor's questioning of the victim, coupled with the refusal to disclose mental health records to the defendant, violated his Confrontation Clause rights and the error was not harmless. Id. at 551. His conviction was vacated and the matter was remanded for a new trial. Id. at 555.

Based on the inherent dangers associated with this type of evidence and its irrelevance to the charges, this Court should preclude its admission.

### 2. Testimony Regarding Purported Health Diagnoses is Inadmissible Hearsay

The proposed testimony is hearsay not subject to any Rule 803 exception. To the extent that the government seeks to offer such testimony to prove that the accusers did, in fact, have a condition or receive a diagnosis, this is plainly hearsay. See Fed. R. Evid. 801(c) (testimony is inadmissible under the hearsay rules if it is uttered by an out-of-court declarant and offered for the truth of the matter asserted). If a physician evaluated and diagnosed these alleged victims, that is the declarant who would need to be called to testify about it. Yet, here, the government has not secured relevant medical records and are content relying on the accusers' untested assertions as to what diagnoses they received.

### 3. The Alleged Victims Are Not Qualified and Have Not Been Offered to Provide Expert Opinion Testimony Regarding Medical Findings and Diagnoses

The accusers are not qualified to offer diagnoses to bolster their testimony in front of the jury, as this constitutes a medical opinion and should be offered through expert testimony on these subjects, pursuant to Rule 701. Lay witnesses cannot testify about their own medical diagnoses, conditions, and issues related to medical causation. Such testimony offers medical conclusions that

require scientific, technical, or other specialized knowledge of an expert witness. See Woolfolk, supra.; see also Wills v. Amerada Hess Corp., 379 F.3d 32, 46 (2d Cir. 2004) ("Where . . . the nexus between the injury and the alleged cause would not be obvious to the lay juror, [e]xpert evidence is often required to establish the causal connection between the accident and some item of physical or mental injury.") (cleaned up); Barnes v. Anderson, 202 F.3d 150, 159 (2d Cir. 1999) ("[e]xpert medical opinion evidence is usually required to show the cause of an injury or disease because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person."); Kokoska v. City of Hartford, 12-CV-01111 (WIG), 2014 WL 4724879, at *4 (D. Conn. Sept. 23, 2014) ("In the absence of expert testimony or medical records, Plaintiff may not testify that he suffers from a particular psychological diagnosis or that such psychological condition is causally related to the events giving rise to this claim.").

### 4.    Testimony Regarding Health Diagnoses is Unduly Prejudicial

The Court should preclude this evidence as its admission would unduly prejudice the defendants by impermissibly bolstering the accusers' testimony. A Rule 403 objection requires the Court to conduct a "conscientious assessment" to determine "whether there exists any alternative evidence with the same or greater probative value, but with a lesser threat of unfairly prejudicing the defendant, as the proffered evidence." United States v. Ozsusamlar, 428 F. Supp. 2d 161, 170 (S.D.N.Y. 2006).

Such a conscientious assessment reveals the obvious issue with the government's proffered evidence – what is its probative value in the first instance? What fact at issue, regarding allegations of force, fraud, and coercion, will it assist the jury in evaluating? What does a supposed medical or mental health diagnosis after an alleged incident tell the jury about what happened on the date in question? Nothing. Its admission will serve to improperly bolster the accusers' testimony by

implying to the jury that ██████████████████████████████████████

██████████████████████████████

      In <u>Arias I,</u> the Court addressed the defendant's objection to testimony from an alleged victim about a post-incident PTSD diagnosis. 936 F.3d at 799. The Court held that the victim's testimony "that she had received a post-assault diagnosis of PTSD tends to substantially bolster her accusation of a sexual assault" and that "[t]he clear implication of the testimony is that an objective medical professional found that she had suffered a traumatic event, and the timing of the diagnosis would tend to suggest to the jury that the assault was that event." <u>Id.</u> The danger of prejudice and the argument for preclusion are identical here, as the proposed testimony would send the "clear implication" that the Alexander brothers must have caused whatever ailments that the alleged victims describe.

