**Black Srebnick**
CIVIL | CRIMINAL

Office: 305.371.6421
HSrebnick@royblack.com

November 25, 2025

The Honorable Valerie E. Caproni
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Alon Alexander et al.*, 24 Cr. 676 (VEC)

Dear Judge Caproni,

    Defendants Alon, Oren, and Tal Alexander submit this opposition to the government's supplemental motion to exclude the testimony of defense expert Dr. Deryn Strange. This District has repeatedly held that similar proffered testimony from Dr. Strange is admissible under the Federal Rules of Evidence and under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). *See United States v. Maxwell*, 20 Cr. 00330, DE:516 (S.D.N.Y. Nov. 21, 2021) ("Much like Dr. Rocchio may inform jurors that victims of sexual assault often delay disclosure, [the defense expert] may inform jurors that the literature indicates that false accusations can result from suggestive activities or false memory creation"); *United States v. Paduch*, 23 Cr. 00181, DE:126 (S.D.N.Y. May 3, 2024) (allowing Dr. Strange to testify to: her opinion "that information acquired over time can change how people interpret earlier events"; her opinion "that the information that people learn from others can influence how they later recall an event"; "her opinion that the influence of other sources such as media, retelling of a story, therapy, and dreamscan lead to the formation of false memories"; and her opinion "that a history of trauma can increase the likelihood of memory distortion"). "[T]he rejection of expert testimony is the exception rather than the rule." *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 75 (S.D.N.Y. 2001).

    The government's supplemental filing reiterates many of the arguments the government raised in its initial motion. To advance its mistaken reading of the applicable science, the government relies on non-peer-reviewed articles to rebut peer-reviewed scientific literature. The government thus asks this Court to exceed its gatekeeping role under *Daubert*, to disregard the scientific literature, and to instead pre-judge and weigh the competing evidence in the case—a task left to the jury. A *Daubert* hearing will establish

Honorable Valerie E. Caproni
November 25, 2025
Page 2
_____

Dr. Strange's qualifications (which remain uncontested by the government); the reliability of her opinions; and the helpfulness of her opinions to the jury.

It is "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof that are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. *See also Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 317 (S.D.N.Y. 2015) ("[W]hile the evidence underlying" one party's expert testimony may, in the other party's "view, be thin, questionable, or self-servingly selective," the Court's "role as gatekeeper is not to divest" one party "of the task of challenging the weight of such evidence before the trier of fact"). This principle is particularly important in criminal cases, where the defendants' constitutional right to present a complete defense is at stake.

The government's supplement first cites a non-peer reviewed study by Brewin and Andrews (Chris R. Brewin and Bernice Andrews, *False Memories of Childhood Abuse*, British Psychological Society, June 7, 2019, https://www.bps.org.uk/psychologist/false-memories-childhood-abuse) to argue that the peer-reviewed studies cited by Dr. Strange are unreliable. As a peer-reviewed article has found, in rebutting positions advanced by Brewin and Andrews, "[d]ecades of research shows that people can come to remember events that never happened." Robert A. Nash, Kimberly A. Wade, Maryanne Garry, Elizabeth F. Loftus, and James Ost, *Misrepresentations and Flawed Logic About the Prevalence of False Memories*, Appl. Cognit. Psychol. 31: 31-33 (2017) (responding to a 2016 paper by Brewin and Andrews, *see* C.R. Brewins & B. Andrews, *Creating memories for false autobiographical events in childhood: A systematic review*, Applied Cognitive Psychology, doi: 10.1002/acp.3220 (2016)). As Nash *et al.* explain:

> [P]erhaps at this point a critic might charge that the literature we have just presented confirms that most people are *not* susceptible to the influences that create false memories or false beliefs. That is essentially what Brewin and Andrews (2016) themselves have said. ***But such a claim fundamentally misrepresents scientific understanding* . . . *Study after study shows that what begins merely as a subject's willingness to entertain a suggestion often develops over the course of the study into a richer and compelling recollection***. People's ratings of the characteristics of their own memories also increase in parallel with independent judges' ratings. We can ponder for a moment what would happen as the number of sessions increased to approximate the number of times someone would see a therapist. The smart



Honorable Valerie E. Caproni
November 25, 2025
Page 3
_____

> money is on the prediction that the rate of false memories and the strength of self-report ratings would increase.

