PBO4ALEC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                        24 Cr. 676 (VEC)

5  ALON ALEXANDER, OREN ALEXANDER
   and TAL ALEXANDER,

6
                                     Oral Argument
7           Defendants.
   ------------------------------x
8                                    New York, N.Y.
                                     November 24, 2025
9                                    10:30 a.m.

10 Before:

11              HON. VALERIE E. CAPRONI,
                             District Judge
12                   APPEARANCES
   JAY CLAYTON
13      United States Attorney for the
        Southern District of New York
14 ELIZABETH ESPINOSA
   MADISON SMYSER
15 ANDREW JONES
   KAIYA ARROYO
16      Assistant United States Attorney

17 BLACK SREBNICK, P.A.
        Attorneys for Defendant ALON ALEXANDER
18 BY:  HOWARD SREBNICK

19 AGNIFILO INTRATER LLP
        Attorneys for Defendant OREN ALEXANDER
20 BY:  MARC ANTONY AGNIFILO
        TENY GERAGOS
21      ZACH INTRATER

22 WALDEN MACHT HARAN & WILLIAMS LLP
        Attorneys for Defendant TAL ALEXANDER
23 BY:  MILTON WILLIAMS
        DEANNA PAUL
24      ALEXANDER KAHN
   Also Present: Justine Atwood, FBI
25                Antonio Pagan, NYPD

PBO4ALEC

1          (Case called)

2          MS. ARROYO:  Good morning, your Honor.  Kaiya Arroyo,

3     Madison Smyser, Elizabeth Espinosa, and Andrew Jones for the

4     government.  With us today are Special Agents Justine Atwood

5     and Detective Antonio Pagan.

6          THE COURT:  Good morning.

7          Everybody in the audience can sit down.

8          MR. SREBNICK:  Good morning.  On behalf of Alon

9     Alexander who is present Howard Srebnick.  Good morning.

10          THE COURT:  Good morning, Mr. Srebnick.  Good morning

11     Mr. Alexander.

12          MR. AGNIFILO:  Good morning, your Honor.  On behalf of

13     Oren Alexander you have myself, Marc Agnifilo, and in the front

14     row we have Teny Geragos and Zach Intrater.  Good morning, your

15     Honor.

16          THE COURT:  Good morning, everybody. Good morning,

17     Mr. Alexander.

18          MR. WILLIAMS:  On behalf of Tal Alexander, your Honor,

19     Milton Williams along with Deanna Paul and Alex Kahn.

20          THE COURT:  Good morning and good morning

21     Mr. Alexander. good to see you.

22          All right.  Let me tell you what's on track today.

23     We're going to arraign the defendants on the new indictment.

24     And we're going to get through as many of the *in limine* motions

25     as possible.  We've got a date next week for this devoted to

the *Daubert* motions.  But if we need that, we will carry over

until then.

        Let me start with, we got, at 6:30 this morning, a

request for an electronics order that was signed.  You've been

coming here long enough.  You know you need an electronics

order.  Don't wait until the morning because you are going to

run the risk of not getting it signed.  Okay.  You make your

hotel reservation and put in the request for an electronic

order.

        I have a hard stop today at 12:30, so that's why we

may be carrying stuff over.  I'm also going to carryover

intentionally until next week the issue that came in also

either late last night or this morning of a request to either

sever Count 11 or to refer Oren, one or the other.  We'll talk

about that next week.  I will tell you it is highly unlikely

that I'm going to sever the count.  And it's highly unlikely

that I'm going to sever the defendant.  We can talk about

whether a brief adjournment of the trial is needed, but I'm

going to want to hear why that's the case.

        Okay.  So with that, let's start with the arraignment.

The new indictment adds Count 11 which is sexual exploitation

of a minor against Oren Alexander.  Are there any other changes

to the new indictment?

        MS. ARROYO:  Yes, your Honor.  There are a couple of

minor changes.

PBO4ALEC

1          THE COURT:  If you could, for the record, state what

2    they are.

3          MS. ARROYO:  Yes.  For Count One, the government has

4    moved the conspiracy date back to 2008.

5          THE COURT:  What was it before?

6          MS. ARROYO:  2009, your Honor.

7          THE COURT:  Okay.

8          MS. ARROYO:  Count Five now only relates to sex

9    trafficking of a minor.  We are no longer pursuing the force,

10   fraud, and coercion prong for that or the venture prong related

11   to force, fraud, and coercion.

12         THE COURT:  Is that the one that had the attempt that

13   was part of it as well?

14         MS. ARROYO:  No, your Honor, that's a different count.

15         THE COURT:  All right.

16         MS. ARROYO:  We have removed the attempt Count Four,

17   that count as well.

18         THE COURT:  Okay.

19         MS. ARROYO:  I'm sorry, your Honor, that's Count

20   Seven.

21         THE COURT:  Okay.  With that, let me make sure, have

22   all of the defendants read the new indictment which is numbered

23   S4 24 Cr 676?

24         MR. SREBNICK:  Yes, your Honor, we read it to them

25   well.

PBO4ALEC

1          MR. AGNIFILO:  Yes, your Honor.

2          MR. WILLIAMS:  Yes, your Honor.

3          THE COURT:  Okay.  Have you discussed it with your

4     clients?

5          MR. AGNIFILO:  Yes, your Honor.

6          MR. WILLIAMS:  Yes, your Honor.

7          MR. SREBNICK:  Yes, your Honor.

8          THE COURT:  Do you waive a public reading of the new

9     indictment?

10          MR. SREBNICK:  Yes, your Honor.

11          MR. WILLIAMS:  We do.

12          MR. AGNIFILO:  We do.

13          THE COURT:  All right.  Oren Alexander, you are

14     charged with conspiracy to commit sex trafficking, three counts

15     of sex trafficking, inducement to travel to engage in unlawful

16     sexual activity, that's one count of that.  One count of

17     aggravated sexual abuse, and one count of sexual exploitation

18     of a minor.

19          Do you understand what you are being charged with?

20          DEFENDANT OREN:  I do.

21          THE COURT:  How does the client plead, guilty or not

22     guilty?

23          MR. AGNIFILO:  Not guilty, your Honor.

24          THE COURT:  Mr. Alon Alexander, you are charged with

25     conspiracy to commit sex trafficking, three counts of sex

1    trafficking, one count of inducement to travel to engage in

2    unlawful sexual activity, one count of sex trafficking a minor,

3    and one count of aggravated sexual abuse.

4            How does he plead?

5            MR. SREBNICK:  Not guilty.

6            THE COURT:  Do you understand what you are going

7    charge with?

8            DEFENDANT ALON:  Yes, your Honor.

9            THE COURT:  And lastly, Tal Alexander, you are charged

10   with conspiracy to engage in sex trafficking, four counts of

11   sex trafficking, two counts of inducement to travel to engage

12   in unlawful sexual activity, and one count of sexual

13   trafficking of a minor.

14           Do you understand what you're being charged with?

15           DEFENDANT TAL:  Yes, your Honor.

16           THE COURT:  How does your client plead?

17           MR. WILLIAMS:  Not guilty.

18           THE COURT:  Okay.  With that out of the way, let's

19   move on to the *in limine* motions.

20           Let me start with a comment to the defendants.  You

21   spent a massive amount of your reply memo focusing on whether

22   the women that are the victims of the activity understood that

23   they were engaging in a *quid pro quo* sexual activity.  That is

24   just not the law.  I've said it's not the law.  It's not the

25   law.  So I don't know why you spent that much time trying to

persuade me that the women didn't think -- that that was not

what was in their head.  The question is what is in the

defendant's head.  That's how this case is going to be tried.

So, please, the lawyers all adjust to that.  We are not trying

whether the women understood that they were being induced for

sexual assault and therefore they agreed to engage in sexual

activity for a benefit.  These women, if I accept the

government's theory, did not agree, for the most part, to

engage in sexual assault.  They were forced; they were drugged;

they were whatever.  So I just lay that as a base in terms of

how I'm looking at the case.

So the first motion *in limine* as evidence of assault

that are not charged as substantive offense.  Let's start with

as to the availability of Rule 413.  Has the government

disclosed to the defendants all of the alleged the assaults it

wishes to introduce as 413 evidence, together with the relevant

witness statements or a summary of the expected activity?

MS. ARROYO:  Your Honor, the government has split up

the motions, so I'm going to kick it to AUSA Espinosa to answer

this.

THE COURT:  That's fine.

MS. ESPINOSA:  Thank you, your Honor.

Yes, the government has given the defense notice of

each of the 413 assaults that we intend to admit at this time,

along with the witness statements supporting those allegations.

PBO4ALEC

1    We've also provided a written notice in advance to the

2    defendants.

3            THE COURT:  Okay.  So the defense argues that only

4    Oren and Alon are charged with sexual assault and therefore 413

5    does not apply to Tal.

6            Do I have that argument correct from the defense

7    perspective?

8            MR. WILLIAMS:  I believe so.

9            THE COURT:  Ms. Espinoza, what's your view on whether

10   413 applies to sex trafficking?

11           MS. ESPINOSA:  Your Honor, our view is that 413 does

12   apply to sex trafficking, that congress drafted the rule to

13   discuss conduct, rather than specific charges which is why the

14   rule contains a very explicit definition of what constitutes

15   sexual assault.  It includes any conduct prohibited under

16   Chapter 109 of Title 18 --

17           THE COURT:  Hang on a second.  Your microphone --

18           MS. ESPINOSA:  Can you hear me?

19           THE COURT:  Yes.

20           MS. ESPINOSA:  But it also includes specifically

21   defined conduct, including contact without consent between any

22   part of the defendant's body or an object with another person's

23   genitals or anus, or contact without consent between the

24   defendant's genitals or anus and any part of any person's body.

25           Now, as to the statutory definition that refers

specifically to Chapter 109, that is a very limited set of
federal jurisdiction sexual assaults, including aggravated
sexual abuse and sexual abuse.  However, a substantial number
of additional federal crimes involve the contact defined as
sexual assault in Prongs Two and Three.  And courts have
concluded that 413 is a conduct-based analysis, rather than
categorical approach.  I don't believe the Second Circuit has
explicitly addressed that yet, but the Seventh Circuit did
adopt a conclusion that congress's intent in drafting 413 was
the rationale is that a person who has engaged in the covered
conduct is likely to engage in it again, Rule 413 using
statutory definitions to designate the covered conduct, but the
focus on the conduct itself, rather than how the charges have
been drafted.  That's *United States v. Foley,* 70 F.3d 1079 (7th
Cir. 2014).

       And in a civil case in this district, Judge Furman, in
*Boyce v. Weber*, adopted that definition, saying in the
analogous 415 context for a civil TVPA claim that the Seventh
Circuit's conduct-based analysis was the correct analysis to
capture the congressional intent when drafting that rule.

       So under that analysis, all of the other sexual
assaults if the Court admits them under 413 rather than as
direct evidence, meet the definition of sexual assault.  In
each one of those cases there is contact without consent
between either a part the defendant's body the victim's

PBO4ALEC

1    genitals or between the defendant's genitals and another part

2    of the victim's body.

3              THE COURT:  Thank you.

4              Who is going to argue this from the defense

5    perspective?

6              MR. AGNIFILO:  It's going to be me, your Honor.  Under

7    Rule 13 --

8              THE COURT:  Can you push your microphone up.

9              MR. AGNIFILO:  Actually, can I use the podium?  It

10   might be easier.

11             THE COURT:  Wherever you're most comfortable.

12             MR. AGNIFILO:  Am I right your Honor wants to go 413

13   first before we go to the other?

14             THE COURT:  We are going to go back, but yes, right

15   now yes.  Thank you for that.

16             MR. AGNIFILO:  Sure.

17             THE COURT:  Please address whatever I'm asking for.  I

18   have an agenda.  I promise at the end if I miss something, I

19   will give you an opportunity.

20             MR. AGNIFILO:  Thanks, Judge.

21             In answer to your Honor's question it looks like the

22   weight of case law says that it is focused on the activity,

23   rather than the charge.

24             THE COURT:  Correct.

25             MR. AGNIFILO:  That seems to be the state of the law.

PBO4ALEC

We can have a debate whether that's wise, not wise, faithful to the rule, but that seems to be what the cases say. So I'm not going to get up here and say that the cases say something else.

THE COURT: All right. That answers the question of whether 413 applies or not. We'll come back to each of the various people, whether you think 413 applies to that one or not.

MR. AGNIFILO: So I've answered your Honor's question?

THE COURT: You have answered my question.

MR. AGNIFILO: Thank you.

THE COURT: So given that whether he had said that or not, the case law is quite clear that you look at the essence of the charge. Here, the sex act part of the conspiracy as well as the other charges is raping women, many of whom have been drugged. So I agree with the analysis in the *Foley* case that my colleague Judge Furman also adopted, so 413 applies.

So let me confirm that I have correct what the government's theory of the conspiracy is. My understanding is that you are in order to make out the commercial sex act aspect of 18 U.S.C. 1591, you are relying on the things of value that were given to the women to induce them to come to spend time with the defendants, whether that was a house in the Hamptons, or an after-party with somebody famous, something like that. Is that, without getting down into the nitty gritty, is that sort of the essence of your conspiracy charge?

1          MS. ESPINOSA:  That is the essence of what makes it a

2     commercial sex act, yes.

3          THE COURT:  Okay.  Perfect.

4          So I see some of the evidence as being admissible as

5     evidence of the conspiracy, others, I disagree with the

6     government, but I think it's probably admissible under 413.  So

7     let's go witness by witness.

8          Let's start with Substantive Victim Number One.  My

9     understanding of the government's view is that the thing of

10    value is the trip to the Hamptons, but in this case the

11    invitation was to a friend and not to Victim Number One.  What,

12    if anything, weight should I put on that fact?

13         Ms. Espinoza, are you still in charge?

14         MS. ESPINOSA:  Yes, your Honor.

15         In that case, while the invitation was extended

16    directly to the friend, it was then subsequently extended to

17    Victim One through that friend.  Victim One, in fact, did

18    receive the thing of value in connection with the trip to the

19    Hamptons.  She was, in fact, picked up at the train station by

20    Tal Alexander, was taken back to the Hamptons house and stayed

21    there.  In our view, it was not material that the invitation

22    was delivered through a third party.  What is material was that

23    Victim One, in fact, did receive that.

24         Further, the invitation itself is not the only thing

25    that makes that sex trafficking.  She was also harbored at the

PBO4ALEC

house in the Hamptons, and that is another basis by which the
sex trafficking can be accomplished here.