### B.    In the Alternative the Defense Requests Rule 17 Subpoenas for Actual Evidence – the Underlying Medical Records

      If the Court admits the challenged testimony over defendants' objections, the Court should grant the defense Rule 17(c) subpoenas to all medical providers ████████████████████

████████████████████████████████████████████████████████████████

██████████ who evaluated and supposedly made these diagnoses to the accusers to enable defendants to cross-examine the accusers on their testimony and ensure the jury can evaluate reliable testimony.

      The Sixth Amendment provides defendants with the right to confront witnesses in criminal proceedings. <u>See</u> U.S. Const. amend. VI. Granting Rule 17 subpoenas for the records that the accusers themselves have put at issue will ensure that the defendants can confront and cross examine the witnesses on these claims, and call the medical professionals who apparently diagnosed them as witnesses on the defense case.

Rule 17(c) governs the issuance of subpoenas to produce documents in advance of trial. That rule provides in relevant part:

> . . . In General.  A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates.  The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence.  When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

Fed. R. Crim. P. 17(c)(1).

When subpoenas require the production of personal and/or confidential information about an alleged victim, they must be made on notice to the alleged victims so that they have an opportunity to move to quash, modify, or object to their issuance. See Fed. R. Crim. P. 17(c)(3).

A Rule 17(c) subpoena is justified if the moving party demonstrates:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

United States v. Nixon, 418 U.S. 683, 699-700 (1974).

The materials sought pursuant to Rule 17 satisfy the requirements of Nixon.

First, if the Court deems testimony on the medical diagnoses to be relevant, then the accusers' medical and mental health records are relevant to admit. Insofar as the government seeks to rely on lay witness accounts of medical diagnoses, treatment, findings, and causation, it is necessary for defense counsel (and the jury) to understand the veracity and reliability of such testimony.

The court in <u>Arias I</u>, <u>supra</u>, found that the refusal of the district court to grant disclosure of mental health records deprived the defendant of an opportunity to cross-examine the witness:

> "Without access to the records, Arias was unable to ascertain whether or not [the victim's] testimony that she had been diagnosed with PTSD was accurate or whether other traumatic incidents were related to the PTSD diagnosis—separate issues dealing with a distinct mental illness, and which correspondingly would raise alternative theories of defense. And if the records revealed that there was no diagnosis, then Arias was denied the opportunity to cross-examine on an issue which would have directly related to [the victim's] credibility in a case that rested entirely on conflicting testimony."

<u>Arias I</u>, 936 F.3d at 799; <u>see</u> <u>also</u> <u>Arias II</u>, 74 F.4th at 551 ("Arias should have been given an opportunity to explore the veracity of that testimony as well as the chance to refute the unmistakable impression left with the jury that the underlying cause for the PTSD diagnosis was the alleged sexual assault."). Not allowing the defense to access or inspect the records, the defendants would be similarly harmed. The accuser's untested and uncorroborated allegations would be accepted as accurate without the defendants' ability to test whether the diagnoses were "accurate" or due to "other traumatic incidents," exactly what the holding in <u>Arias</u> requires. <u>Second</u>, as these records contain personal and confidential information related to an individual's doctor-patient relationship, they cannot otherwise be procured by defense counsel absent an order from the Court.