*Id.* (italics in original; bolded italics added). "In short, scholarly opinions about the fragility of memory derive from many different types of studies[.]" *Id.* (citing Bahrick, Hall and Berger, *Accuracy and distortion in memory for high school grades*, Psychological Science, 7, 265-271 (1996) [people remember their school grades as better than they actually were]; Lief & Fetkewicz, *Retractors of False Memories: The evolution of pseudo-memories*, Journal of Psychiatry & Law, 23, 411-435 (1995) [people who came to realize they were abused but later realized the memories were false]; J. De Rivera, *Understanding persons who repudiate memories recovered in therapy*, Professional Psychology: Research and Practice, 31, 378-386 (2000) [same]; Schacter & Loftus, *Memory and law: What can cognitive neuroscience contribute?*, Nature Neuroscience, 16, 119-123 (2013) [reviewing the many studies of information showing that people's memories are easily and quickly distorted]). The government oversimplifies Dr. Strange's proffered testimony—and the relevant literature—in suggesting that it refers only to wholesale creation of false memories. Moreover, under *Daubert*, the "focus, of course, must be solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595. The methodology supporting Dr. Strange's conclusions is reliable; the government must save its nit-picking of her conclusions for cross-examination.

Dr. Strange relies on research indicating that memory's malleable nature is *not limited to false memory creation* but rather stands for the broader principle that reinterpretation does occur. The government contends that a "cursory review of the relevant research reveals notable holes in Dr. Strange's opinion." Govt. Suppl. Motion at 3. But that is precisely the problem with the government's argument. Scientific literature is not meant to be reviewed in a cursory fashion, but rather by a trained expert who has a professional understanding of the implications of the research against the backdrop of broad-based and thorough familiarity with the relevant psychological literature. That literature rebuts the point raised by the government: "Though the studies are enormously burdensome to conduct, involving contact with parents and multiple interviews and online surveys per participant, ***the actual manipulation of memory is quite mild***." Gillian Murphy and Ciara M. Greene, *Who Got Lost in the Mall? Challenges in Counting and Classifying False Memories*, Applied Cognitive Psychology (2025) (emphasis added). The government's own cited authorities support this point; indeed, the government relies on research from Alan Scoboria in its own brief. But as "Scoboria and Mazzoni (2017) noted"—in a different article than that relied upon by the government—this manipulation of memory in the



Honorable Valerie E. Caproni
November 25, 2025
Page 4

_____

studies "***pales in comparison to the kind of memory distortion that might occur over years of suggestive therapy***." *Id*. (citing A. Scoboria and G. Mazzoni, *Invited Commentary on Brewin and Andrews* (2016), Applied Cognitive Psychology 31, no. 1:28-30, (2017)) (emphasis added). "[T]he implantation methods used in these studies are fairly light-touch." *Id*. The government's misapprehension of the scientific literature does not rebut the reliability of the methodology used by Dr. Strange.[1]

The government also argues that the proffered testimony should be excluded because "typically only a minority of participants develop a false memory of the event." The government relies on a 2017 study from Alan Scoboria, *A Mega-Analysis of Memory Reports from Eight Peer-Reviewed False Memory Implantation Studies*, Memory 2017 at 25-27, to support this point, arguing that the false memory rate can range from 19 percent to 46 percent; as well as an article from Amanda J. Barnier, et. al., *A conceptual and Empirical Framework for the Social Distribution of Cognition: The Case of Memory*, Cognitive Systems Research March 2008 at 15 (finding rates of 30 percent). As an initial matter, these statistics render the testimony relevant and admissible—they do not justify its exclusion, nor does the government explain why these statistics are a basis for exclusion rather than a topic to explore on cross-examination.

Second, and more importantly, experts have explained that false memory statistics as low as 15 to 20 percent (purportedly representing the percentage of participants who

---

[1] Notably, the government's "cursory review" does not challenge the reliable coding scheme used in the studies relied upon by Dr. Strange. To the extent that it does, there are "extensive debates in the memory literature regarding how best to code transcripts for the presence of a false memory[.]" Gillian Murphy and Ciara M. Greene, *Who Got Lost in the Mall? Challenges in Counting and Classifying False Memories*, Applied Cognitive Psychology (2025) ("[r]esearchers have previously critiqued count-based methods of assessing memory" such as those used in a 2024 study by Andrews & Brewin, whose research the government has cited) (citing K.A. Wade, M. Garry, and K. Pezdek, *Deconstructing Rich False Memories of Committing Crime*: *Commentary on Shaw and Porter* (2015), Psychological Science 29, no. 3:471-476 (2018), and agreeing with the criticism of Andrews and Brewin; arguing that "[c]ounting the presence of 'key' details from a prompt is one way to assess the richness of false memories, but it is not the only way—and in fact, we would argue it is one of the least valuable in terms of understanding memory (re)construction"). These nuanced debates over best coding schemes do not change the fundamental conclusion compelled by the scientific studies: that memory reinterpretation happens particularly when certain suggestive factors are present.