THE COURT:  All right.  Who is going to tell me why
that's not evidence in the conspiracy?

MR. AGNIFILO:  It's not evidence in the conspiracy,
Judge, because I believe to be evidence of the conspiracy,
there has to be evidence, as your Honor said, that the
defendants are using this invitation to come to the Hamptons
for this person, for the victim, not indirectly through another
person.  I agree with the Court, it is from the defendant's
point of view.  And here there is just no evidence of that, as
your Honor has alluded to.

THE COURT:  Yeah, I'm not sure how much that matters.
If you are picking up a bunch of folks at the train station,
they didn't leave the other woman sitting there.  So
invitations like this are common in my experience are "you and
your friend come."

MR. AGNIFILO:  If I can push back gently on that,
Judge.  Ultimately what the government now has said is because
Tal picked them up from the train station.

THE COURT:  And harbored them.

MR. AGNIFILO:  Well, "harbor" is a funny word.  Our
overall contention so we've made it clear is these are young
guys, meeting young women, having completely consensual sex.

THE COURT:  I understand that.  But I have to accept

PBO4ALEC

1  that the government is going to be able to prove what it says

2  it can prove.  If it doesn't, you get an acquittal.

3         MR. AGNIFILO:  But the concern which is less with one

4  of the purported victims that are sort of charged in the

5  indictment is that we're going to get into a 403, and I know

6  I'm jumping the gun.

7         THE COURT:  We'll get to those.  Don't shoot your

8  argument for those here.

9         MR. AGNIFILO:  I won't.

10        THE COURT:  This one I'm only focused on Victim One

11 under the circumstances of that whether it comes in as evidence

12 of the conspiracy.

13        MR. AGNIFILO:  Right.

14        So it looks to me that if the government is relying on

15 someone giving someone a ride from the station, that's just not

16 sufficient, you know, as an indicia of a *quid pro quo* in the

17 defendant's mind.  I mean it would be rude and, you know,

18 totally out of character for any decent person.  "I'm going to

19 take your friend because I invited her.  I'm not going to take

20 you."

21        THE COURT:  Well, there are a lot of things that the

22 government's alleged that were rude and not acceptable conduct.

23        MR. AGNIFILO:  Right.  But if we are focusing though

24 on a *quid pro quo* --

25        THE COURT:  I'm not sure that an inducement is a *quid*

1    *pro quo*, but okay.

2            MR. AGNIFILO:  I think here, where the person who

3    claims to be a victim is not invited, that they're brought from

4    the train station and harbored there -- I mean, is no

5    allegation they were locked up.  There is no allegation of

6    things along those lines.  Certainly, that would be evidence.

7    I think we need something that approaches something like

8    evidence that would indicate that the defendants used this

9    to -- the phrasing, in my opinion, is so awkward "on account

10   of."  We'll say "in exchange for."

11           THE COURT:  It seemed extremely awkward.

12           MR. AGNIFILO:  I don't know why those chose those

13   words, but they did.  On account of, in exchange for, as a *quid*

14   *pro quo*, whatever it is.  I just think that this is just

15   insufficient evidence of that mental state on the part of any

16   defendants.

17           THE COURT:  I disagree.  Victim One is admissible as

18   evidence of the conspiracy.

19           Victim Two the thing of value was a trip from Chicago

20   to the Hamptons.

21           Mr. Agnifilo?

22           MR. AGNIFILO:  Victim Two, I have no argument on

23   Victim Two.

24           THE COURT:  Okay.  Victim Two is admissible as

25   evidence of the conspiracy.

PBO4ALEC

1          Minor Victim Three.  For Minor Victim Three, let me

2     come back to Ms. Espinoza.

3          So you're arguing that CC-1 is a coconspirator.  Can

4     you make me a proffer of what your evidence is going to be that

5     he is a coconspirator, as opposed to, he's just a party planner

6     who ended up in the Hamptons?

7          MS. ESPINOSA:  Your Honor, the evidence will be that

8     he is a party promoter who regularly worked with the defendants

9     in order to ensure that there were women at the party, women

10    and girls in this case, at the parties in the Hamptons.  That

11    he rented the house that they all stayed in that summer.  The

12    rental house in the Hamptons was jointly rented by CC-1 and by

13    the defendants, that on multiple occasion that summer CC-1

14    facilitated the invitations to women and girls to come out to

15    spend weekends in the Hamptons at that house, where they were

16    harbored by the defendants to take party -- he arranged party

17    buses to transport them from Manhattan to the Hamptons for

18    evenings at a club and then onto the house where they stayed.

19         THE COURT:  Would he be the one who made the decision

20    that the bus took them out there but was then not available to

21    take them back to the city?

22         MS. ESPINOSA:  Your Honor, I don't know that we are in

23    a position right now to know who made the specific decision

24    that the bus was not going to return.

25         But I will say as to Minor Victim Three specifically,

PBO4ALEC

she was invited to the Hamptons for the weekend.  There was no
expectation from Minor Victim Three that she would return to
the Hamptons that night.  She packed a bag, took it with her
intending to stay for Memorial Day weekend.

THE COURT:  Did she have a friend there with her who
maybe was not quite as prepared?

MS. ESPINOSA:  I believe that is Victim Four and Five,
your Honor, that expected that they would return to Manhattan
that night but were unable to do so and were instead taken back
to the house where they stayed.

THE COURT:  On this one I'm inclined to admit it as
evidence of the conspiracy.  But if there is not evidence that
Coconspirator One really is -- the person that they're
referring to as Coconspirator One, if not enough to get me to
the notion that he is a coconspirator, then I will reconsider
that.  Okay.

Victims Four and Five, Mr. Agnifilo?

MR. AGNIFILO:  So --

THE COURT:  You can preserve your argument if you
don't have a new argument.  Let me just tell you where my head
is.  If there is clear evidence of the person being induced to
go to a place which would be a thing of value, then it's going
to be admitted as evidence of the conspiracy.  If there's not,
we're going to talk about them, and that's sort of the
non-substantive victims.  So you can preserve your objection,

PBO4ALEC

1    but unless you have something new to say to persuade me that

2    that doesn't apply in this case?

3              MR. AGNIFILO:  I have a point of clarification I'm

4    wondering if I can ask the Court?

5              THE COURT:  Sure.

6              MR. AGNIFILO:  In regard to these particular purported

7    victims that are also in substantive counts of the indictment,

8    I'm not clear on what extra it would be -- because there is

9    going to be evidence of -- we know that these witness are going

10   to testify.

11             THE COURT:  Correct.

12             MR. AGNIFILO:  Because they are in substantive counts.

13   So the question is what extra is there?  I mean, there is going

14   to be their testimony.  The government is going to argue that

15   it's evidence of the conspiracy.  I'm not aware if the Court is

16   conceding of a charge that's in addition to -- so ultimately,

17   this seems, and I'm sorry to say it, I'm just trying to see the

18   relevance, it seems moot to me.  Because if they are going to

19   testify any way because they are in a count, I'm not really

20   sure what extra is gained by the decision today that they are

21   or are not part of the conspiracy?

22             THE COURT:  You could have saved me a lot of

23   aggravation by just saying that in your brief.

24             Ms. Espinoza, do you have a response to that other

25   than, yes, you agree?

PBO4ALEC

1          MS. ESPINOSA:  We agree, your Honor.

2          THE COURT:  So that takes us to Victim Six, Victim

3    Seven, and the new Minor Victim 25, if I have her number right.

4          MS. ESPINOSA:  It's new Minor Victim Eight.  The

5    victim previously referred to as Minor Victim Eight will now be

6    Minor Victim 26.  And I apologize for the confusion that will

7    cause.  We will make sure to clearly label things, going

8    forward.  But for purposes of the indictment, we wish to keep

9    them consecutive.

10         THE COURT:  So that covers all of the victims that are

11   also the focus of a substantive count.

12         That brings us to the people that are not charged in

13   substantive counts.  So let's start with Minor Victim Eight,

14   Victim Nine, and Minor Victim 25.

15         Is this still you, Ms. Espinoza?

16         MS. ESPINOSA:  Yes, your Honor.

17         THE COURT:  Okay.  How are you pulling these people

18   into the conspiracy?  Is there, for each of these, a thing of

19   value that's being provided?

20         MS. ESPINOSA:  Well, your Honor, I think that there is

21   a thing of value in the form of an invitation to an after-party

22   after the club.  But we are not necessarily taking the position

23   that every single one of the conspiracy victims, as we refer to

24   them in our brief, meets every single element of substantive

25   sex trafficking.  We are also arguing that they are admissible

PBO4ALEC

as evidence of the conspiracy because they show the means and
methods of the conspiracy, how the defendants carried out the
criminal aims of the conspiracy.

THE COURT:  I get that, and sometimes I see it.  But
if it's a single defendant that is only one of them, how is it
going to show the means and methods of the conspiracy?  I get
your 413 argument or even the 404(b) argument which is it shows
how each of them, individually, wanted to have sex.  I mean,
that seems to be the theme is that within their world of how
they wanted to operate, giving the woman drugs so she was
incapacitated was part of what they wanted.  And I get that,
and that's also how the conspiracy operated.  But it could both
how the conspiracy operates and quite independent of the
conspiracy, how each individual man operated.  In order to say
I'm allowing it in as affirmative evidence of the conspiracy,
as opposed to saying it's admissible but it's admissible as
413, how do you get me over the hoop to say as to these
particular incidents I should view it as evidence of the
conspiracy?

MS. ESPINOSA:  Your Honor, I think as to a number of
these particular victims there are multiple defendants working
together, including as to the ones we had just referenced which
will now be called Minor Victim 26, Victim Nine, and Minor
Victim 25.

THE COURT:  I'm sorry, Minor Victim Eight is now 26?

PBO4ALEC

1    MS. ESPINOSA:  That's right, your Honor.  I apologize

2    that's because of the new count in the superseder.

3    THE COURT:  Okay.  Tell me, again, that -- in that

4    case I've got they were invited -- the women were invited to an

5    after-party that didn't exist, and they were given drinks at a

6    bar.

7    MS. ESPINOSA:  Yes, your Honor.  The three girls one,

8    18-to-17-year-old girls met Alon and Oren Alexander at a

9    nightclub in Aspen.  They were given drinks at the brothers'

10   table in that nightclub.  When the club was closing, the twins

11   invited the three girls back to their hotel for an after-party.

12   This was at a nice hotel in Aspen.  The victims were familiar

13   with it.  It was held out to them as a party so they could

14   continue hanging out after the club had closed.  Once they got

15   back to that hotel room, the three victims realized there was

16   no party.  It was a dark hotel room.  Alon took Minor Victim 26

17   into the bathroom where he digitally penetrated her until she

18   bled and raped her.  Meanwhile Oren sexually assaulted Victim

19   Nine on the bed while Minor Victim 25 was in and out of sleep

20   on the other bed.  After Alon and Minor Victim 26 came out of

21   the bathroom, Alon attempted to digitally penetrate Minor

22   Victim 25.

23   So this is an example of how the twins were working

24   together to drug and sexually assault these victims.  Each one

25   of the victims reported that after drinking the drinks that the

1    twins gave them at the club that they experienced symptoms

2    completely inconsistent with how they felt had after drinking

3    in the past.

4         THE COURT:  Okay.  Mr. Agnifilo?

5         MR. AGNIFILO:  Yes, Judge, thank you.

6         A couple of things, first of all, these young women in

7    Aspen on their own.  They got to Aspen.  No one brought them

8    there.

9         THE COURT:  That's irrelevant.

10        MR. AGNIFILO:  But I'm just going back to some of the

11   things your Honor pointed out about people going to the

12   Hamptons.

13        THE COURT:  Yeah, this is different.  Okay.

14        MR. AGNIFILO:  So it's different in that regard.

15        I tried to make sense of what the government was

16   alleging, what, kind of, was the methods and means, the

17   architect of their conspiracy.

18        THE COURT:  Yeah.

19        MR. AGNIFILO:  And they seize on a few things that

20   really are not a part of this particular uncharged act.  They

21   talked about, you know, planning things in advance.  They talk

22   about use of social connections, that the brothers used social

23   connections.  They use things like promises of luxury

24   experiences, things like that, the pooling of money.  Which is

25   why your Honor asked me what my position was on Victim Two,

1    which was she been flown from Chicago, I didn't objective to it

2    because I get it.  I mean, I don't accept the theory

3    wholeheartedly, but I understand what they are alleging.

4          Here, we don't have any of that.  Nothing is planned

5    in advance.  There is no promise of a luxury experience.  There

6    is an after-party.  And the fact that the brothers are each

7    with a different person -- I mean, one thing that I expect we

8    are going to admit in our opening statement is that there was

9    an interest in group sex.  The government is not going to have

10   to prove that.  The government not going to have to prove it

11   independent of us admitting it.  The evidence in this case is,

12   frankly, overwhelming about that.  I mean, there are text

13   messages --

14         THE COURT:  But you're glossing over the fact that the

15   evidence was that they were drugged.

16         MR. AGNIFILO:  I'm going to push back on that.  What

17   they say is that they had a number of drinks in the club, and

18   they felt essentially more inebriated than usual.  My whole

19   issue of this case, it's a toxicology case without any

20   toxicology evidence.

21         THE COURT:  Yeah, but it's a lot of women saying the

22   same thing.  And you know what, there have been enough women

23   who have been drugged in bars that the notion that you need a

24   toxicologist to say they have been drugged, maybe a jury will

25   buy that, maybe they won't.

PBO4ALEC

1      MR. AGNIFILO:  I don't think the answer is more of the

2  same, I don't.

3      THE COURT:  Let's say it's not evidence of the

4  conspiracy, why is it not evidence of 413?  Why is it not 413

5  evidence?

6      MR. AGNIFILO:  It is 413 evidence, but 413 doesn't

7  stand -- I'm jumping the gun, again.

8      THE COURT:  That's fine.  I understand that you can

9  say that even if it comes in as 413, it should be excluded

10  because it's unduly prejudicial.