<u>Third</u>, defense counsel cannot adequately prepare for trial while this critical issue remains unresolved. In a case based entirely on uncorroborated witness accounts and testimony regarding years-old events, defense counsel needs every opportunity to meaningfully and effectively confront the accusers. Should the Court permit these witnesses to testify about diagnoses and conditions revealed after the allegations at issue, defense counsel needs an opportunity to probe the veracity of that testimony and refute it, including investigating alternative reasons for

███████████████████████████████████████████

███████████████████████████████████████████

Fourth, Rule 17 subpoenas cabined to medical and therapy records that the accusers themselves have introduced into the case is not a "fishing expedition." To the contrary, the defendants' request is appropriately tailored to an issue the government intends to introduce. The defendants seek to review the accusers' medical records to verify (1) whether the diagnoses are accurate and, if so, when they were given and by whom; and (2) whether any other events, either before or after the allegations in this matter, may have contributed to that diagnosis. Without such information, a jury would be left with an incomplete understanding of the accusers' testimony. In sum, the government cannot have things both ways. They cannot admit lay testimony concerning physical and psychological diagnoses without the defense being able to challenge this testimony with the actual records.

## V.    DEFENSE EVIDENCE USED FOR IMPEACHMENT ON CROSS-EXAMINATION SHOULD NOT BE REQUIRED TO BE PRODUCED BEFORE TRIAL

Next, we ask for a ruling that the defense does not have to preview or forecast its cross examination of government witnesses. Specifically, we ask that the Court not require us to hand over to the government all of the exhibits we plan to use on cross-examination before the cross itself, especially when those exhibits would undermine the credibility of the witness.

John Henry Wigmore's famous assertion that cross examination is "beyond any doubt the greatest legal engine ever invented for the discovery of truth," United States v. Salerno, 505 U.S. 317 (1992) quoting 5 J. Wigmore, Evidence, Sec. 1367, p.32 (J. Chadbourn rev. 1974), would be a nullity if the witness was shown all the defense exhibits to be used during the cross ahead of time. Rule 16, read properly, requires production only of "case-in-chief" exhibits.   In our view, these are exhibits used by the defense with witnesses that the defense calls during the defense case.

41

We seek a ruling now because we now possess, and are continuing to gather, a raft of material that flatly undermines the credibility of a number of government witnesses. We intend to confront these witnesses with their own words and actions (as memorialized in tangible evidence) and call into question the veracity of their allegations. But we should not be required to produce this material to the government in advance of cross-examination, and certainly not in advance of trial. Otherwise, the government will be able to prepare their witnesses on how to handle this devastating impeachment material. The jury should be allowed to actually see the unrehearsed, uncoached reactions of the witnesses to assess their credibility.

It would be fundamentally unfair not just to the defendants but to the trial process to require the defense to lay out its impeachment material two weeks before trial starts. The defense intends to produce Rule 16 material, as we identify it, in a timely fashion. We also intend to produce all defense exhibits we intend to use as part of the defense's case-in-chief by the agreed-upon deadline of December 22, 2025.

Here, however, we seek an Order from the Court that the defense is not required to disclose the exhibits we intend to use on cross-examination until after the government's witness has finished their direct examination (thus precluding the government from preparing the witness using these materials).

Once the government invokes reciprocal discovery, Federal Rule of Criminal Procedure 16(b)(1)(A) requires a defendant to provide the government with those items it intends to use in its "case-in-chief at trial." We expect that the government will respond that "case-in-chief" includes exhibits that a defendant may introduce when cross-examining a government witness. The law, common sense, and common practice in this and neighboring districts supports the contrary view.  United States v. Harry, 2014 WL 6065705 (D.N.M. Oct. 14, 2014) analyzed this

issue extensively. The court conducted a wide-ranging survey of the term "case-in-chief" by the Supreme Court and other federal appellate courts and concluded that: "[c]ourts have repeatedly used the term case-in-chief to refer to the part of a trial between the time that a party calls its first witness and when it rests." Id. at *6. The Harry court determined that United States v. Hsia, 2000 WL 195067 (D.D.C. Jan. 21, 2000) was wrongly decided, because Hsia interpreted "case in chief" in a way "contrary to the traditional definition of the word." Id. at *7 (noting that the "case-in-chief" definition results from the reading of a secondary, non-favored definition found in Black's Law Dictionary).