Honorable Valerie E. Caproni
November 25, 2025
Page 5

_____

developed rich false memories packed with perceptual detail) are "somewhat astounding given that some of these memories were elicited under experimental conditions designed to produce low false memory rates." Nash *et al.* (2017). "If this figure were true, then false memories would still be a serious problem. But the figure is higher than 15 percent. False memories occur even after a few short and low-pressure interviews, and with each successive interview, they become richer, more compelling, and more likely to occur. ***It is therefore dangerously misleading to claim that the scientific data provide an 'upper bound' on susceptibility to memory errors***." *Id*. (emphasis added). "[P]rior published work . . . has established that memory rates can vary hugely when different [coding] schemes are applied." Murphy and Greene (2025). "Whether false memories occur in a given paradigm 5% of the time or 55% of the time ***does not change what these paradigms tell us about the nature of human memory, nor does it change the forensic implications***." *Id*. (emphasis added). "Even if we could settle on an agreed [false memory] rate (a very difficult task given the variables involved), that would not tell an investigator or an expert witness whether a given memory is false." *Id*. (citing T. Smeets, H. Merckelbach, M. Jelicic, and H. Otgaar, *Dangerously Neglecting Courtroom Realities*, Applied Cognitive Psychology 31, no. 1:26-27 (2017)). "[T]o quibble over the precise rate of false memory in a given study is essentially to miss the point regarding the potential harms to the therapeutic patients." *Id*. (citing K.A. Wade, P. Riesthuis, C. Bucken, H. Otgaar, and E.F. Loftus, *Still Lost in the Mall—False Memories Happen and That's What Matters*, Applied Cognitive Psychology 39, no.1: e700028 (2025)). Such quibbles likewise miss the point regarding the reliability of the testimony, the helpfulness of that testimony to the jury, and accordingly its admissibility under *Daubert*.

To the extent that the government's proposed expert may disagree with certain nuances in Dr. Strange's opinions, scientific disagreement about the nuance of such studies and the lessons derived from such studies is not a basis for exclusion under *Daubert* but rather a dispute for the jury to resolve. *See Colon ex rel. Molina*, 199 F. Supp. 2d at 75 ("the Second Circuit espouses a particularly broad standard for the admissibility of expert testimony") (citing *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) for the principle that such testimony is to be admitted unless purely conjectural or based on totally unfounded assumptions). In seeking to substitute its own view of the scientific literature for that of the expert, the government distorts the *Daubert* standard. "Unless the information or assumptions that [defense] experts relied on were 'so unrealistic and contradictory as to suggest bad faith,' inaccuracies in the underlying assumptions or facts do not generally render an expert's testimony inadmissible." *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 269 (S.D.N.Y. 2010) (citing *Zerega Ave. Realty Corp. v. Hornbeck*



*Offshore Transp., LLC*, 571 F.3d 206, 214 (2d. Cir. 2009)). "The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (internal quotation marks and citation omitted). "This limitation on when evidence should be excluded accords with the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Id*.

The government's hyper-focus on distinguishing the facts of the peer-reviewed studies relied upon by Dr. Strange (again, applying a common-law approach rather than a scientific one) stands in contrast to the conclusions reached by its own expert, Dr. Rocchio. Materials recently provided by the government indicate that when Dr. Rocchio was asked by the government to provide a study to support opinions Dr. Rocchio formed with the "Trauma Science Research Group about the literature surrounding false memory," Dr. Rocchio replied:

> [I]t was not a specific study—we were a group of interdisciplinary professionals with specialized expertise in trauma science surrounding memory and memory accuracy, distortion and suggestibility, evidence-based of interventions for treatment of sexual abuse trauma on professional practice, and the impact of media reports regarding false memories. ***We did conduct interviews and collect data from local therapists regarding their beliefs and practices*** with survivors of sexual abuse as well as knowledge regarding memories for sexual abuse, both in adulthood and childhood, ***but we did not publish it***. We met on a monthly basis for over 3 years, reading the literature, discussing these issues, talking about clinical experiences, and conducting interviews with therapists.

Email of Nov. 18, 2025 from Dr. Rocchio to government (emphasis added). If the government is seeking to offer opinion testimony based on conversations with "local therapists regarding their beliefs and practices" and monthly talk meetings with interdisciplinary professionals, the defense *must* be permitted to rebut such loosely formed opinions with expert opinions derived from peer-reviewed scientific literature as well as from professional training and experience. That is what the defense seeks to elicit via Dr. Strange. Scientific research, including that cited in the defense expert disclosure and the initial defense response, overwhelmingly confirms that memory is malleable and can be



Honorable Valerie E. Caproni
November 25, 2025
Page 7

_____

shaped due to a variety of external suggestive factors—including certain therapeutic treatments.