11      MR. AGNIFILO:  Unduly prejudicial 403 or -- I mean,

12  413, we'll get to it when your Honor wants to get to it.  I

13  think it's a deeply problematic evidence rule.

14      THE COURT:  Perhaps, but it is the rule I have to

15  apply.

16      MR. AGNIFILO:  It is.

17      Also, my interpretation of the Second Circuit *Schaffer*

18  case, the Second Circuit *Schaffer* case we cite in our papers is

19  that 413 is almost never going to stand on its own.  413 is

20  always going to be something that is hand in hand with 404(b)

21  and more so 403.

22      THE COURT:  Well, not really 404(b) because it's an

23  intention with 404(b).

24      413 says you introduced this for propensity.  This is

25  classic -- assuming, again, for the defendants.  I'm assuming

1    that the government is going to be able to prove what they say.

2    So assuming they can prove that, this is classic propensity

3    evidence.  If it were no 413 and we were just looking at

4    404(b), it would probably also be admissible under 404(b).  But

5    you would be arguing they're only going to put this in for

6    propensity.  So there is tension between 404(b) and 413.

7         But in this case it hits the 404(b) elements that is

8    to say it's a *modus operandi* of these defendants, that's the

9    government's theory, and it would satisfy that.  For all of

10   these, there is going to come a point, and the government has

11   acknowledged it in their brief, they are not planning to put

12   all of this evidence in.  And that is a good thing because it

13   would not all come in.  At some point it becomes cumulative and

14   just too much, at which point your 403 argument would have

15   resonance.  It's hard to do that in the abstract because I'm

16   sure the government has a hit list of 1 to 26 and what order

17   they plan to call these in and where they would draw the line,

18   but I'm not going to do that for them.

19        MR. AGNIFILO:  My view, and I've given it a lot of

20   thought, I think I am this is one way to look at it.  There's

21   no doubt that 413 allows what 404(b) did not.  I mean, 404(b)

22   was, sort of, the classic approach to this other kind of

23   evidence that started in 1901 with a case called *Molineux* and

24   then continued the Supreme Court decisions.  We cite them in

25   our papers.  And about 20 years after the Federal Rules of

1    Evidence were passed and 404(b) was passed, we found 413.

2          And I think the Second Circuit's ruling in *Schaffer* is

3    trying to be very careful.  And it was certainly not an

4    endorsement of 413.  I think the Court in *Schaffer* was highly

5    critical of 413 and basically said listen, we are not here --

6    and I think this is their words -- we're not here to say this

7    is something that's good for public policy, or this is

8    something that we endorse.  They went out of their way to say

9    that which you don't always see the Circuit do.  But I think

10   the Circuit was doing it for a reason.  And I think the reason

11   the Circuit was doing it was almost affixing a warning label to

12   413 and basically saying, 413 is now the rule of the land.  We

13   are not going to opine on whether it's constitutional or not,

14   but the Second Circuit and the Tenth Circuit and some other

15   circuits have sort of raised the issue.  And the reason it's

16   constitutional -- and Second Circuit says this -- the reason

17   it's constitutional is it goes hand in hand with 403.

18         So all of this winding of whether 404(b) or 413, it

19   all ends up in, sort of, the analysis under 403.  And we're

20   saying that is obviously the right way to do this.  But the

21   reason that I think what is, sort of, different about it, is

22   propensity, character, I think stands -- 413 aside -- stands in

23   a different sted than the traditional 404(b) reasons.  And so

24   413 might have a different interfacing with 403 than 404(b) has

25   with 403.  And I think these are the way that these three rules

kind of coalesce and come together.

And I'll just point out I actually have the actual book of Weinstein, which not a lot of people have.  I can't remember the last time I brought it to court, so I have it, and the government can use it if they see fit.

Anyway, back to the matter at hand, this particular instance --

THE COURT:  Let's focus on this one.  Two of the defendants were involved.  The women were invited to an after-party that didn't exist, and there is evidence that they were drugged.  I understand you reject the evidence that they were drugged.  For my purposes, accept that based on the proffer of the government, based on what the women and girls say happened, that's going to hit the preponderance for me to say, from that perspective, that's adequate evidence.  Now, when I actually hear them that may go out the door, but based on the proffers.

MR. AGNIFILO:  My worry with that is I think under 403 -- and I'm very well aware of kind of -- and your Honor is not wrong.  Obviously, toxicology is not always found in these sort of instances and sometimes is not found in these instances.  The problem, though, under a 403 analysis is there is just no -- I mean, where do we limit it?  We don't have, what I'll call, "hard" evidence of intoxication.  We don't have a witness saying --

PBO4ALEC

1        THE COURT:  The witness's testimony is hard evidence

2   if it's credited.

3        MR. AGNIFILO:  If it's credited.  We are talking about

4   recollections from years ago.

5        THE COURT:  Again, this is evidence for a jury.  I'm

6   the judge.  You know better than that.

7        MR. AGNIFILO:  But I think it's relevant to a 403

8   analysis.

9        THE COURT:  Okay.

10       MR. SREBNICK:  So here is my position on this, your

11  Honor has been very patient.  It doesn't hit enough of the

12  government's proffer methods and means of the conspiracy to be

13  admissible as other crimes evidence under 413 or 404(b) or 403.

14       THE COURT:  So because it's evidence of methods and

15  means, I actually think, although it's a close call, I think it

16  is evidence of the conspiracy, and it's admissible under that

17  argument.  Even if it were not, I would admit it as 413

18  evidence as to Alon and Oren.

19       That brings us to Victims 10 and 11.  This was the one

20  that's an after-party after a boxing match.  Was it not --

21  like, were celebrities supposed to be present?  Was this just,

22  like, kind of -- the evening wasn't clear to me of what the

23  women thought.

24       MS. ESPINOSA:  Yes, your Honor.  Victim 11 was invited

25  by Oren Alexander to an after-party at the penthouse of the

PBO4ALEC

1    Cosmopolitan in Las Vegas.

2            THE COURT:  Is that a hotel?

3            MS. ESPINOSA:  Yes, it's a Hotel, your Honor.  It's a

4    high-end hotel suite.  He represented it as the penthouse suite

5    that that hotel.  Victim 11 brought her friend, Victim Ten,

6    with her.  When they arrived at that hotel suite, Tal Alexander

7    was in the suite, then the twins came out of the bedroom,

8    escorted two women out, took Victim 10 and Victim 11 on what

9    they represented was a tour of the suite, took them into the

10   bedroom, locked the doors and then took turns raping the two

11   victims.

12           And that is, your Honor, an example of the defendant's

13   working together to carry out the aims of the conspiracy.  The

14   twins working in concert while Tal Alexander was present

15   outside of the door with bartenders.  And they used here the

16   promise of, again, an after-party that was not real at a

17   high-end hotel to lure the victims to a location where they

18   could rape them.

19           Now, here there is no evidence of drugging, but they

20   did lock the door behind the twins and the two girls, confining

21   them in a room with two men that were larger than them and

22   proceeded to rape them.

23           THE COURT:  Mr. Agnifilo?

24           MR. AGNIFILO:  Yes, Judge.  Victim 11, I believe, and

25   Oren had a pre-existing relationship.  I believe they met at

1    some earlier time in Greece.  They stayed in touch, it seems,

2    on Instagram.  I think this is all in various of the

3    government's filings.  And so they stayed in touch.  And Oren

4    allegedly invites her to a party, an after-party type thing.  I

5    don't know that it was a penthouse.  It was a hotel.  I don't

6    know if there is anything about this hotel that is so out of

7    the ordinary that the defendant would consider it some type of

8    thing of value, you know, to have sex on account of.

9            And so ultimately in this case, as the government

10   says, there is no allegations of drugging.  And I'm hearing

11   from the government's evidence and from what I've seen in their

12   filings that this really seems to be the gravamen of the other

13   crimes evidence, as your Honor has pointed out.  You know, the

14   drugging, we don't have that here.

15           Obviously, we contest the allegations.  And one of the

16   things I think that is important, as your Honor and the parties

17   are working through all of this, all of this is going to be

18   very sharply contested --

19           THE COURT:  I understand that.

20           MR. AGNIFILO:  -- in every corner.  So I understand

21   that your Honor, for the time being, because you have to make

22   rulings the way we make rulings, is you are taking these things

23   in the light most favorable to the government, and I appreciate

24   that.  But in terms of 403 factors and things like that, we

25   have, you know, counter narratives.  Many of these events have

PBO4ALEC

written communications between the different people

participating.  I mean, there are other witnesses that might be

involved, so this is not as simple as the government is saying

by a long shot.

But here I think without the drugging, obviously, they

met in Las Vegas.  The defendants didn't bring them there.

Again, you don't hit a lot of the methods and means in the

government's proffered conspiracy, and I ask that it be

excluded.

THE COURT:  Ms. Espinoza, do you want to have your

last word on this?

I'm troubled by this as evidence of the conspiracy,

but I would admit it as 413.

MS. ESPINOSA:  Your Honor, I think it is.  Our view is

it is evidence of the conspiracy because it shows how the

defendants worked together, the relationship between the

coconspirators in order to carry out the criminal aims.  And

not every single --

THE COURT:  Wait a minute.  So you've got Oren meets

up two women at a bar.  They have drinks.  He says, come up for

after-party.  So you are putting a lot of weight on he invited

women for something that didn't -- he invited them,

essentially, to empty hotel room where his brother was, both of

his brothers, or the two people involved in the invitation.

MS. ESPINOSA:  In this particular case, your Honor,

PBO4ALEC

1   Oren messaged Victim 11 on Instagram to invite her to a party

2   in his penthouse suite.  His before brothers were there.  Tal

3   was there when they entered the suite.  And he Alon were

4   working together in order to carry out the rapes and sexual

5   assaults.

6           THE COURT:  Well, they both, according to the victims,

7   one raped each woman.  So your theory is that then brought them

8   altogether?

9           MS. ESPINOSA:  They then switched places.  The twins

10  each raped one victim, and then each raped the other victim in

11  this particular case.  So each woman was raped by two twins.

12          THE COURT:  Right, I understand that.

13          All right.  You persuaded me that it comes in as

14  evidence of the conspiracy, again, subject to all of this

15  actually being --

16          MS. PAUL:  I'm sorry, your Honor, can I please be

17  heard briefly as it relates to Tal?

18          THE COURT:  Yes.

19          MS. PAUL:  I understand that the government is saying

20  that Tal was present in the suite and opened a door.  That's

21  the extent of his involvement in this, according to the

22  government.  No one is going to say he remained in the suite

23  when Alon and Oren allegedly took these two women into another

24  room.  He opened a door and nothing more.  And admitting this

25  as evidence of direct conspiracy as it relates to him is unduly

PBO4ALEC

1    prejudicial and shouldn't be admitted.  Thank you.

2           THE COURT:  Ms. Espinoza?

3           MS. ESPINOSA:  Your Honor, I think that here it is

4    still evidence of all three defendants facilitating the sexual

5    assault of these victims.  As the victims will testify, when

6    Victim 10 and Victim 11 entered the suite, Oren and Alon

7    escorted two other women out and took them back in.  It was

8    clear what they were doing was a part of their pattern and

9    practice, their *modus operandi*.  And that Tal's presence there

10   with the bartenders in the other room put up a small venire of

11   After-party that they had created in order to lure these

12   victims there.

13          THE COURT:  I hear you, but I disagree.  So that

14   evidence comes in as evidence of the conspiracy.  If it didn't,

15   I would, again, admit it under 413.

16          All right.  Victim 12.  This was watch watching the

17   NBA finals at actor's house?

18          MS. ESPINOSA:  That's right, your Honor.

19          THE COURT:  All right.  Mr. Agnifilo?

20          MR. AGNIFILO:  All right.  So the allegations, as I

21   understand that the government is making, is that Tal Alexander

22   invited another person, not this woman but someone else, to

23   watch the basketball game.  The woman that Tal actually

24   invited, invited this person to come over.  And then she says

25   that one was defendants, I don't think she says who, offered

1   her a drink and molly, which she voluntarily consumed.  Then

2   they went to a nightclub and then someone gave her a drink at

3   the nightclub.  And then the allegation is that Alon, it seems

4   alone, had sex with her against her will.  This doesn't have

5   enough, again, of the hallmarks, I submit, of the government's

6   proffered conspiracy.  There is nothing from the defendant's

7   perspective -- the defendants didn't invite her.  Someone else

8   invited.  I think that is relevant in terms of hitting some of

9   those metrics.  Here, there is no working together, as the

10  government said.  The government's focused on things like false

11  after-parties, there is none of that.  So we just don't have

12  enough of the indicia for this to be admissible.

13          THE COURT:  Ms. Espinoza?

14          MS. ESPINOSA:  Your Honor, I disagree that this does

15  not have sufficient indicia to be part of the conspiracy.

16          Now, here, in terms of the invitation, this is

17  analogous to Victim One.  The invitation may have been passed

18  through another person, but Victim 12 still received the

19  benefit of it.  And here we expect Victim 12 will testify that

20  Tal is the defendant who gave her molly at the apartment and

21  then afterwards there is indication that there were multiple

22  defendants present and aware of what was happening.

23          Now, Alon, here is the one who raped Victim 12 without

24  her consent.  But while Alon was raping Victim 12, Tal walked

25  into the room, saw what happening, engaged in some conversation

PBO4ALEC

 1   with his brother, did not appear surprised or caught off guard

 2   by what was happening before leaving.  And here I will also

 3   note that there is evidence of drugging.  That Victim 12 lost

 4   her memory at the club, came to naked in Alon's bed, after

 5   which he raped her for a second time after telling her they had

 6   already had sex.

 7           So here there is evidence of drugging.  There is also

 8   evidence, both of the means and method and knowledge of the

 9   coconspirators of what was happening here.  That Tal saw what

10   was brother doing, did not react in any way that indicated that

11   he didn't understand what was going on or that he was not on

12   board with what was going on.  And that Alon was executing the

13   standard playbook that these defendants executed again and

14   again, where they lure a woman to a location where they can

15   drug her and then rape her.

16           THE COURT:  I agree this is evidence of the

17   conspiracy.