> Because the term case-in-chief has continuously been defined and used in a manner that refers to the part of a trial in which a party calls its first witness until it rests, and because there is no indication that the term was intended to be defined in rule 16(b)(1)(A) in a manner contrary to its traditional definition, the Court concludes that the term "case-in-chief," as rule 16(b)(1)(A) used the phrase, refers to evidence that a party presents between the time that the party calls its first witness and the time the party rests. There could be cases where everyone agrees that, to avoid recalling witnesses, everyone will just ask all of their questions while the witness is present; and the cross-examination is really a direct examination with non-leading questions; and in such cases the defendant's case-in-chief should include that direct examination; but without such circumstances, the Court should treat case-in-chief with its traditional meaning. This bright-line rule seems particularly right, again that a defendant does not have to put on a case-in-chief at all, and if the defendant does not, it does not appear fair for the Court to nonetheless find that everything the defendant says in the United States' case-in-chief is the defendant's case-in-chief.

Id. at *10; see also United States v. Kubini, 304 F.R.D. 208, 214 (W.D. Pa.2015) ("Hsia and Swenson do not represent settled law and other courts have criticized the approach set forth therein."). Other district courts support this approach. See United States v. DeLeon, 2015 WL 15145. Notably, in United States v. Lambert, 580 F.2d 740 (5th Cir. 1978), the Fifth Circuit held that the defense was not prejudiced by the government not producing evidence to the defense prior to cross-examination of the defendant because the evidence was introduced only as impeachment evidence during cross-examination. Id. at 746.

The defense will make the initial determination whether specific evidence is subject to our reciprocal discovery obligations under Rule 16. See United States v. Holden, 2015 WL 1514569 (Mar. 19, 2015). But much of the evidence that we intend to use on cross-examination of the government's witnesses is truly impeachment material, and therefore it is not subject to reciprocal discovery obligations. Recent practice in similar cases supports this position.

In United States v. Raniere, 18 Cr. 204 (E.D.N.Y.) (NGG) the government attempted to get an Order from the Court to receive all cross- examination materials from the defense prior to the witness taking the witness stand. The Court granted the government's motion. ECF No. 622. However, after lengthy oral argument on the issue, the Court held that if there are "questionable cross-examination materials," that the defense should provide those "materials to the Court *ex parte*" for the Court to rule as to whether those materials should be produced to the government in advance of cross-examination. *See* 5/6/2019 Transcript at p. 647. At trial, the Court proceeded by reviewing materials *ex parte* if there were any materials that the defense believed were not case-in-chief material and was to be used to question the veracity of the government's witnesses.

In United States v. Combs, 24 Cr. 542 (S.D.N.Y.) (AS), the Court ordered that all exhibits, except for impeachment exhibits, be produced to the government the night before the witness' testimony by 7 p.m., and ordered the government not to prepare their witnesses on those exhibits unless the government was already intending on showing those documents to the witness. ECF No. 339. Any objections to any exhibits were then raised later that evening, and discussed in Court before witness testimony, similar to this Court's individual rules.

We believe that a procedure similar to Combs is appropriate here: defendants should produce exhibits the night before cross examination to ensure efficiency but prevent the government from preparing their witnesses using the defendants' own evidence. The practice used

in <u>Combs</u> would also align with this Court's individual rules, which state that the Court strongly prefers to resolve objections to exhibits prior to the time that trial sessions begin each day. With counsel producing exhibits that we intend to introduce on cross-examination the night before each trial day, the parties would be able to bring any objections to the Court in advance enabling the Court to "hold a conference prior to the time that the trial session is scheduled to begin." This would allow for an efficient trial, and can give the Court comfort that the defense is not looking to play games nor to cause delays.

As defense counsel, it is difficult to predict how defense will use exhibits until we see how a witness answers questions. And at this stage of the proceeding, when defendants have just received Jencks Act material, we cannot be expected to know what our case-in-chief will be, or whether there will even be one, before the government's case begins. Moreover, it is simply unworkable that we will know what material—if any—we intend to offer into evidence in examining government witnesses until witnesses actually testify.