The government also advances points appropriately saved for cross-examination when it challenges Dr. Strange's opinion regarding EMDR therapy. The government does not challenge the reliability of the methodology used in the EMDR study cited by Dr. Strange, Sanne Houben et al., *Lateral Eye Movements Increase False Memory Rates*, Clinical Psychological Science, 2018, Vol. 6(4) 610-616. The government instead contends that exclusion is warranted because *a single study* failed to replicate the results of the initial study. But a single failure to replicate does not render a study unreliable under *Daubert*—particularly when, as Dr. Strange is qualified to testify based on her training and experience, there is a growing body of data accumulating that EMDR is implicated in problematic cases. And the Italian court case relied upon by Dr. Strange confirms what the studies have already indicated: it establishes a proven false memory case resulting from EMDR. Dr. Strange's opinion is based on the scientific literature; the court case confirms what the literature suggests.

The government next proceeds, as it did in its initial motion, to treat as true its own closed view of the facts of this case—asserting that if the government does not intend to introduce certain facts, such facts do not exist.  The "facts" alleged by the government have not been established and are a core dispute in the trial. To the extent there are additional facts relevant to the expert opinion, the defense proposes to establish as much on cross-examination. To the extent that a witness cannot recall the particular course of treatment she received but testifies that she reported a sexual assault to a therapist, the suggestive influence of any potential course of treatment is relevant. The government argues that "there is no basis"—under the government's narrow view of relevant facts—"to think that any of the victims in this case had the misfortune to choose a problematic therapist." There is likewise no basis to think that any of the government's witnesses chose a skilled therapist. The defense must be permitted to cross-examine witnesses on the particular course of treatment they received. This is in no way in tension with the defense motion to preclude prejudicial evidence regarding PTSD diagnoses or the long-term effects of sexual assault. The difference is that the course of treatment is relevant to ascertaining the reliability of the recollection. The government conceded that testimony about the long-term effects of sexual abuse must serve a specific and relevant purpose, *see* Govt. Motion in Limine at 51-52, and the government has not identified any such purpose as to any witness in this case. The defense has, however, identified a specific and relevant purpose for the admission of particular treatment methods.



Honorable Valerie E. Caproni
November 25, 2025
Page 8

_____

The government also concedes that at least one of its witness "did report undergoing prolonged exposure therapy for a period of time." The government asserts that expert testimony to explain to the jury why recollections following such therapy may not be reliable is nonetheless inadmissible because of other allegations the government intends to prove at trial. But the defense disputes these allegations, resulting in a classic factual dispute for the jury—it does not in any way undermine the admissibility of the proffered testimony.

The government also appears to suggest that because the APA Guidelines recommend a neutral approach to memories of abuse, there is no risk of memory reconstruction. This argument makes several assumptions of disputed fact: first, that even if applied in good-faith, the APA Guidelines would yield perfect results and avoid any restructuring of memory; and, second, that therapists everywhere (who have generally not done PhD work like Dr. Strange) are intimately familiar with the APA Guidelines. The government can cross-examine Dr. Strange about the implications of the APA Guidelines; the Guidelines do not, however, form a basis for exclusion of Dr. Strange's testimony.

Finally, the government restates arguments made in its initial motion when it argues that Dr. Strange's proffered testimony impermissibly opines on witness credibility. The fact that Dr. Strange has reviewed the Jencks material does not render her testimony excludable under *Daubert*. Dr. Strange does not seek to opine that everyone develops false memories or that specific individuals in this case developed false memories. As made clear in the defense response to the government's original motion, Dr. Strange seeks only to identify potential sources of suggestive influence that could lead to the reshaping of memory. The government's position is inherently contradictory: on the one hand the government asserts that Dr. Strange's testimony does not fit the facts of this case, and on the other hand the government assert that if Dr. Strange reviews the facts of the case, Dr. Strange should not be permitted to testify. That is not the rule. Jurors do not understand the extent to which memory can be malleable. The defendants have the right to offer the jury a scientific basis for determining whether the witness accounts are reliable. The jury can conclude that none of the scientific research is relevant and base its decision on other facts introduced at the trial. Or the jury can choose to credit the testimony of Dr. Strange and view witness testimony of decade-old recollections as unreliable.



Honorable Valerie E. Caproni
November 25, 2025
Page 9
_____

      The government has not offered a proper basis for excluding the testimony of Dr. Strange and the motion should be denied.

                                Respectfully submitted,

                                */s/ Howard Srebnick*
                                Howard Srebnick
                                Jackie Perczek
                                Jason Goldman

                                *Attorneys for Alon Alexander*

                                Marc Agnifilo
                                Zach Intrater
                                Teny Geragos

                                *Attorneys for Oren Alexander*

                                Milton L. Williams
                                Deanna M. Paul
                                Alexander Kahn
                                *Attorneys for Tal Alexander*