18           Victim 13, this is the one that, sort of, all takes

19   place in Tel Aviv.  I'm inclined not to see this as evidence of

20   the conspiracy.  Ms. Espinoza?  This just sounds like people

21   got together in a restaurant.

22           MS. ESPINOSA:  Your Honor, here I think we would be

23   prepared to admit this one under 413, rather than as direct

24   evidence of the conspiracy.

25           THE COURT:  Let me hear from the defense.  Why is this

PBO4ALEC

1      not 413 as to Alon?

2              MR. AGNIFILO:  As long as your Honor allows me to

3      argue 403 at the right time, this probably is 413.

4              THE COURT:  Now is the time.  I mean, you have a 403

5      argument as to the cumulative nature of it.  But this standing

6      alone, if this is the only one they put into evidence, do you

7      have a 403 argument about it?

8              MR. AGNIFILO:  One second.

9              MR. SREBNICK:  Judge, may I be heard on behalf of Alon

10     just on this one?

11             THE COURT:  Sure, of course.

12             MR. SREBNICK:  The so-called Victim 13, this is an

13     accuser who reaches out to Alon because she finds out Alon is

14     in Israel.

15             THE COURT:  Right.

16             MR. SREBNICK:  She pursues him.

17             THE COURT:  Yeah.

18             MR. SREBNICK:  She goes to his place.

19             THE COURT:  Yeah.

20             MR. SREBNICK:  And after they supposedly have an

21     intimate encounter, she stays with him for over an hour to have

22     dinner and then she leaves.

23             THE COURT:  Yeah, I read the whole description of it.

24             MR. SREBNICK:  Under that, I think even under a

25     preponderance there is a legitimate question as to whether this

1    constitutes the kind of conduct the government is alleging.  Of

2    course, she describes it as assault, that's her description.

3              THE COURT:  Right.

4              MR. SREBNICK:  I think your Honor can say at some

5    point, that kind of accusation where the other evidence -- and

6    we have other witnesses that we will call to describe the

7    circumstances of her pursuing Alon -- that turns this into a

8    mini trial over Accuser Victim 13 in the context of all these

9    other allegations that we are defending.  And I think the

10   Court, at that point, can say this is not the kind of mini

11   trial that --

12             THE COURT:  We're not having a mini trial on it, but

13   okay.  I hear you.

14             Is the government arguing that it should come in under

15   413 theory as to Tal?

16             MS. ESPINOSA:  As to Tal, your Honor?

17             THE COURT:  Tal, yeah.

18             MS. ESPINOSA:  No, your Honor, just to Alon.

19             THE COURT:  So the evidence is admissible in 413 as to

20   Alon.

21             Victim 14, this was, again, it all started just, kind

22   of, as a date with Alon.  I'm not inclined to see this as

23   evidence of the conspiracy.

24             MS. ESPINOSA:  Here it started as a date with Alon,

25   your Honor.  But, again, as with multiple other victims that

1    we've already spoken about, the twins took turns raping her.

2    So it demonstrates, again, the twins working together to carry

3    out the aims of the conspiracy.  There is indicia of drugging.

4    This victim reports feeling very unusual after the drink that

5    she had drunk.  The defendants ignored her request to not

6    engage in any sexual activity due to recent surgery.  And the

7    twins, again, took turns sexually assaulting her together.

8              THE COURT:  Mr. Agnifilo?

9              MR. AGNIFILO:  Yes, your Honor.  I think one of the

10   problems we are running into is it seems like if the woman at

11   issue is saying anything about voluntarily drinking being

12   unusual, then all of a sudden we are rushing to the standpoint

13   that they were given drugs.

14             THE COURT:  We're not rushing to that.  I've got to

15   make an evidentiary call at this point.  And accepting that the

16   adult woman and even 17-and-18-year-olds who have drunk alcohol

17   before, they know -- again, subject to cross-examination, that,

18   in fact, they didn't have two glasses of wine, they had eight

19   glasses of wine, I understand that there may be fertile grounds

20   for cross-examination.  But for purposes of *in limine* rulings,

21   based on the government's proffer that the women were

22   testifying that something was unusual.  And given the fact that

23   I'm aware that date rape drugs are not uncommonly put into

24   drinks that result in the woman feeling something unusual.  I

25   think I can add A and B together to say for purposes of the *in*

*limine* ruling, I'm going to conclude from that that they have

adequate evidence that the jury could conclude from the

evidence from the witness's testimony that they were drugged.

        MR. AGNIFILO:  I don't believe that, and I don't

believe the government is going to contest this, she drove back

to Westchester.

        THE COURT:  Okay.  Many people drive when they

shouldn't.

        MR. AGNIFILO:  Well, but it's not an irrelevant fact.

        And, yes, your Honor is right.  There is obviously

fertile cross-examination for all of this.  But I think at the

outset, it is fair to consider, kind of, the different, sort

of, arguments that are being offered.  Here, we don't have the,

sort of, inducement prong.  I think what she said is she felt

woozy after voluntarily drinking alcohol.  I just don't think

that's enough.  She also says she had a surgery recently.  So

there is lots of contrary explanations just on the face of the

information that I think should give one pause before we

conclude by a preponderance that there was drugging or

something like that.  And I don't believe that if we take the

drugging out of the equation that there is sufficient indicia

under the conspiracy to let this in.

        THE COURT:  I'm inclined to allow this witness under

413 as to both Alon and Oren.

        Victim 15, she was invited to a party while everyone

PBO4ALEC

1    was already in the Bahamas.  There was no inducement to go to

2    the Bahamas.  Again, I'm inclined not to see this as evidence

3    of the conspiracy.

4                MS. ESPINOSA:  Your Honor, here we think 413 as to

5    Oren for Victim 15.

6                THE COURT:  413 as to Oren.  Do you want to be heard?

7                MR. AGNIFILO:  Yes, Judge.

8                I don't believe this is admissible under 413.  And I

9    don't believe individually it's even admissible under 403.

10               THE COURT:  Okay.  Why not?

11               MR. AGNIFILO:  My understanding is that this woman

12   realizes that she is in the Bahamas at the same time that Oren

13   is in the Bahamas and that he is staying nearby.  Oren invites

14   her and her friends to a party.  It says that Oren and his

15   group gave her drinks.  I don't know what that means.  They're

16   not saying that Oren gave her a drink.  And that Oren took her

17   to a hotel room that had other women's belongings in it.  I

18   don't know what the significance of that is.  The government

19   put it in.  And I think it speaks of a possibility that, you

20   know, this woman wanted something exclusive that wasn't going

21   to happen.

22               THE COURT:  Again, that's good cross-examination.  But

23   my recollection is that she testified she was not in control of

24   herself, correct?

25               MR. AGNIFILO:  But also I think that the other women's

PBO4ALEC

1   belongings are especially relevant because I believe there was

2   prior --

3              THE COURT:  What do you want me to conclude from that?

4   I couldn't figure out why it mattered.

5              MR. AGNIFILO:  I think it mattered because they had

6   had sex before.

7              THE COURT:  Who had sex before?

8              MR. AGNIFILO:  I think it was Oren and this woman,

9   consensual sex.  I don't think that's disputed, I don't think.

10  And so here we are --

11             THE COURT:  Hang on.

12             Is there any contest that Victim 15 and Oren had

13  previously had sexual relations?

14             MS. ESPINOSA:  Your Honor, I expect that Victim 15

15  would say that they did, some months earlier, had consensual

16  sex which is not relevant to the allegation here when Victim 15

17  will testify that Oren held her down and forcibly raped her in

18  response to her saying "no, no, no."  And that's what makes it

19  admissible under 413 because it clearly meets the definition of

20  sexual assault as laid out in the rule.

21             THE COURT:  So why does the fact that they had sex on

22  a prior occasion matter?

23             MR. AGNIFILO:  It mixes with the fact that she notices

24  there are other women's belongings.

25             THE COURT:  So what?  According to the proffer she

1  testified to being raped.  So tell me why it's not 413?  You

2  may be able to devastate her on cross-examination so that no

3  member of the jury is going to believe her.  But I'm accepting

4  the proffer.  So why isn't it 413?

5          MR. AGNIFILO:  Everything is 413.  It seems like

6  everything in the world if it's in the nature of a sexual

7  assault is 413.

8          THE COURT:  Pretty much.

9          MR. AGNIFILO:  That's not the issue.  The issue is

10 whether -- and I don't know if your Honor is moving in this

11 direction -- that collectively, in the collective, whether 403

12 requires that some of this not be admissible.

13         THE COURT:  Absolutely it does.  And that's why I said

14 15 minutes ago that I am not going to allow the government to

15 put in all 26 of these.  But I can't go through -- I can't

16 micromanage their case, nor can you.

17         MR. AGNIFILO:  I think I understand what your Honor is

18 saying.  It is probably 413.

19         THE COURT:  Okay.

20         MR. AGNIFILO:  I don't think it's evidence of the

21 conspiracy.

22         THE COURT:  I'm not admitting it as evidence of the

23 conspiracy, only under 413.

24         MR. SREBNICK:  Judge, may I make one analytical point.

25 Under *Huddleston* analysis of 404(b) the Court said it's a

1    question of the preponderance of the evidence, not just a prima

2    facie showing relying solely on the accusation, but it's a

3    preponderance of the evidence.  And in this case where you are

4    presented with additional information, facts as to Oren or Alon

5    in Israel where you have additional information --

6            THE COURT:  What's the additional information that you

7    want me to focus on?

8            MR. SREBNICK:  For example, with the event in Israel

9    where the --

10           THE COURT:  We are past Israel.

11           MR. SREBNICK:  I just want to make sure that I

12   preserve that the preponderance of the evidence includes all of

13   the circumstances, not just the allegation.  It includes other

14   facts, other witnesses who observed that the accuser was

15   pursuing one of the brothers, that the accuser goes there

16   voluntarily.  The accuser had sex with the person before.  The

17   accuser has dinner with Oren or Alon after the alleged assault.

18   If this was a civil case, preponderance of the evidence, how

19   would the jury determine that?  And I think the Court should

20   invite the same kind of analysis.  How do you, as the finder of

21   fact, determine whether that set of circumstances by a

22   preponderance of the evidence establishes a sexual assault, not

23   limiting it just to what the accuser says.

24           THE COURT:  So far what you've told me is they had

25   consensual sex on a prior occasion.  That argument amounts to

PBO4ALEC

1    once you have consensual sex, the man has the right to rape

2    you, and I'm not accepting that.

3            MR. SREBNICK:  I'm not saying that, and I concur.

4            THE COURT:  Based on what I have heard, and I will say

5    this again, I am assuming the victims are going to be credible

6    when she says she said no, and he raped her anyway.  So tell me

7    what more you want me to consider on that point?

8            MR. SREBNICK:  The example, that applies to Alon is

9    the accuser in Israel, who after supposedly being assaulted,

10   she decides to go out to dinner with Alon.

11           THE COURT:  I hear you on that but I also know that

12   they are going to have an expert that says that kind of thing

13   is not unusual.

14           MR. SREBNICK:  Ultimately, then how do you make a

15   preponderance until you consider all of that, Judge?

16           THE COURT:  If after the witness testifies on direct,

17   she is totally not credible, revisit the question.

18           Victim 16, this is the victim that went to Oren's

19   apartment by invitation, and then I guess Alon was present?

20           MS. ESPINOSA:  That's right, your Honor.  This

21   particular occasion is, indeed, evidence of the conspiracy.

22   Victim 16 met Oren, drank champagne, became far more

23   intoxicated than she typically did after drinking that amount

24   of champagne.  Oren took her back to the apartment.  At the

25   apartment, Oren raped Victim 16.  And afterwards Alon came in

1   and said that it was his turn, and "this is how we do things."

2   And that, your Honor, is evidence of the conspiracy.  Because

3   it shows the criminal aims of the conspiracy.  Again, it's

4   another example of twins working together to carry out those

5   aims.  And in particular, Alon saying "it's my turn now.  This

6   is how we do things," is very powerful evidence of the

7   conspiracy.

8          THE COURT:  Mr. Agnifilo?

9          MR. AGNIFILO:  Yes, Judge.  To state the obvious, but

10  I think I should actually say it, all three defendants deny

11  raping anybody.

12         THE COURT:  I understand that.  They have pled not

13  guilty.  I assume that they have done nothing wrong.  They have

14  a presumption of innocence which I'm absolutely observing.  But

15  I still have to rule on the *in limine* motions.

16         MR. AGNIFILO:  No question.

17         I want to pick up and apply here to what Mr. Srebnick

18  said a few minutes ago, which is that I think we need something

19  more -- right now it's a "he said, she said."  And your Honor

20  is focusing on the "she saids."

21         THE COURT:  Correct.

22         MR. AGNIFILO:  But I don't know that that is the only

23  way to do a preponderance of the evidence analysis.  I think a

24  preponderance of the evidence analysis when there is a "he

25  said, she said" is to look at the other indicia and to look at

1   other reasonable explanations.  The reasonable explanation here

2   could very easily be there was consensual sex and when there

3   was an invitation to have a threesome, that invitation was

4   denied because when, even according to the government's

5   allegations, when a second brother, a third participant offered

6   to, sort of, participant she said no.  And I don't think it

7   happened.  I think that's the allegation.

8        So what I'm encouraging the Court to do is to take it

9   as a given that there is a factual assertion on the defense

10  side that there wasn't rape, that there wasn't forced sex, none

11  of those things, that there was no drugging.

12       The other thing is, frankly, we are going to admit to

13  a lot of it.  Like I said, there was efforts at group sex, no

14  question.  That is going to be something that is very obvious

15  in the evidence, and we are not going to contest it.  So we

16  need, I submit, more than that.  And without harder evidence of

17  the drugging, without in these instances --

18       THE COURT:  The problem with that it essentially gives

19  men a permission slip to drug women because very few women,

20  from statistics that I think we have all seen, actually go to

21  the police afterwards.  So it would be fair game because they

22  are never going to have a toxicology report.

23       MR. AGNIFILO:  If I could and I know our time is

24  limited today but I know we are going to go again next week.

25  The government used the term "playbook" a little while ago.

And I want to sort of introduce a concept that I think is going

to be important, which is the defendants -- I don't know if

it's more than most guys in their 20s or the same or whatever

it is -- were very keen on having lots and lots of sex with

them.  There is no two ways about it.  And they cultivated a

life around it, around success in business, which they did for

other reasons, they wanted to have parties.  Some guys play

Dungeons & Dragons and don't cultivate a life that's going to

be attractive to women, that's not what these guys did.