For the alleged victims that we were able to identify prior to the government producing Jencks Act material, the defense has been able to locate evidence that undermines nearly every aspect of the alleged victims' narratives. The defense believes this evidence is proper impeachment, as it undermines witnesses' year-long narrative to prosecutors and agents. In support of our contention that this is proper impeachment material, if helpful to this Court's analysis, counsel is prepared to provide an *ex parte* declaration with examples of these proper impeachment materials.

We believe that many witnesses are going to testify untruthfully on direct examination—whether it be because of their own current situation, their motive to lie for monetary gain, or their situation at the time. The witnesses (as we will show on cross) do not want to admit to the world

that they consensually engaged in sexual activity with any of the Alexander brothers. The defense will be able to show that their testimony is not truthful and the way to do that is to show the jury numerous instances where their testimony is a lie, through, in part, photographs and through close-in-time text messages.

Defendants have a right to confront witnesses with the element of surprise. If we are forced to give the government, far in advance, the evidence with which we will confront witnesses, the prosecutors will sit down with the witness and they will prepare the witness.  The witness's testimony in front of the jury will change, and it will change forever. The defendants will not be able to show the jury that the witness was not being truthful. The defendants will not be able to show the jury certain specific areas where the witness lied, exaggerated, or misremembered certain things. And the reason the defendants will not be able to do that is because we would have given the government material to help the government prepare their witness for this examination.

To the contrary, if the defense would like to question government witnesses about evidence related to the defendant's work history, their successful work endeavors, or something that is clearly not impeachment of the witness' false narrative of sex assault, the defense agrees that is case-in-chief material. In other words, if defense counsel ventures into a new area outside the scope of direct examination with the witnesses, the defense agrees that this is "case-in-chief" testimony, and exhibits supporting that new area of examination must be turned over.

Accordingly, we seek an Order from the Court requiring the defense to disclose the exhibits we intend to use on cross-examination the evening before the material will be used, and precluding the government from preparing its witnesses with those materials.

**CONCLUSION**

For the reasons discussed above, defendants request, respectfully, that the Court exclude:

- The testimony of Rocchio and Hail (or, in the alternative as a first step, that the Court conduct a <u>Daubert</u> hearing);

- The testimony of ███;

- The evidence related to ███ discussed above;

- The portions of alleged Victim 4's testimony discussed above; and

- Testimony about medical or mental health treatment that took place long after the charged conduct.

Finally, we request that the Court rule that defense evidence, to be used as impeachment on cross-examination, need not be produced pre-trial.

Dated:  November 5, 2025
      New York, New York

Respectfully submitted,

Marc Agnifilo
Zach Intrater
Teny Geragos
Agnifilo Intrater LLP
140 Broadway, Ste. 2450
New York, NY 10005
Tel: (646) 205-4350
marc@agilawgroup.com
zach@agilawgroup.com
teny@agilawgroup.com

*Attorneys for Oren Alexander*

Howard Srebnick
Jackie Perczek
Black Srebnick, P.A.
201 South Biscayne Blvd.

Suite 1300, Miami, Fl 33131
Tel: (305) 371-6421
hsrebnick@royblack.com
jperczek@royblack.com
Jason Goldman
The Law Offices of Jason Goldman
275 Madison Avenue, 35th Floor
New York, NY 10016
Tel: 212-466-6617
jg@jasongoldmanlaw.com

*Attorneys for Alon Alexander*

Milton L. Williams
Alexander Kahn
Deanna M. Paul
Walden Macht Haran & Williams LLP
250 Vesey Street, 27th Floor
New York, New York 10281
Tel: (212) 335-2381
mwilliams@wmhwlaw.com
akahn@wmhwlaw.com
dpaul@wmhwlaw.com

*Attorneys for Tal Alexander*