These guys put a premium on "I want to be attractive

to women.  I want women to be with me."  All of these things I

think could be looked at and fit into that narrative.  And we

are not going to walk away from a stitch of that.  We are going

to take all of that on.  And we are going to end up agreeing

with a lot of -- certainly not all of it -- a lot of the

government's case because there is a great deal of effort and

emphasis that these three young men placed on being interesting

to women, attractive to women, and attracting women.  That's

what they wanted to do.  They worked hard, and they played

hard, and their playing hard involved being attractive to

women.

So a lot of this is not really going to be in dispute.

I, mean there was interest in trying to have group sex.  At one

point there was, I think, a couple of text messages they use

the word "orgies" as a verb.  "We are going to try to orgy

1    them," things like that.

2            THE COURT:  That means Mr. What's His Name didn't pull

3    that word out of the air, that they got it from his clients,

4    using "orgy" as a verb.  I never heard it used as a verb.  It

5    was new to me.  This was before your time.

6            MR. AGNIFILO:  I was told I might not have been here

7    for that.

8            THE COURT:  You were not.  It did make the front page,

9    I think, of the Post, though.  Just to defendants, to be clear,

10   orgy is not a verb.

11           MR. AGNIFILO:  People gift things now to people.

12   Nothing is a noun anymore.

13           THE COURT:  Yeah, I don't know.  The world is coming

14   to an end.

15           MR. AGNIFILO:  Exactly.

16           THE COURT:  And your time is coming to an end on this

17   point.  I get your point.  I understand your point.  And the

18   government's point is, again, when the women didn't go along,

19   they drugged them, or if they said no, they raped them, that's

20   what makes a case.

21           MR. AGNIFILO:  That is exactly right.  That is

22   obviously a huge, huge issue dispute.  But I think we are going

23   to agree with so many of the facts that got to the point.

24           THE COURT:  Right.

25           MR. AGNIFILO:  And our contention is the women wanted

1  to be there.  It was fun.  There are videos of young people

2  having fun.  There is kite surfing.  There beautiful -- and

3  what the government is going to say, "look, they had sex on

4  account of all those things."  And that's going to be their

5  argument.  And we are going to say they had consensual sex

6  because they were all young and having fun, and this was part

7  of the weekend.

8          THE COURT:  Yep.

9          MR. AGNIFILO:  And that's why we are going to have a

10  trial.

11          THE COURT:  Right.

12          MR. AGNIFILO:  But I think a lot of these other things

13  that the government is going to try to bring into the case in

14  the nature of uncharged events are unnecessary.

15          THE COURT:  If you're right it's just more evidence

16  that they were playboys who were having lots of fun with lots

17  of woman.  So your whole argument is a double-edged sword.

18  This is only problematic for your client if the jury believes

19  the victim that she was not engaged in consensual sex.

20          MR. AGNIFILO:  My concern is the jury might not

21  believe the victims that are named in the indictment, but might

22  say -- this is of danger of 413, and this is what the Second

23  Circuit said and other circuits said.  The danger going to be

24  even if they didn't do what is alleged in Count Five, they did

25  this thing in the Bahamas that we heard about, or they did this

PBO4ALEC

1  thing in Israel that we heard about, or they did this other

2  thing that we heard about.  And if they didn't do this, they

3  did the other thing.  And that's why 413, frankly is a

4  terrible, terrible rule of evidence.  It's on the books, I

5  know.  And 403, which is a wonderful rule of evidence, tempers

6  it.

7          THE COURT:  And these will be tempered because all of

8  these things aren't going to come into evidence.  I can't say

9  that again.  I've heard your point.

10         So this is evidence is going to come in as evidence of

11 the conspiracy.

12         MR. SREBNICK:  Judge, as to that particular alleged

13 victim 16?

14         THE COURT:  This is Number 16.

15         MR. SREBNICK:  I don't believe there was notice as to

16 Alon.  If the government can confirm one way or the other if I

17 have that right.  Although, they mentioned Alon.

18         THE COURT:  It only has to be noticed if there is 413

19 evidence.  I'm admitting it as evidence of the conspiracy.

20         MR. SREBNICK:  What we heard today was that Alon,

21 according to the proffer, invited this so-called Victim 16 to

22 have sex with him.  She declined, and he didn't have sex with

23 her.

24         THE COURT:  Okay.

25         MR. SREBNICK:  So, again, by preponderance of the

evidence, knowing all the facts and their claim that these are

basically men that will rape at will, now you have to decide by

preponderance, does this really fit the description of what the

government says is their *modus operandi*.

            THE COURT:  Okay.  At least at this point, based on

the proffers, it does.  So that evidence can be admitted as

evidence of the conspiracy.

            Again, with the same caveat of whether it's coming in

as 413 or coming in as evidence of the conspiracy, there is

going to be a point where it's too much and it's unduly

prejudicial, and it no longer hits the 403 balance.

            You are standing up?

            MS. PAUL:  Yes, your Honor.  I apologize for standing.

            Just for the record, this is now another case of

evidence that you are admitting as direct evidence of the

conspiracy where Tal is not alleged to have been there or

participated in.

            THE COURT:  Look, in a conspiracy everybody doesn't

have to be present for anything.  That's just the law of the

conspiracy, we all know that.  I take your point.

            Victim 17, this one I had some questions about.  This

is the victim who was invited to a real estate conference in

Las Vegas, but she worked at Douglas Elliman.  She turned down

the ride on the company plane.  So it's not clear to me what --

            MS. ESPINOSA:  Your Honor, at this point I can cut

1  this one off and say that we do not plan to call Victim 17.  So

2  we can move on to Victim 18.

3          THE COURT:  So that's moot.

4          Victim 18, the thing of value was dinner with Oren and

5  a Formula 1 racecar driver.

6          MS. ESPINOSA:  Your Honor, and then Oren invited them

7  all back to his home where he sexually assaulted Victim 18.

8          THE COURT:  Okay.  He was by himself, and it was

9  really just a dinner, right?

10          MS. ESPINOSA:  I think, here, your Honor, we will say

11  that this one admissible under 413, rather than conspiracy

12  evidence.

13          THE COURT:  Yeah, you didn't have me on the

14  conspiracy.  Okay.

15          Mr. Agnifilo.

16          MR. AGNIFILO:  Obviously, it's uphill battle 413.

17  What I would add to the factual recitation is that this

18  person's friend was interested in going to the dinner to meet

19  the Formula 1 driver.  This purported victim was not invited at

20  all.  But the friend wanted to meet the Formula 1 driver.  This

21  person went with the friend, and then I think all of them went

22  back to Oren's house in Miami.  And your Honor is right, it's a

23  one-on-one situation.  There are no other brothers involved.  I

24  believe there no allegation of drugging.  She had some whiskey,

25  I believe but voluntarily.  So I don't think this should come

53

PBO4ALEC

1  in under 413.

2         THE COURT:  The evidence says she was raped, no?

3         MR. AGNIFILO:  No, I don't believe so.

4         THE COURT:  Well, they didn't just go back to the

5  apartment and do nothing or it wouldn't be on my list.

6         MS. ESPINOSA:  The evidence is Oren masturbated on her

7  and forcibly digitally penetrated her.  So that is a sexual

8  assault under the terms of 413.

9         THE COURT:  So Victim 18 is admissible under 413 only

10 as to Oren.

11        Victim 19, this was invitation to Oren's house after

12 evening at a club in Miami.

13        MS. ESPINOSA:  Your Honor, this one we will also say

14 is 413 as to Oren.

15        THE COURT:  I agree it's not evidence of the

16 conspiracy.

17        Mr. Agnifilo?

18        MR. AGNIFILO:  I have nothing when it comes to 413,

19 unfortunately.  I will make --

20        THE COURT:  You maintain your 403 argument.

21        MR. AGNIFILO:  I'll make 403 argument.

22        THE COURT:  Got it.  So that's admissible under 413,

23 only as to Oren.

24        Victim 20, this is the event in Acapulco.  The thing

25 of value was an invitation to an after-party at the defendant's

PBO4ALEC

1    villa in Acapulco.

2            You want to tell me more about it, Ms. Espinosa?

3            MS. ESPINOSA:  Your Honor, this one is a bit of a

4    longer story than that.  It's admissible as conspiracy evidence

5    for several reasons.  Here, Victim 20 met the twins in

6    Acapulco.  They invited her back to an after-party where she

7    observed people having sex and doing drugs.  Victim 20 wanted

8    to leave, couldn't leave at that point because it was the

9    middle of the night in Acapulco.  There was no way for her to

10   safely do that.  Oren took her to a bedroom.  And after they

11   engaged in some consensual kissing, Oren masturbated next to

12   her.  We are not saying that in and of itself is a sexual

13   assault but it is part of the evidence of the conspiracy that

14   I'll continue to layout.

15           One particularly important piece of conspiracy

16   evidence that Victim 20 provides is the next night, back at a

17   nightclub, Victim 20 saw Oren with a bag of pills.  And he was

18   dropping those pills into girls' drinks at his table.  He was

19   also giving pills to girls who opened their mouths for him to

20   give them pills.  This is evidence that Oren had access to

21   drugs and at least then that he put drugs in drinks.

22           Separately Victim 20 met up with Oren in

23   December 2009, so sometime later in Aspen.  After a day of

24   skiing, had drinks at a bar --

25           THE COURT:  Let's separate the two.  I had forgotten

1    that she comes up twice.

2           Let me get defense to address the issue of just the

3    Acapulco.  Here is the thing about the Acapulco thing.  I get

4    the notion that there are drugs at a party.  There are people

5    having drugs, having sex in Acapulco, and she couldn't leave.

6    But she knew Acapulco.  She knew that when she got there she

7    was going to be trapped there because she can't really leave.

8    And bunches of guys having a party and having sex with women at

9    a hotel room in Acapulco, that's not your theory of this case.

10   That's the defense theory.

11          MS. ESPINOSA:  Correct, your Honor.  But the theory of

12   the case does involve the defendants putting drugs into

13   people's drinks, which is what Victim 20 observed Oren doing

14   the next day.

15          THE COURT:  That's different.  And if that is what you

16   are seeking to admit, that I understand.  Is that all you are

17   going to admit?  So that's all you're going to admit if that's

18   how I rule?

19          MS. ESPINOSA:  I think that in the event you ruled

20   that way, we would certainly seek to admit the evidence of the

21   drugging.  We do think that the evidence of what happened to

22   Victim 20 subsequently in Aspen is similarly admissible.

23          THE COURT:  We're going to get to Aspen in a second.

24   Let's say in Mexico for just a second.

25          MR. AGNIFILO:  One second, Judge.  I just need to

PBO4ALEC

1    consult.

2              THE COURT:  That's fine, consult.

3              Mr. Agnifilo we are talking only about Acapulco, and

4    only -- I've already sort of ruled.  The events in the hotel

5    room are not admissible under 413.  And I'm not persuaded that

6    piece of the story is admissible as evidence of the conspiracy.

7    So let's focus on the fact that she had been to the room.  She

8    saw drugs in the room, and the next night she saw them dropping

9    pills into drinks.

10             MR. AGNIFILO:  Her statement, as I understand it, is

11   that she saw them dropping pills into woman's mouths and

12   drinks.  She does say "and drinks."  I think there is an

13   evolution to her account, but that's for cross-examination.

14             So I mean what I'm trying to see if this predates the

15   conspiracy.  And the conspiracy is alleged to begin in 2008.

16   So it's on the early side of it, the Acapulco part.

17             THE COURT:  I mean, the hotel room is not going to

18   come in as evidence of the conspiracy.  The question is whether

19   the access to drugs and drugging people, if that evidence comes

20   in as evidence of the conspiracy.

21             MR. AGNIFILO:  We have challenges to it from a factual

22   standpoint.

23             THE COURT:  Understood.

24             MR. AGNIFILO:  But there is a witness statement where

25   she is going to say this is what she saw.

1      THE COURT:  With that limitation on her testimony as

2  to Mexico, the evidence of access to drugs, seeing that they

3  had access to drugs, and also the drugging of drinks and the

4  women comes in.

5      That brings us to Victim 20 in Aspen.  Here he invited

6  her skiing and then out to dinner.  That was kind of what

7  happened.  And he takes her back to his hotel room where there

8  was an assault.

9      MS. ESPINOSA:  Yes, more or less.  Victim 20 goes to

10  drinks after the day of skiing at a sky bar alone with Oren.

11  Alon and Tal joined them there.

12      THE COURT:  She is there with Oren.

13      MS. ESPINOSA:  And then Alon and Tal join them for

14  drinks.

15      THE COURT:  So ultimately all three are together.

16      MS. ESPINOSA:  Ultimately all three are present.

17      Victim 20 had initially had a friend with her.  The

18  friend leaves.  While Victim 20 is having drinks with Oren and

19  his brother, they pour her at least one glass of wine.  After

20  having a glass or two of wine that evening, her memory became

21  extremely fuzzy, only having brief snippets from the rest of

22  the night.  One of those memories is being in Oren's bed trying

23  to block her genital area from him and saying no.

24      The next flash of memory is being in the shower with

25  Oren and Oren slamming her head against the tile wall several

1  times.

2       The third flash of memory that she has is being

3  dressed in what she described as a clown outfit and being

4  pushed out the door of Oren's condo.  And then she woke up the

5  next morning in her friend's apartment missing her underwear.

6       Victim 20 confronted Oren about what happened.  She

7  called him.  She said she left her credit cards at his house

8  and wanted to go back to get them.  She picked up Oren and Alon

9  in her car and took them back to her condo to look for what she

10 said was her credit cards but was, in actually, her underwear.

11      During that car ride Victim 20 confronted Oren,

12 saying, "I don't remember what happened.  What happened last

13 night?"  And Oren responded, "don't worry about it.  We had

14 fun."  And refused to give her any more details.

15      Victim 20 found her underwear in the shower of Oren's

16 condo.  Again, said, I don't remember.  Tell me what happened.

17 He, again, brushed her off with "don't worry about it."  Victim

18 20 left, at that point, resolving to never see Oren again.

19      And then a couple of weeks later, after experiencing

20 symptoms consistent with a sexually transmitted disease, she

21 went to the doctor and was diagnosed with chlamydia.  Again,

22 Victim 20 called Oren and said, what happened that night?  And

23 again, Oren tried to brush her off.  And victim 20 said, well,

24 something happened because I have chlamydia.  Oren then pushed

25 back on whether it could be him.  Victim 20 explained he was

1    the only source.

2           That is evidence of a number of parts of the

3    conspiracy.  It shows drugging.  It shows force.  And it shows

4    that very early on in the charged conspiracy, in 2009, Oren was

5    aware that his victims didn't remember what was happening, that

6    they weren't consenting to what had happened.  And so the fact

7    that Victim 20 confronted him early on is also important

8    evidence of the Oren's knowledge and intent going forward in

9    the conspiracy.

10           THE COURT:  Okay.  I'm inclined to admit it under 413

11   as to Oren but not as evidence of the conspiracy.

12           Mr. Agnifilo?

13           MR. AGNIFILO:  I don't know that I have anything that

14   is going to be able to a change your Honor's mind on 413.

15           THE COURT:  Victim 21, vis-a-vis Oren.  This was an

16   invitation to Oren's part apartment.  And I think there was

17   non-consensual sex at the apartment.  Is that the government's

18   proffer, Ms. Espinoza?

19           MS. ESPINOSA:  Your Honor, I think on that particular

20   occasion, we're not saying that there was force or --

21           THE COURT:  This was the woman who wrote "rapist" on

22   the --

23           MS. ESPINOSA:  Correct, your Honor.

24           There's two pieces to that story.  First, Victim 21

25   meets with Oren at his apartment.  He begins kissing her,

escalates very quickly.  Victim 21 did not really want to have

sex with him, but essentially went along with it.  But somebody

burst into the room with a camera recording the encounter, and

Victim 21 was very upset.

After that, Victim 21 began communicating with Tal and

agreed to meet up with Tal for dinner.  He took her back to the

apartment, and that's when the second encounter happened.

Victim 21 had smoked marijuana.  She observed Tal sprinkle what

he said was resin on top of it.  When Victim 21 was in Tal's

bed, Oren and another man burst into the room.  Tal held Victim

21 down and digitally penetrated her while the other men stood

around the bed, one of whom was carrying a camera.

Victim 21 repeatedly said she had to go.  The assault

stopped after Tal digitally penetrated her.  She, again,

confronted the defendants about what happened, writing "rapist"

on the wall.  This is the victim who sent Facebook messages to

a large number of the defendant's friends telling them what had

happened.  She sent a message to the defendant's mother telling

her what had happened.  She sent messages to both Oren and Tal

confronting them about what they'd done.

Again, this is evidence showing two of the defendants

working together.  Victim 21 also reports some symptoms

consistent with drugging including beginning to hallucinate

after she left the apartment.  And it also, again, is an

example of a victim confronting the defendant's about her

1    experience and what had happened to her when she was with them,

2    again, fairly early in the conspiracy in 2010.  So very it is

3    probative of their knowledge and intent of the lack of consent

4    of their victims.

5            THE COURT:  Mr. Agnifilo?

6            MR. AGNIFILO:  Yes, very quick, Judge.  Here the

7    purported victim says that she smoked marijuana that had what

8    was described to her as resin put on it.  So there is really no

9    meaningful evidence that there was anything that she did other

10   than volitionally smoke the marijuana.  So I don't know that

11   this is the kind of case where one of the instances where there

12   is any remotely plausible account that she was drugged.  She

13   voluntarily smoked marijuana.

14           THE COURT:  I think what my impression of what the

15   government is suggesting is that something was put on the

16   marijuana that was not just marijuana so that it would be like

17   putting something in a drink that is not just alcohol.  That is

18   their theory.

19           Is that correct, Ms. Espinoza?  Your theory is there

20   was something put on the marijuana that changed its effect?

21           MS. ESPINOSA:  Yes, your Honor.

22           MR. AGNIFILO:  We are getting awfully speculative.

23   She had asked what it was.  She was told it was resin.  I don't

24   know what the effect of that is.  I don't know if the Court

25   knows exactly what the effect of that either for this point,

PBO4ALEC

1    for the purpose of a preponderance of the evidence that she was

2    drugged without her knowledge.  Again, it's I don't think it's

3    part of the conspiracy under 413.  That's obviously an uphill

4    battle for us, but I don't believe it's conspiracy evidence.

5         THE COURT:  I think it's a close case, but I'm going

6    to admit it as evidence of the conspiracy.  If her testimony

7    strains out differently from what we expect, you can re-raise

8    the issue.

9         Victim 24, this was the one who was invited back to

10    Oren apartment.

11         MS. ESPINOSA:  Both 23 and 24 we move to admit under

12    413 as to Oren.

13         THE COURT:  23, I didn't have her written down.

14         MS. ESPINOSA:  At the top of the 24, your Honor, of

15    our motion *in limine*.

16         THE COURT:  The top of page 24.

17         MS. ESPINOSA:  Of our motion *in limine* begins with

18    Victim 23 who met Oren on the Raya dating app and met up with

19    him in Miami in Art Basel.

20         THE COURT:  24 is them talking on a -- I'm sorry,

21    page 23.  You know what, I totally skipped over her.  Tell me

22    the story of 23.  Are 23 and 24 the same?

23         MS. ESPINOSA:  They are similar in the some ways.  At

24    the same time they both met Oren on a dating app.  Victim 23

25    met Oren at Art Basel in Miami.  He invited her to an

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    after-party, gave her a margarita.  She drank about half of it,

2    began to lose control of her body.  Oren took her back to his

3    condo.  At that condo he attempt to fully undress her.  She

4    attempted to stop him from doing so.  Oren ended up pulling

5    Victim 23's underwear to the side and raping her repeatedly and

6    aggressively.  And the next day it left her with pain and

7    swelling as a result of that sexual assault.

8              THE COURT:  Mr. Agnifilo, Victim 23, as to 413

9    evidence, not as to evidence of the conspiracy.

10             MR. AGNIFILO:  Under 413 I don't know that I have

11   anything that will persuade the Court from finding this 413

12   evidence

13             THE COURT:  You want to move onto 24, same issue 413?

14             MS. ESPINOSA:  That's Oren as well, your Honor.  Again

15   Oren invited Victim 24 back to his apartment for a date.  He

16   had met her on the same dating app.  He gave her a soda, which

17   she had sipped some of.  Oren then took Victim 24 on what he

18   said would be a tour of his apartment, took her into the

19   bedroom, blocked from leaving the room, held her down on the

20   bed and forcibly raped her, despite pleas to stop.

21             THE COURT:  413, Mr. Agnifilo.

22             MR. AGNIFILO:  Your Honor, there obviously a context

23   to this that makes the story implausible in terms of contact

24   between the two.  But I see what the Court's been ruling, if

25   there is a proffer of sexual assault or rape, you know, the

PBO4ALEC

1    rest is going to be for trial, and I assume it's the same with

2    this.

3            THE COURT:  Correct.

4            So Victim 24 comes in as 413 as to Oren only.

5            The next is the videotape tape.  This is now direct

6    evidence of Count 11, correct?

7            MS. ESPINOSA:  That's right, your Honor.

8            THE COURT:  So is there metadata that shows the order?

9    First off, do I now have all of that evidence?  I have a

10   videotape, and I have a bunch of stills and a bunch of really

11   horribly shot little snippets of video.  It's whatever the

12   government put on the laptop that you delivered to me.

13           MR. JONES:  Yes, your Honor.  I wouldn't say you have

14   everything recorded that night.  I think you have what's

15   relevant from that night.  It includes everything the defense

16   referenced in their papers, asked us to put in and everything

17   we referenced in ours as well.

18           THE COURT:  Mr. Agnifilo, the fact that they indicted

19   it now gets rid of, essentially, your argument, correct?

20           MR. AGNIFILO:  I think it gets rid of the argument as

21   to my client.  I think the other defendants may have arguments

22   they want to raise about the prejudicial spill over of this

23   evidence in light of Count 11 as to their clients, but I will

24   leave that.

25           THE COURT:  We'll deal with that next week, whether

1    should be a severance either of the count or of the defendant.

2         MR. AGNIFILO:  Yes.

3         THE COURT:  Let me say that obviously comes in.  And I

4    think under the rule of completeness, the defendant is going to

5    be able to introduce the pieces of video and pictures that the

6    defense thinks contradicts the government's theory that it was

7    non-consensual sex.  Put aside that for Count 11, it's evidence

8    of the conspiracy generally.  And with all due respect to the

9    defense description of what can be seen on the video, a jury

10   might buy that.  I did not, for what it's worth.  I thought a

11   jury would be persuaded that the woman was incapacitated, at

12   least by a preponderance for purposes of admission of the

13   evidence.

14        MS. ESPINOSA:  Your Honor, we agree that the other

15   video and stills from that should come in.  I'm happy to

16   address the timeline if you prefer or can save it for next

17   week.

18        THE COURT:  Save it for next week.

19        Ms. Paul, you are stay standing up again.

20        MS. PAUL:  Yes, your Honor, I'll reserve this argument

21   for next week.

22        THE COURT:  Then I got some hanging chads that came up

23   in the defense response.  Let me make sure that everything has

24   been taken care of.

25        The defense says that Victim 22 is in the 413 notice

1    but not in the MIL.

2              MS. ESPINOSA:  Your Honor, we are no longer seeking to

3    call victim 22.  She is not in the motion *in limine*.

4              THE COURT:  So Victim 22 is out.

5              And then Minor Victim 25 is not in the 413 notice or

6    in the MIL.  So is she still alive and with us?

7              MS. ESPINOSA:  No, your Honor.  She was in both.  She

8    was originally referred to as "Friend One" in the 413 notice.

9    We issued an amended 413 notice referring to her as Minor

10   Victim 25.  She is now addressed together with -- what is said

11   on page 11 starts with Minor Victim Eight, Victim Nine, and

12   Minor Victim 25 in our motion *in limine*.

13             THE COURT:  So we covered that.

14             MS. ESPINOSA:  We covered her.

15             THE COURT:  I already said this before but let me say

16   again the defense has argued that because of the similarities

17   of the 413 evidence to the charged substantive offense that

18   some of it should be excluded as unfairly prejudicial.  They

19   would like it all excluded as unfairly prejudicial.  The

20   government has said that you are not going to introduce all of

21   this, and you are not.  I don't know where I'm going to draw

22   the line, but there is going to be a point where it's just too

23   much, it's unduly prejudicial.  It's duplicative and a waste

24   the jury's time.

25             That brings us to statements of the defendants and

1  coconspirators.  Am I correctly understanding -- is this still

2  you, Ms. Espinoza?

3          MS. ESPINOSA:  This will be Ms. Smyser now, your

4  Honor.

5          THE COURT:  Ms. Smyser, do I correctly understand that

6  the government's theory is that the three brothers are kind of

7  the core of the conspiracy.  But there are other people that

8  come in, maybe and go out throughout the course of the

9  conspiracy, providing drugs, providing rides, being party

10  planners, also participating in videotaping or whatever.  Is

11  that kind of your basic theory?

12          MS. SMYSER:  I think that's true especially as to the

13  charged conspiracy.  Obviously, we have arguments about the

14  drug chats and them all being evidence of the drug conspiracy.

15  But, yes, I think you have the basics.

16          THE COURT:  So my general view is we all know what

17  coconspirator hearsay is.  To the extent they demonstrate that

18  there is a conspiracy, statements in furtherance of the

19  conspiracy will come in.  For example, the out-of-court

20  statements about setting up rendezvous, paying for plane fares,

21  arrangements to transport women from Point A to Point B, all of

22  that is clearly, again, subject to the government actually

23  proving the conspiracy, appears to be coconspirator statements

24  in furtherance of the conspiracy.

25          I would like to hear from the government on some of

1    the other stuff that is less obviously in furtherance.  It

2    seems to me, again, I want to hear from you, but at first

3    glance, the line of cases that deals with gang guys who are

4    mobsters who brag about kills and loan sharking and whatever,

5    all of that, I don't see that as really analogous to what's

6    going on here.  Now, the Lion's Den or whatever that group chat

7    was certainly gives me pause.  But help me understand how all

8    of those statements are in furtherance of their conspiracy to

9    induce women for sex against their will.

10           MS. SMYSER:  Your Honor, I think your first point that

11   the kind of inner circle of this conspiracy are the defendants.

12   But the people who help them in their conspiracy is important.

13   Their conversations with other people outside of the conspiracy

14   or outside of that inner circle with the defendants is

15   important because they rely on their friends and their

16   associates to help further the conspiracy.  Those are people

17   who are bringing them drugs.  They are people who are at these

18   parties that they plan where victims are raped.  And it is

19   because of these other people's participation that the

20   conspiracy is able to be carried out.

21           For example, your Honor, I want to just take an

22   example here.  In the motion we layout a communication

23   between --

24           THE COURT:  What page?

25           MS. SMYSER:  On page 51 of the motion.

1    THE COURT:  Yes.  I had questions about furtherance.

2    MS. SMYSER:  That's fair.

3    In, for example, that third bullet, the motion is

4    laying out a communication between Oren and CC-7 in which Oren

5    is bragging about him and Alon finding a girl if SoHo and

6    taking her back to the apartment and "training" or having sex

7    with her.  In that conversation Oren describes him and Alon as

8    "a force" which is relevant to a conspiracy.  And CC-7 says,

9    "no is not an option."  In which Oren agrees with and says

10   "no."

11   This is relevant here because CC-7 is a person that we

12   can demonstrate a person through other evidence is someone who

13   discusses drugs with Oren and other members of the conspiracy.

14   He discusses MDMA, for example.  He also present in Israel in

15   the apartment when Alon rapes Victim 13.  He is a member of

16   this Lion's Den chat.  They are working together with these

17   other people to create these opportunities in which they rape

18   woman and have the drugs that they need in order to rape women.

19   That's why these kinds of statements, which are sometimes

20   backward looking, are still in furtherance of the conspiracy.

21   THE COURT:  Okay.  Who would like to be heard from the

22   defense?

23   MS. GERAGOS:  I think I am, your Honor.  May I come to

24   the podium?

25   THE COURT:  Please do.

1    Didn't we just adjourn or didn't you seek an

2  adjournment because you just had a baby?

3         MS. GERAGOS:  Yes, your Honor.

4         THE COURT:  You look terrific.

5         MS. GERAGOS:  Thank you.

6         THE COURT:  I'm sure I'm not supposed to say that.

7  You are on your feet and maybe this is better than being at

8  home with an infant.

9         MS. GERAGOS:  This is certainly better than crying all

10 day.

11        THE COURT:  You can cry all day when you leave.

12        MS. GERAGOS:  That's right.

13        First, I want to just reiterate what we put to in our

14 papers.  We do think it's the more appropriate way to address

15 this than what is addressed in your Honor's individual rules to

16 do this daily.  Because what Ms. Smyser pointed to, the third

17 bullet point which has nothing to do with any 413 alleged

18 victim, nothing to do with the conspiracy alleged victim, and

19 nothing to do with a the statutory victim.  And so something

20 like this, admitting it at this point when your Honor hasn't

21 heard any evidence, anything regarding CC-7, anything regarding

22 any of the alleged victims we think is just premature.  So I do

23 want to reiterate the point we made in our motion, we would

24 much rather do this day by day.  I think it would be more

25 efficient.

1      THE COURT:  That is actually my plan.  My plan is to

2  say, I have concerns and I'm going to need to understand for

3  all of this how it's in furtherance.  I think the government

4  may be a little far over their skis on what constitutes in

5  furtherance as to some of this.

6      As to procuring drugs, I agree with their theory that

7  even though there is not a drug conspiracy charge, it's

8  integral to the conspiracy that is charged.  And an agreement

9  between people to illicitly procure drugs is itself a

10  conspiracy, and therefore conspirator statements as part of

11  that other conspiracy will also be admissible, so long as it's

12  in furtherance of that conspiracy.

13      MS. GERAGOS:  I hear, your Honor.  And I understand,

14  obviously, the conspiracy here is a long running one from 2008

15  until 2021.  However, the majority of the statements that the

16  government has pointed to and that they put in their papers

17  have nothing to do with any of the charges acts.  So I do want

18  to reiterate that point.  Because I think it's prejudicial.  I

19  think it's going to lead the jury to come to a conclusion that

20  doesn't actually tie to any of the charges acts.  I just want

21  to make that point clear.

22      THE COURT:  I think the government's view of in

23  furtherance is too broad.  And I think your view, as you just

24  articulated, about in furtherance is too narrow.

25      MS. GERAGOS:  Perhaps your Honor can come to something

PBO4ALEC

1    in had the middle.

2              THE COURT:  I will.  But I really can't do it in the

3    abstract.  You are absolutely right.  In the abstract, if it's

4    say in furtherance of the conspiracy and it's a coconspirator,

5    it's admissible.  If it's not, it's not.  And in the abstract,

6    conversations and about procuring drugs would form its own

7    little conspiracy, and the coconspirator would apply to that

8    conspiracy as well.  That's kind of an overarching thing.  The

9    only other overarching thing is the government being too broad,

10   and you being too narrow.

11             MS. GERAGOS:  Understood.

12             I think what you're asking is just with respect to

13   this third bullet point, or do you want me to just address in

14   furtherance?

15             THE COURT:  I'm happy for you not addressing it at all

16   because I'm not going to rule on anything beyond what I just

17   told you which is really just a statement of what rules are.

18             MS. GERAGOS:  All right.  Understood then.

19             MS. SMYSER:  Before we move on, your Honor, I just

20   want to note that these are statements, when made by the

21   defendants, that we would also be seeking to admit against them

22   individually which may also qualify as coconspirator

23   statements.

24             THE COURT:  They might, of course.  So in that

25   example, the example on page 51, I can't remember who was

1  talking, was it Oren?

2          MS. SMYSER:  Oren was talking.

3          THE COURT:  Oren's statements are going to be

4  admissible as to Oren.  And the other person's statements are

5  going to come in so that his statements make sense.  The only

6  question is whether these come in as to the other defendants.

7          MS. GERAGOS:  We may have relevance objections.  I

8  just wanted to make that clear also.

9          THE COURT:  You don't waive your relevance objection.

10          MS. GERAGOS:  Thank you.

11          THE COURT:  Thank you.

12          So we will deal with those on a case-by-case basis as

13  we go.

14          That brings as to adoptive admission.  I have a

15  question about the Lion's Den group chat.  When does it start,

16  and when it does it end?

17          MS. SMYSER:  Your Honor, there are several versions of

18  this chat.  I think the version where this comes from spans

19  from sometime in 2016 to 2018, but I can pull up the exact.

20          THE COURT:  I was just curious.

21          MS. SMYSER:  It's about two years.

22          THE COURT:  Would you like to be heard on your

23  adoptive admission argument?

24          MS. SMYSER:  Sure, your Honor.  This is really about

25  the video, as well as the statement in particular made by CC-2,

1    "old days at the Alexanders."  And I think both people believe

2    that this -- or both parties agree that this video is violent.

3    And it shows four naked men passing around a woman.  And it

4    appears to be commercially produced.  But it's one of these

5    kinds of statements that would expect a response from someone.

6    Because if anyone insinuated that someone did the kind of thing

7    that was depicted in the video which is something violent, that

8    would be the kind of thing that someone would deny.

9            THE COURT:  I'm sorry to interrupt.  What's the

10   evidence that any defendant, let alone all three, saw it?

11           MS. SMYSER:  That they are participating in this group

12   chat.

13           THE COURT:  That's your only evidence?  Do you have

14   metadata that shows it was opened at or around the time it was

15   sent?

16           MS. SMYSER:  I don't believe we have that because it's

17   a group chat.  But they are participating in the group chat

18   before.  And they are participating in the group chat after.

19   So I think it is it's a fair inference that they saw this, even

20   if they didn't see it at the exact time it was sent.  It would

21   still be something that you would respond to if you were being

22   accused of doing something of the nature of the thing depicted

23   in the video.

24           So I just want to say, your Honor, that the defendants

25   in there papers are talking about this being ambiguous or a

1    joke and not the kind of thing that you would respond to.  But

2    with the context here I think that's simply not true.  I think

3    it's important to consider that CC-2, the person who sends this

4    and makes the statement about the old days at the Alexanders is

5    someone who knew about the defendant's assaults and, in fact,

6    participated in them.  He was present at Memorial Day weekend

7    2009 in the Hamptons, which is the focus of Count Five.  And

8    not only was he present, but he participated in the gang rape

9    of Minor Victim Three with four individuals, Alon and Tal

10   Alexander, CC-2, and another individual.  They held her down.

11   They held her down and had sex with her.  And then years later

12   he sends a video of four naked men passing around a woman and

13   calls it "old days at the Alexanders."  That, as I said, is the

14   kind of thing that someone would respond to.

15           I think that the defense also notes that "old days at

16   the Alexanders" doesn't imply that the defendants had a similar

17   incident because they might just be talking about hosting

18   parties.  But that is clearly not what this is about.

19           THE COURT:  Or of watching porn.

20           MS. SMYSER:  Your Honor, I think that's right.  As the

21   defense points out, this video isn't of a piece of all kinds of

22   porn.  It demonstrates something in particular, and it's a

23   violent incident with four men, which is the kind of thing that

24   CC-2 participated in with the Alexander brothers.

25           So for all of those reasons, your Honor, we find that

1  this is really probative given the context.  And it is not

2  unduly prejudicial, given all of the other kinds of evidence

3  that are expected to come in at this trial, all of the

4  testimony of victims being raped, the 2009 video and things of

5  that nature.  And so for those reasons, the government thinks

6  it should be admitted.

7          THE COURT:  All right.  Thank you.

8          I'm not going to admit the video.  For a statement to

9  be admitted as an adopted admission, there needs to be evidence

10 that the defendant heard, understand, therefore acceded to the

11 statement.  *See Phipps v. Comprehensive Cmty. Dev. Corp.*, 2005

12 WL 287413, at *13-14 (S.D.N.Y. Feb. 4, 2005).

13         In other words, it needs to be more probable than not,

14 given the statement's context, that the party would have

15 objected to the statement.  *U.S. v. Williams,* 577 F.2d 188, 194

16 (2d Cir. 1978).

17         In this case the government has not adequately

18 demonstrated that any defendant, let alone all three, saw and

19 read or observed the video.  Days passed after the text before

20 any defendant returned to the group chat.  Accordingly, the

21 Court will not admit as adopted admission.

22         That said, I have to say, gentleman, I do not

23 understand the defense argument that it was a joke.  What's the

24 joke?  I totally don't get it.  What's funny?

25         MR. KAHN:  Your Honor, I was planning to address this

1   motion so I'll respond to your question.

2           I don't think the particular message of the content at

3   all was a joke.  It was more of the context.

4           THE COURT:  What's the context of it being a joke?  I

5   don't get it.

6           MR. KAHN:  It was a social group chat amongst people

7   who knew each other forever.

8           THE COURT:  Showing a woman being manhandled.  What's

9   the joke?

10          MR. KAHN:  Of course, the video is not joke.

11          THE COURT:  So it was very poorly worded.  To the

12  extent that's your argument, that was not appropriate.

13          MR. KAHN:  Understood, your Honor.  Just gently to

14  reply, I think it was more to say that this was not a specific

15  accusation about some things specifically that happened in the

16  past.

17          THE COURT:  That would have been a fine argument to

18  make.  Your argument was "this a joke."  And just I don't

19  understand the joke.  I didn't see what was funny about it.

20          MR. KAHN:  Understood.  Thank you.

21          THE COURT:  Prior consistent statements.  Here, well,

22  the government generally has the law correct on when prior

23  consistent statements are admissible.  So if the conditions of

24  Rule 801(d)(1) are met, either because the defendant challenges

25  the witness's statement as a recent fabrication, or that the

1    statement is motivated by a recently arising improper motive,

2    presumably like a civil lawsuit or attacks the witness's

3    credibility for some other reason, like the events were very

4    long ago, or her memory is suspect or she was drunk or under

5    the influence of drugs at the time so her memory is suspect,

6    she got cold feet after having consensual sex, all of those,

7    then the prior consistent statements will come into evidence.

8    Here, again, I can't really make any firm rulings until I

9    actually hear what the evidence is.

10            Anything want to say anything about that from the

11   defense perspective?

12            MS. GERAGOS:  No, that was our argument.

13            THE COURT:  That's fine.

14            The next is preclusion of -- we're still on the

15   government's motions.  Preclusion of irrelevant or unfairly

16   prejudicial evidence from the defense.  So that brings us to

17   Minor Three's consent.  The defense says that it has evidence

18   it wants to introduce, vis-a-vis "voluntary acts that are

19   relevant to 1591."  You totally lost me on your argument.  I

20   don't understand what are the voluntary acts that would give

21   rise to it being appropriate to introduce or argue that Minor

22   Victim Three consented.  Who is handling this?

23            MR. SREBNICK:  One moment, your Honor.

24            We are going to address this next week.  We don't want

25   to have it addressed as part of the 412, and we don't want to

PBO4ALEC

1    have a discussion of any of those matters on the public record.

2    We will address it next week as part of the 412 issue.

3         THE COURT:  Okay.  I was trying to avoid only hearing

4    about it then.  But okay at the defense request, I will defer

5    ruling on that, but I'm baffled by what that could be.

6         The next is, this one we do argue, and I think we

7    could finish this up before 12:30.  So the defense wants to

8    introduce essentially evidence that sometimes they had sex and

9    it was consensual.  Do I have that right what you want to do?

10        MR. SREBNICK:  Not exactly, Judge.  To the extent that

11   there is a suggestion that group sex is necessarily not

12   consensual, we want to make sure that that suggestion is not

13   left with the jury in that there are --

14        THE COURT:  You want to introduce evidence that

15   sometimes the defendants had consensual group sex?

16        MR. SREBNICK:  That is certainly a major part of what

17   we would like to --

18        THE COURT:  Any objection to that?

19        MS. SMYSER:  Yes, your Honor.

20        THE COURT:  What's the objection to that?  That

21   sometimes they had consensual group sex, as opposed to

22   sometimes -- got it.  Okay?

23        MS. SMYSER:  Yeah, I think it's plainly barred, your

24   Honor, as good acts evidence.

25        THE COURT:  How are you going to get past just saying

1   they didn't always violate the law?  The fact that sometimes

2   they had sex with women in a group setting where the women

3   agreed is irrelevant to whether the evidence that the

4   government presents where they were trying to have group sex

5   where the women didn't agree, whether the women did not agree

6   in those circumstances.

7           MR. SREBNICK:  We all agree that the fact that some

8   women consent doesn't mean that other women necessarily

9   consent, full stop, we all agree.

10          THE COURT:  Why is it relevant that sometimes women

11  agree to consensual group sex when the government's evidence is

12  these particular women did not?

13          MR. SREBNICK:  We are not trying to transfer consent

14  at all.

15          THE COURT:  Why is it relevant?

16          MR. SREBNICK:  Because I think the government's theory

17  is that basically no woman would consent to --

18          THE COURT:  That's not their argument.  They will not

19  going to argue that.  If they argue that, you object, and I

20  will sustain the objection.

21          What else did you want to put in as to they didn't

22  always do bad things?

23          MR. SREBNICK:  To the extent that the government has

24  alleged this pattern that they're a pack of wolves, the way

25  they are describing these defendants.  And we have evidence of

1    hundreds of consensual encounters that these defendants

2    participated in.  And I understand we are not trying to

3    transfer consent here, that's not the point.  The point is the

4    government is saying that the way they do business is to hunt

5    down and rape women.

6            THE COURT:  The government is not going to argue that

7    every sexual relation these defendants had was non-consensual

8    or the result of being drugged.  They are not going to argue

9    that.  And you are not going to introduce evidence that they

10   had hundreds of sexual liaisons that were consensual.

11           MR. SREBNICK:  I understand the Court's position.  And

12   I will think more about that.  But my concern is that jury not

13   be left with the impression that in the handful of occasions

14   they had sex, they did it by way of rape.

15           THE COURT:  I don't think that is going to be the

16   impression that is left.  The impression that's going to be

17   left is they are charged with committing crimes when their

18   sexual liaisons were not consensual.

19           MR. SREBNICK:  Judge, we just talked about the alleged

20   coconspirator statements and the context of the group of

21   friends who talk about --

22           THE COURT:  The lion's Den or whatever it is.

23           MR. SREBNICK:  Whatever it's called, the suggestion

24   that the government wants the jury to believe is that basically

25   is a chat to arrange for criminal activity.

82

PBO4ALEC

THE COURT:  Well, it may have been, from time to time,
used that way.

MR. SREBNICK:  And we want to show that's not the
pattern or practice.

THE COURT:  But you can't show -- it's not a pattern
or practice case.  This is a case of specific crimes being
charged.  If on some occasion that group chat was used for
elicit purposes, that's relevant.  It's not relevant that other
times it was used for innocent purposes.  That's neither here
nor there.  It doesn't make it more likely than not that for
times it was used for illicit purposes.  We are going to have
to agree to disagree on this.  The law is very clear that you
cannot try to defend a criminal charge by showing that in other
instances you did not commit a crime.

MR. SREBNICK:  I think the government is the one that
used the phrase "pattern."  I think that's their theory that
this is part of the pattern.

THE COURT:  But they're not saying that every minute
of every day they were engaged in a pattern of criminal
conduct.  No one is.  When I was a prosecutor I prosecuted
gangsters who spent most of their time doing gangster things
but not all the time.  So you couldn't defend you're a gangster
by saying, look, I went to a christening.  That's not a
defense.

MR. SREBNICK:  We're not talking about christenings

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    here, Judge.  We are talking about a chat whose purpose was for

2    young men to engage in consensual sexual activity.  The

3    government describes it through a small subset, relatively

4    speaking, we are down to under 20 some odd accusers over the

5    course of, it could be, a thousand other encounters --

6             THE COURT:  That's still a crime.

7             MR. SREBNICK:  Of course it is.  But that's a question

8    for the jury to decide.

9             THE COURT:  Correct.

10            MR. SREBNICK:  In deciding whether this chat with

11   statements in furtherance of a conspiracy to commit rape, we

12   are entitled to show that, no, this was not a chat to suborn

13   rape.  It was a chat to engage in conventional social behavior.

14   And we don't want the jury left with the impression that these

15   20 or so accusers represent the universe of what this chat is

16   about.  And, of course, we are going to debate very strictly

17   the credibility of those 20 or so.  But there are literally

18   hundreds of examples where there was no accuser at all, none.

19            THE COURT:  Those aren't admissible because they are

20   irrelevant.  Again, they are not going to argue that every

21   sexual relation they had was a rape or a sexual assault.  But

22   again, I have to do this on a case by case.  In principal you

23   see where I'm coming from?

24            All right.  It does not look like the defense contests

25   that evidence of general charitable activities or other good

1  works are not admissible, is that correct?

2      MR. SREBNICK:  We may well present character witnesses

3  to the extent that becomes relevant as part of a character

4  defense.

5      THE COURT:  Well, the rules on character evidence is

6  very limited, as you know.  The fact that they gave money to

7  their synagogue is not coming in.  Okay?

8      MR. SREBNICK:  Understood.

9      THE COURT:  Let me see.  I'm past my hard stop.  But

10  let me see if I can run through a few other things.

11      The government's motive for the investigation or

12  prosecution including nay selective prosecution claims, you

13  agree that's not admissible?

14      MR. SREBNICK:  We don't intend to offer it.

15      THE COURT:  So that's out.

16      Novelty of the charge, the defense says they will not

17  argue that, so that is moot.

18      References to the Me Too movement, the defense is

19  asking for the decision to be deferred until trial.  Okay.  But

20  I have to say that my reaction in principal is that it's not

21  relevant and not admissible.  But if it becomes relevant

22  because of something one of the experts says, raise it with me

23  first before you go down that route.

24      Delay in reporting the assaults is, of course, fair

25  ground on cross-examination.  There is no -- I don't think the

1  government disputes that.

2           The defendant's personal characteristics that are not

3  relevant to any pertinent trait, such as wealth, marital

4  status, parental status, and religion.  The defendants argue

5  that some aspects of their background is relevant, including

6  their wealth.  I agree that wealth is relevant.

7           Does the government dispute that?

8           MS. SMYSER:  No.

9           THE COURT:  I'm not sure what the defense means beyond

10 that.  Mr. Srebnick, Alon argued that you want to argue that he

11 withdrew from the conspiracy because he entered into a serious

12 relationship.

13          MR. SREBNICK:  First --

14          THE COURT:  How are you going to get that into

15 evidence unless he testifies?

16          MR. SREBNICK:  His wife.

17          THE COURT:  She can't testify that he was monogamous.

18          MR. SREBNICK:  No, but the government is not

19 contending at all that Mr. Alon Alexander engaged in any

20 extramarital sexual activity, period, full stop.  The

21 government is not claiming he funded his brothers continued

22 single life, full stop.

23          THE COURT:  If your theory that he withdrew, the rules

24 for withdrawal not just that he got married.  I haven't looked

25 at the law and what constitutes withdrawal in a conspiracy.

1    But you've got to do more than just quit participating.

2              MR. SREBNICK:  Understand that Alon's position is he

3    didn't join a conspiracy, so we are clear.

4              THE COURT:  Understood but then there is no

5    withdrawal.

6              MR. SREBNICK:  Your Honor, there are two ways that I

7    know of, at a minimum, to withdraw:  Go to a law enforcement

8    and report your compadres to the cops.  And say, hey, I was

9    robbing banks.  I'm out.  Let me give you the names of Bonnie

10   and Clyde.  That's one way to do it.

11             The other way is to show that the person has totally

12   abandoned the objectives of whatever the arrangement was,

13   whether consensual or non-consensual sex.  And he said to his

14   brothers, I'm out.  I'm getting married.  I'm telling the world

15   I'm getting married.  I'm telling the world I'm not engaging in

16   any more sexual activity with anyone else on the planet Earth.

17   If you want to party, you pay for it yourself.  You pay for the

18   after parties.  You pay for the drinks.  I'll be home, and let

19   me introduce you to my life, two children, the lifestyle I'm

20   leading totally inconsistent with a single life.  I think

21   that's relevant to whether he "withdrew" from what conspiracy

22   the government says started 15 years earlier, ten years

23   earlier.  And that's our position, and we should be permitted

24   to present that evidence.

25             THE COURT:  I'm going to require you to brief that

1    that constitutes withdrawal.  Understand, you've got a problem.

2    Your whole theory was he wasn't part of a conspiracy so arguing

3    withdrawal is problematic.

4            MR. SREBNICK:  My theory is he was part of a social

5    construct that did not constitute a crime.  And that whatever

6    that social construct was, "the single life" I'll call it.  He

7    withdrew from the single life.  And he left his brothers to

8    continue with the single life, but he withdrew from that.  And

9    that constitutes a total abandonment of any of the conduct,

10   whether consensual or not, that was part of the claim the

11   government's makes.  Because consent is the government's issue.

12   The conduct not illegal to have sex, full stop.  It is illegal

13   to have non-consensual sex.

14           THE COURT:  Or commercial sex.

15           MR. SREBNICK:  It's no different than if Alon had

16   said, you guys, we used to go to the bank.  And they were

17   robbing the bank maybe.  But I'm not going to banks anymore.

18   I'm out.  To use my bank robbery example.  I do not visit banks

19   anymore.  Count me out for any visits to the bank whether you

20   are going to rob them or just take an ATM withdrawal.

21           THE COURT:  Ms. Smyser?

22           MS. SMYSER:  Your Honor, I think based on what has

23   been presented, it's not clear to me that even rises to the

24   level of withdrawal.  Mere cessation of an activity within the

25   conspiracy is not withdrawal.  And the law is very clear that

1   you need a definite decisive and affirmative action to disavow

2   yourself from the conspiracy, including reporting yourself to

3   law enforcement or communicating that abandonment to your

4   coconspirators.  And I have not heard a way from Mr. Srebnick

5   that that is coming into evidence without Mr. Alon Alexander

6   testify.  And we are happy to respond to this in briefing.  But

7   as of now I don't think there is any basis for his personal

8   circumstances to be admitted unless it's going to actually rise

9   to the level of withdrawal.

10          THE COURT:  How long do you want to tell me why, as a

11  matter of law, this is admissible?

12          MR. SREBNICK:  Ten days.

13          THE COURT:  Okay.

14          MR. SREBNICK:  Are the government --

15          THE COURT:  We will set a schedule in the order that

16  comes out afterwards.

17          MR. SREBNICK:  To be clear, the government used the

18  right word.  "Disavow" is what the cases say.  So what Alon

19  Alexander did is he took a vow of exactly the opposite.  A vow

20  not to participate in sexual activity with anyone else.  That

21  vow was made publicly to the world.  It is documented in public

22  records.

23          THE COURT:  The number of men who get married and

24  still have extramarital sex I think I can take judicial notice

25  that that happens.

PBO4ALEC

1          MR. SREBNICK:  I conquer except that's not the test.

2     The test for withdrawal is --

3          THE COURT:  That's what you are going to brief.  Okay.

4          The defense agrees not going to raise possible

5     punishment.  Of course, if there is any cooperating witness

6     that pled to these charges, that's fair grounds for

7     cross-examination.

8          The government's action in effecting the arson Alon

9     and Oren on Count Ten, is there anything you want to add to

10    what you've already written?  I read all your briefs.

11         MR. SREBNICK:  We think it's a jury question.  And we

12    understand the Court issued its ruling.  We think the matter

13    needs to be found by the jury.  Otherwise you are directing a

14    jury in contravention of Mr. Alexander's jury trial rights.

15         THE COURT:  I disagree.  The issue that you are

16    raising which is, where did the arrest take place, is a legal

17    issue.  That's why you briefed it that way.  I decided it as a

18    legal issue.  They still got to prove up as a factual matter

19    that the arrest occurred here in the Southern District of New

20    York.

21         Evidence concerning victim's lawyers.  Okay.  We're

22    past my hard stop, so that's going to be a longer discussion.

23         I need to understand, I need to have a better

24    understanding of what exactly it is that the defense wants to

25    introduce.

PBO4ALEC

1          MR. WILLIAMS:  I will relay that carefully for you

2      next week.  I'd like to spend some time on that argument.

3          THE COURT:  I want you all to spend lots of time on

4      all of these arguments.

5          MR. JONES:  To the extent there is going to be a new

6      position taken at next week's argument, we'd ask for a letter

7      in advance so we are not responding to any kind of *ad hoc* --

8          THE COURT:  Actually, here is what I would suggest.

9      Why don't the parties talk to each other on this point and see

10     if there is a ball of operative facts that the parties agree

11     that is what the defense wants in and that the government

12     doesn't object to.  It seems to me the fact that certain

13     victims are represented and it's by the same lawyer, is not

14     particularly problematic.  The issue is where do you go from

15     there?  The issue as to that it seems to me asking a witness

16     did anybody ever tell you what anyone ever else said about

17     these events, is within the realm of appropriate

18     cross-examination.  So see if with those guardrails you can

19     reach some agreement.

20         MR. WILLIAMS:  Your Honor, I just want to make the

21     representation there is nothing new going to be presented other

22     than what is in our papers and the case law in there.

23         THE COURT:  That's where we will start next Tuesday.

24     You will also talk about jury selection next Tuesday.  And we

25     will talk about --

PBO4ALEC

1          MR. AGNIFILO:  Can I raise an issue of timing on

2     Tuesday?

3          THE COURT:  Yes.

4          MR. AGNIFILO:  I have been going back and forth with

5     the government with on this.  We have the Luigi Mangione's

6     state suppression hearing that starts on the 1st of December.

7          THE COURT:  What day is that.

8          MR. SREBNICK:  Monday, December 1st.  The People of

9     the State of New York indicates they are calling 28 witnesses

10    and they are playing hours and hours of body cameras.  So I

11    went back to the government -- we are not sitting on the

12    Mangione hearing on Wednesday.  And we are going to break for

13    the day at 4:00 on Tuesday.  So I guess the immediate request

14    is could we do later in the day on Tuesday and if we can't go

15    all the way to 4:00, I'll go back to Judge Carro and say we

16    have to end at a certain time.

17         THE COURT:  We are not going to do it at 4:00.  It's

18    going to take longer than an hour to do.  I'm happy if it works

19    for everybody else to move it over to the 3rd.

20         MR. AGNIFILO:  I don't know about the government.

21         THE COURT:  Talk to each other.  I understand your

22    problem.

23         On the other hand, let me also just say as I said

24    before, there are an awful lot of lawyers on this case.  I'm

25    not suggesting you are not essential.  But there are a lot of

1    lawyers on this case.  And I'm sure there are a lot of lawyers

2    on the Mangione case.

3            MR. AGNIFILO:  Well, there is certainly my wife.  We

4    have to mention that.

5            Putting this out as a possibility, I'm wondering if

6    4:00 is too late, is 3:00 too late?  The reason I say that is

7    because I can go back to Judge Carro, and say we have to stop

8    at 3:00.  I'm just trying to get the Court's guidance so the

9    parties know what to shoot for.

10           THE COURT:  3:00 would be better.  If you all promise

11   not to be long-winded then maybe that works.  I'm just

12   concerned if we start at 3:00 we're going to end up slopping

13   over to the 3rd anyway so why not just do it oven the 3rd?

14           MR. AGNIFILO:  We'll talk.  Thanks, Judge.

15           THE COURT:  Talk and send me a letter.

16           We are way past my hard stop.  Have a very happy

17   Thanksgiving.  Don't eat too much.  If you are cooking, I hope

18   everything works out.  If you are not cooking, be nice to the

19   people who are cooking, like you can clean up maybe.  Don't

20   just sit on your tush and watch football.  With that, I will

21   see you all next week.

22           MS. GERAGOS:  So sorry, before we break today, we have

23   a deadline for request to charge and *voir dire*.

24           THE COURT:  I adjourned that.

25           MS. GERAGOS:  I didn't ask in our letter for the *voir*

PBO4ALEC

1   *dire* to be extended.  I just want to make that clear in light

2   of the new indictment, not the baby, we would like that --

3           THE COURT:  So the *voir dire* can kick over as well.

4           Thanks everybody.

5           (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25